IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA
[UNDER SEAL],

PLAINTIFF,

v.

[UNDER SEAL],

DEFENDANTS.

CIVIL ACTION

----------------------------

FILED UNDER SEAL
PURSUANT TO
31 U.S.C. § 3730(B)(2)

COMPLAINT

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA [UNDER SEAL], <br><br> JUNE RAFFINGTON, <br><br> PLAINTIFF, <br> v. <br><br> BON SECOURS HEALTH SYSTEM, INC., BON SECOURS NEW YORK HEALTH SYSTEM, SCHERVIER NURSING CARE CENTER, SCHERVIER LONG TERM HOME HEALTH CARE PROGRAM, BON SECOURS FLORIDA INTEGRATED SERVICES, INC., BON SECOURS MARIA MANOR, BON SECOURS PLACE, and BON SECOURS ST. PETERSBURG HOME CARE SERVICES, INC. [UNDER SEAL], <br><br> DEFENDANTS. | CIVIL ACTION <br><br> -------------------------- <br><br> FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2) |

## COMPLAINT

Plaintiff and <u>qui tam</u> Relator June Raffington, through her attorneys Sanford Wittels & Heisler, LLP, for her Complaint against the Defendants Bon Secours Health System, Inc., Bon Secours New York Health System, Schervier Nursing Care Center, Schervier Long Term Home Health Care Program, Bon Secours Florida Integrated Services, Inc., Bon Secours Maria Manor, Bon Secours Place, and Bon Secours St. Petersburg Home Care Services, Inc. (together hereinafter "Defendants") alleges as follows:

## I. <u>INTRODUCTION</u>

1.  This is an action to recover damages and civil penalties on behalf of the

2

United States of America arising from false and/or fraudulent statements, records, and claims made and caused to be made by the Defendants and/or its agents and employees in violation of the Federal False Claims Act, 31 U.S.C. §3729 et seq., (hereinafter "the FCA") and the New York State False Claims Act, N.Y. State Fin. Law §189 et seq. (hereinafter denoted as "the New York State FCA").  Defendants' fraudulent billing practices, which run the gamut from illegally billing Medicaid for care that should have been billed to Medicare at much lower reimbursable rates to forging doctors' signatures and altering records to obtain deceitful reimbursement has cost, and continues to cost, the federal government millions of dollars each year.  Furthermore, Plaintiff-Relator June Raffington seeks to recover damages and/or injunctive relief arising from Defendants' wrongful termination of her employment, in violation of 31 U.S.C. § 3730(h) and N.Y. State Fin. Law § 191.

## II. <u>PARTIES</u>

2.      Relator JUNE RAFFINGTON is a resident of Poughkeepsie, New York. Relator Raffington holds an Associate's degree in Nursing from Dutchess Community College, a Bachelor's degree in Nursing from the State University of New York New Paltz, and a Master's degree in Nursing from Hunter College.  Relator Raffington has held a New York state nursing license since 1986.  From 2000 to 2008, Relator Raffington worked at Hudson Valley Home Care as Director of Professional Services.

3.      Relator Raffington was employed by Defendants Bon Secours Health System, Inc., Bon Secours New York Health System, Schervier Nursing Care Center, and Schervier Long Term Home Health Care Program (together "the New York Defendants") from December 2008 through October 2009 as Vice President ("VP") of Home Care

Services of Defendant Schervier Long Term Home Health Care Program ("Schervier Home Health Care").

4.      As VP of Home Care Services, Relator Raffington was responsible for the operational, fiscal and clinical leadership of the long term home health care program at Defendant Bon Secours New York Health System ("BSNY"). Defendant BSNY is in the business of providing home health care to patients who are elderly, post-surgery, or who generally require home attendant care. In her VP capacity, Relator Raffington promoted the home health care agency within the local market, upheld regulatory compliance, and managed all long term home health care staff to ensure that service delivery standards were being maintained.

5.      The New York Defendants wrongfully terminated Relator Raffington in October 2009 for investigating and attempting to rectify the fraudulent billing practices she witnessed at Defendant Schervier Home Health Care.

6.      Defendant BON SECOURS HEALTH SYSTEM, INC., ("Bon Secours") is a not-for-profit Catholic health system headquartered in Marriotsville, Maryland that owns, manages, and/or joint ventures 18 acute-care hospitals, one psychiatric hospital, five nursing care facilities, five assisted living facilities, and 15 home care and hospice programs. Its 2009 annual report states that Bon Secours earned revenues of $2.9 billion in 2009. Upon information and belief, Bon Secours owns and operates Defendant Bon Secours New York and its subsidiaries, Schervier Home Health Care and Schervier Nursing Care Center. Barbara Knott, the Vice President of Home Health Services for Bon Secours, consulted with Bon Secours Home Health Care programs across the nation during Relator Raffington's tenure with the company, and, upon information and belief,

much earlier.   Ms. Knott has acted and continues to act as a direct agent and representative of Bon Secours with regards to long term home health care policies.  Upon information and belief, her active participation in the fraudulent activity at Bon Secours New York and Schervier Home Health Care is indicative of the fraudulent activity in which she participates across the nationwide chain of Bon Secours facilities.

7.       Defendant BON SECOURS NEW YORK HEALTH SYSTEM ("BSNY") is a subsidiary of Bon Secours.  Upon information and belief, BSNY owns and operates Schervier Nursing Care Center and Schervier Home Health Care.  The BSNY executive team, which includes Chief Executive Officer ("CEO") James Higgins, Chief Financial Officer ("CFO") Kity Khundkar, Executive VP Louis Harris encouraged, and VP of Human Resources ("HR") Frances Sequeira aided, and directly participated in the fraudulent activity Relator Raffington witnessed during her employment with the New York Defendants.

8.       Defendant SCHERVIER LONG TERM HOME HEALTH CARE PROGRAM ("Schervier Home Health Care") is a not-for-profit program that provides in-home medical care to up to 480 individuals.  Upon information and belief, approximately 70 percent of the program's patients live in Bronx County, while the remaining 30 percent live in Westchester County.

9.       Defendant SCHERVIER NURSING CARE CENTER ("Schervier Nursing Center") is a not-for-profit nursing home located in the Riverdale neighborhood of Bronx, New York.  It provides medical care to up to 364 residents within the facility. Upon information and belief, the BSNY executive team encouraged, aided, and directly

perpetrated fraudulent schemes at Schervier Nursing Center that were similar to the fraudulent schemes carried out at Schervier Home Health Care.

10.     The New York Defendants were Relator Raffington's joint employers. During her job search, Relator Raffington received a "Position Specification" published by Bon Secours and BSNY.   Bon Secours gave Relator Raffington a central email address with the domain name "bshsi.org", Bon Secours's web address.   BSNY executives work on the same campus that houses the Schervier Nursing Center and Schervier Home Health Care.

11.     All employees of Schervier Nursing Center and Schervier Home Health Care, including Relator Raffington, reported and continue to report to the BSNY executive team, including CEO Higgins, CFO Khundkar, and Executive VP Harris. Every Monday, Relator Raffington met with Mr. Harris to review the status and progress of Schervier Home Health Care.   Moreover, Relator Raffington's termination letter explicitly mentions that Mr. Harris "made several attempts to reach [her] by phone" to inform her of her termination.   Furthermore, the letterhead of Relator Raffington's termination letter features the logo of Schervier Nursing Center and BSNY. Bon Secours VP of Home Health Services Barbara Knott also served as a supervisor to Relator Raffington whenever Ms. Knott was performing consultation services at the Bronx campus.

12.     Defendant BON SECOURS FLORIDA INTEGRATED SERVICES, INC. is a not-for-profit nursing facility located in St. Petersburg, Florida that provides skilled nursing, assisted living, home care, and rehabilitation services.   The St. Petersburg campus includes Bon Secours Place, Bon Secours Maria Manor, and Bon Secours St.

Petersburg Home Care Services (together with Bon Secours Florida Integrated Services, Inc. "Bon Secours Florida"). BSNY CEO Higgins and BSNY CFO Khundkar, also serve as CEO and CFO, respectively, for Bon Secours St. Petersburg. Upon information and belief, the Federal FCA violations alleged herein also occurred and are continuing to occur at Bon Secours Florida.

13.     Defendant BON SECOURS PLACE is an assisted living facility located in St. Petersburg, Florida. James Higgins and Kity Khundkar also serve as CEO and CFO, respectively, for Defendant Bon Secours Place.

14.     Defendant BON SECOURS MARIA MANOR is a nursing home located in St. Petersburg, Florida. James Higgins and Kity Khundkar also serve as CEO and CFO, respectively, for Defendant Bon Secours Maria Manor.

15.     Defendant BON SECOURS ST. PETERSBURG HOME CARE SERVICES is a long term home health care program located in St. Petersburg, Florida. James Higgins and Kity Khundkar also serve as CEO and CFO, respectively, for Defendant Bon Secours St. Petersburg Home Care Services.

### III. JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over the subject matter of this action pursuant to New York State Finance Laws Sections 189 and 191. Under 31 U.S.C. § 3730(e) and New York State Finance Law Section 190(9), there has been no statutorily relevant public disclosure of the allegations or transactions in this

Complaint.  Moreover, Relator Raffington has direct and independent knowledge and is the original source of the information on which the allegations of this lawsuit are based.

17.    This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which nationwide service of process. Further, Defendants have at least minimum contacts with the United States.  Defendants can be found in, reside in, transact and have transacted business in this District.  The Relator also resides in this District.

18.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found in, reside in, and transact and have transacted business in the Southern District of New York.

## IV.  THE MEDICAID AND MEDICARE PROGRAMS

19.    The Medicaid and Medicare programs were established through Title XIX of the Social Security Act of 1965.  Whereas Medicare is a federally funded government insurance program that covers acute medical costs for the elderly, Medicaid is a jointly funded federal-state program that covers medical costs for low-asset individuals.  Unlike Medicaid, which pays at an hourly rate for most of the services relevant to the instant case, Medicare provides a lump sum in accordance with a formula that estimates the cost of necessary services.

20.    Like all health care providers, elderly nursing care facilities funded by Medicaid and Medicare must certify that they have furnished or caused to be furnished the care, services and supplies itemized in claims that they bill to Medicaid and Medicare and that the services were provided in accordance with applicable federal and state laws and regulations.

8

## V. BACKGROUND OF THE FEDERAL AND NEW YORK STATE FALSE CLAIMS ACTS

21.     The Federal False Claims Act was originally enacted in 1863 and was substantially amended in 1986 by the False Claims Amendments Act, Pub.L. 99-562, 100 Stat. 3153.  After finding that federal program fraud was pervasive, Congress enacted the 1986 amendments to enhance and modernize the Government's tools for recovering losses sustained by frauds against it.  The amendments were intended to create incentives for individuals with knowledge of Government frauds to disclose the information without fear of reprisals or Government inaction and to encourage the private bar to commit resources to prosecuting fraud on the Government's behalf.

22.     The FCA provides that any person who presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States Government, or knowingly makes, uses, or causes to be made or used false records and statements to induce the Government to pay or approve false and fraudulent claims, is liable for a civil penalty ranging from $5,500 up to $11,000 for each such claim, plus three times the amount of the damages sustained by the federal Government.

23.     The FCA allows any person having information about false or fraudulent claims to bring an action for himself and the Government, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendants during that time).  Based on these provisions, qui tam Plaintiff and Relator June Raffington seeks through this action to recover damages and civil penalties arising from the Defendants' knowing fraud on the U.S. Government.

24.     In 2007, New York State passed its own False Claims Act.  The New York State FCA permits the New York State Government to intervene.

9

## VI. FACTUAL ALLEGATIONS

### A. Summary of Defendants' Fraudulent Practices

25.     Defendants perpetrated the following fraudulent schemes aimed at defrauding the state and federal Medicaid and Medicare programs.  Plaintiff-Relator more fully details the facts underlying these schemes in later paragraphs following this introductory subsection.

26.     Since at least October 2005, and, upon information and belief, much earlier, Defendants exclusively billed Medicaid for health care services that they should have billed to Medicare.  Defendants willfully disregarded this well-known obligation and instead fraudulently billed exclusively to Medicaid because it paid out at a higher rate than Medicare.

27.     Since at least May 2009, and, upon information and belief, much earlier, Defendants forged physician signatures on patient records that they submitted to Medicaid and Medicare for payment.

28.     Since at least September 2008, and, upon information and belief, much earlier, Defendants fraudulently billed Medicaid by falsely representing that services provided to patients were medically necessary, when in fact they were not.

29.     Since at least September 2008, and, upon information and belief, much earlier, Defendants fraudulently billed Medicare by falsely representing in preparation for state audits that services covered by Medicare had been performed, when in fact they had not.

30.     Since at least July 2009, and, upon information and belief, much earlier,

Defendants fraudulently billed Medicare for patients receiving long term care who did not qualify for Medicaid, even though Medicare does not cover long term care.

31.    Since at least August 2009, and, upon information and belief, much earlier, Defendants fraudulently billed Medicaid and Medicare based on fraudulent recertifications not supported by nurse or physician reassessments.  Both Medicaid and Medicare require that patients be reassessed every sixty days before a heath care provider can continue to bill either program for patient services.   The reassessment process requires that a registered nurse conduct a physical examination and create a report describing the findings.  A physician must then approve the report.  By continuing to bill Medicaid and Medicare, Defendants falsely represented to the government that their claims were supported by the proper recertifications.

32.    Since at least April 2009, and, upon information and belief, much earlier, Defendants billed Medicaid for services for certain patients without the required prior approval by the relevant local Department of Social Services ("DSS").  As a result, Defendants fraudulently billed excessive amounts to Medicaid.

33.    Since at least August 2009, and, upon information and belief, much earlier, Defendants surpassed the maximum budgets set by DSS even for certain patients who had been approved by DSS for Medicaid reimbursement.   Disregarding these budgets, Defendants fraudulently billed exorbitant and unjustified amounts to Medicaid.

34.    Since at least December 2008, and upon information and belief, much earlier, Defendants fraudulently billed Medicare at an amount based on estimates of patient needs, even though Defendants systematically failed to provide the medical services required to meet the needs of their Medicare-only patients.

35.     Relator Raffington informed her superiors of the fraudulent nature and illegality of all violations alleged herein and of Defendants' obligation to correct the violations.  Defendants, however, took no steps to rectify their fraudulent practices and continued to fraudulently bill Medicaid and Medicare.  Upon information and belief, these fraudulent practices continue to the present.

36.     Upon information and belief, the same fraudulent practices occurring at the New York Defendants' facilities and alleged herein have occurred and continue to occur at Bon Secours Florida.

37.     Upon information and belief, Defendants' fraudulent billing practices cost and continue to cost the Government millions of dollars each year.

### B. Defendants Fraudulently Billed Medicaid Without Maximizing Medicare

38.     Under New York State rules, a long term home health care provider like Bon Secours cannot receive Medicaid payments unless (1) the provider has prepared written justification for not having made an application for Medicare or (2) the provider's application for Medicare benefits has been rejected.  For patients who have both Medicare and Medicaid coverage, qualified services covered by Medicare must be billed to Medicare and not to Medicaid.  This process is called "maximizing" Medicare or "split-billing."

39.     Because Medicare pays for services with a flat rate based on predefined treatment schedules, Medicare sometimes does not reimburse the actual costs of covered treatments.  For patients who have both Medicare and Medicaid coverage, qualified services covered by Medicare must be billed to Medicare even had Medicaid would pay

the provider for the same services at a higher rate if the patient had Medicaid only.

40.     The New York Defendants defrauded the New York State Government by obtaining state payments through Medicaid for services that should have been billed to the wholly federal Medicare program.

41.     Because Medicaid reimburses a provider for the full cost of treatment and Medicare reimburses on a flat rate lower than the full cost of treatment, the New York Defendants caused the New York State and Federal Governments to pay them Medicaid reimbursements for the expenses not covered by Medicare or Medicaid.

42.     Around July 2009, Relator Raffington discovered that Defendants Schervier Home Health Care and Schervier Nursing Center (together "Schervier") staff had no knowledge of the split-billing requirement.

43.     Relator Raffington immediately notified Ebnul Hassan, Schervier's Billing Supervisor, of the company's failure to comply with the split-billing requirement.  In response, Mr. Hassan stated that Schervier had not done split-billing since at least October 2005, when the billing software was updated.  As Relator Raffington discovered, Schervier's billing software did not even allow for split-billing.

44.     Upon further investigation, Relator Raffington also discovered that Barbara Knott, Bon Secours VP of Home Health Services, had directed Schervier nurses not to comply with split-billing requirements.

45.     Relator Raffington immediately began writing a manual for the split-billing process to share with Schervier staff.   After Ms. Raffington reviewed approximately 60 to 70% of the records for Schervier Home Health Care patients with both Medicaid and Medicare, she identified approximately 40 to 44 patients whose

services Schervier Home Health Care had failed to split bill for 2009. These patients constituted approximately ten to twenty percent of Schervier Home Health Care's patients and, upon information and belief, resulted in Defendants wrongfully obtaining millions of dollars from the Government.

46.     Around late September 2009, Relator Raffington arranged for a representative from Schervier's Information Technology Department to alter the software to allow split-billing. By the time the New York Defendants terminated Relator Raffington, the software had not been fully updated to allow for split-billing. No repayment to Medicaid was made prior to Relator Raffington's wrongful termination.

47.     Upon information and belief, Defendants' fraudulent Medicaid billing practices cost and continue to cost the Government millions of dollars each year.

### C. Defendants Forged Physician Signatures on Patient Records Submitted to Medicaid and Medicare for Reimbursement

48.     It is commonly known within the medical field that physicians must approve all patient services charged to the Medicaid or Medicare programs. Records of physician signatures ensure that all medical care reimbursed by Medicare or Medicaid is necessary.

49.     In or around late May 2009, Relator Raffington discovered copies of patient billing records that contained different versions of the same physicians' signatures. Ms. Raffington believed the signatures had been forged. She later learned from a medical records clerk that Schervier Operations Manager Christopher Hickey (who reported to Ms. Raffington) stayed late to review and forge these records. Mr. Hickey never informed his supervisor Ms. Raffington of these late-night review sessions.

50.     In or around June 2009, Mr. Hickey admitted to Relator Raffington that he had forged doctors' signatures on medical records submitted to Medicaid and Medicare in the past. He further admitted that he had engaged in this fraudulent conduct since before Relator Raffington's employment with the New York Defendants. He explained that Bon Secours VP of Home Health Services Barbara Knott had ordered him to forge the signatures and that Ms. Knott herself had forged signatures on medical records submitted to Medicaid and Medicare. Relator Raffington instructed the Schervier Medical Records Department to obtain authentic signatures from the physicians on all forged forms.

51.     In July 2009, Relator Raffington reported the forgeries to her boss BSNY Executive VP Louis Harris, Corporate Compliance, and Schervier HR. Mr. Harris responded by transferring the records to BSNY CFO Kity Khundkar, who would then handle repayment to the government of fraudulent charges identified by Ms. Raffington. Mr. Harris then gave copies of the forged physicians' orders to HR VP Frances Sequeira, who was tasked with investigating Ms. Knott's participation in forging the signatures.

52.     Later in July 2009, Bon Secours terminated Mr. Hickey for forging physician signatures. Ms. Knott never suffered any consequences.

53.     By the time Bon Secours wrongfully terminated Relator Raffington in October 2009, all the forged forms had not been corrected, and Kity Khundkar had not repaid the government for the fraudulent charges. Upon information and belief, Ms. Knott still works as Bon Secours's nationwide consultant on long term healthcare policy.

54.     Upon information and belief, Defendants' fraudulent signature practices cost and continue to cost the Government millions of dollars each year.

**D. Defendants Fraudulently Billed Medicaid for Home Health Aide Services When They Provided Only the Less Expensive Personal Care Aide Services**

55.     Medicaid pays for Personal Care Aides ("PCAs") and Home Health Aides ("HHA") on an hourly rate.  Medicaid covers HHA services at a higher hourly rate than PCA services because HHAs are more highly trained than PCAs.

56.     While preparing for the close of the fiscal year in or around August 2009, Relator Raffington discovered that someone at Schervier had improperly raised the level of care for a large number of Schervier Home Health Care patients to HHA.  These patients had originally received care from PCAs but were now receiving services from HHAs.  No physician or nurse had ordered these changes and the medical status of these patients had not changed so as to warrant the upgrade in care.

57.     After further investigation, Relator Raffington discovered that, in September 2008, BSNY CFO Kity Khundkar directed Bon Secours VP Barbara Knott to have HHAs replace PCAs for all Schervier patients with Medicaid receiving PCA care, regardless of those patients' medical needs.  Barbara Knott then instructed Schervier Operations Manager Christopher Hickey to implement this order.  BSNY Executive VP Louis Harris also had knowledge of the PCA to HHA replacements.  According to Ms. Knott, Schervier Home Health Care implemented this change at the direction of BSNY CFO Kity Khundkar to obtain an "infusion of cash" to inflate BSNY's first quarterly earnings.  Relator Raffington identified at least sixty-eight patients who had received unnecessary HHA services at the expense of the Medicaid program.

58.     Upon discovering this blatantly fraudulent conduct, Relator Raffington reported it to her boss Louis Harris.  Mr. Harris did nothing in response.

59.   Upon information and belief, Defendants' fraudulent Medicaid billing practices cost and continue to cost the Government millions of dollars each year.

**E.** ***Defendants Retroactively Altered Billing Records in Order to Fraudulently Bill Medicare for Services Defendants Did Not Provide***

60.   HHA services are covered by Medicaid and by Medicare when the patient can demonstrate acute medical need.  PCA services are never covered by Medicare.

61.   In August 2009, the New York Medicaid Inspector General commenced state-wide Third Party Liability (hereafter "TPL") audits, sending out New York State Medicaid contractors to investigate providers.  While preparing for the audit, Relator Raffington discovered that Schervier had fraudulently revised medical records in advance of previous TPL audits.  In preparation for TPL audits in the past, Bon Secours VP Barbara Knott had instructed Schervier Billing Supervisor Ebnul Hassan to alter the billing records to misrepresent that patients who actually received PCA care had received HHA care.

62.   In the event that New York State Medicaid contractors were to reject patient services that included PCA services, Medicare would not then cover those PCA services.  Schervier would then bear the costs of all services for patients whose Medicaid coverage had been rejected by the state.  In order to avoid this scenario, Ms. Knott ordered Mr. Hassan to retroactively change the billing records, so that Medicare would pay for fraudulent HHA costs rejected by Medicaid.  In this manner, Defendants fraudulently misrepresented the level of care they provided to their patients in order to defraud Medicare into recompensing the losses from their failed attempts to defraud Medicaid.

63.     Upon information and belief, Defendants' fraudulent alterations of billing records cost and continue to cost the Government millions of dollars each year.

**F. Defendants Fraudulently Billed Medicare for Long Term Care Not Covered by Medicare**

64.     Unlike Medicaid, Medicare covers only acute medical care and not long term care.  In some instances, Medicare will cover certain costs of long term care for patients who also suffer from acute medical illnesses or injuries, such as serious wounds or temporary illness.  Very few of Schervier's patients suffered from acute illnesses and the vast majority received only long term care.

65.     In January 2009, Relator Raffington discovered that approximately twenty to twenty-five patients were improperly receiving long term care that Schervier had billed to Medicare.  Upon further scrutiny of the patients' cases, Relator Raffington found that the vast majority of the patients had applied for and failed to secure Medicaid or had never applied for Medicaid at all.  In both cases, Schervier continued to fraudulently bill Medicare for those patients' long term care.  Very few of those patients actually suffered from any acute medical need that would be eligible for reimbursement from Medicare.

66.     Relator Raffington brought this to the attention of her boss Louis Harris, who did nothing in response.

67.     Later in January 2009, Relator Raffington tasked clinical supervisors with identifying those patients who had Medicare only and who were receiving unnecessary care unlawfully billed to Medicare.  Relator Raffington then arranged for the discharge of those patients who were not in need of home health care and who did not have acute medical needs.

18

68.     When Defendants wrongfully terminated Relator Raffington in October 2009, Schervier was still billing Medicare for the long term care of many of these patients.

69.     Upon information and belief, Defendants' fraudulent billing of Medicare for long term care has cost and continues to cost the Government millions of dollars each year.

## G. Defendants Fraudulently Billed Medicaid and Medicare by Submitting Fraudulent Patient Reassessments to the Government

70.     In order to bill patient services to Medicaid and Medicare, providers must reassess their patients every sixty days. This reassessment requires that a registered nurse physically examine a patient and describe her findings in a written report. The nurse's report is then submitted to a physician, who signs the report if she concurs with the nurse's assessment. The provider must then submit a recertification form (OASIS-485 form), which must be supported by the approvals of both a registered nurse and a physician. Only after these steps are completed may a provider continue to bill patient services to Medicaid and Medicare.

71.     In or about August 2009, Relator Raffington discovered that Schervier had been submitting recertification forms to the Government without the required nurses' visits or physician approvals. Instead, Schervier and BSNY executives instructed clerical staff to complete and submit the recertification forms to the Government, even though the clerical staff lacked the medical expertise required to reassess patients and never left the office to perform actual patient evaluations.

72.    Before Relator Raffington could review the records and correct this problem, Defendants wrongfully terminated her in October 2009.

73.    Upon information and belief, Defendants' deceptive recertification practices cost and continue to cost the Government millions of dollars each year.

### H. Defendants Fraudulently Billed Medicaid for Services to Patients Not Approved by the Local Departments of Social Services

74.    For a long term healthcare provider to bill Medicaid for patient services, the local Department of Social Services ("DSS") must first approve each patient. Once DSS approves a patient, it sets an individualized budget for that patient. In order to bill above the amount budgeted for a patient, a provider must obtain further approval for that patient from their local DSS. The local DSS offices for Bronx County and Westchester County are New York City Human Resources Administration ("HRA") and Westchester DSS ("WDSS"), respectively.

75.    In or about April 2009, HRA representatives met with Relator Raffington and Schervier staff to emphasize that HRA approvals were required for all patients with Medicaid.

76.    Immediately after the meeting, Relator Raffington initiated an in-depth review of Schervier Home Health Care's billing records for 2008. By June 2009, Relator Raffington identified 80 to 90 patients in the Bronx for whom Schervier had submitted billing to Medicaid without any HRA approval. These patients constituted approximately one third of Schervier Home Health Care's Bronx patients.

77.    As a result of her wrongful termination by Defendants for complaining about Defendants' fraudulent practices, Relator Raffington did not have the opportunity

to review the records of Westchester Medicaid patients who were not approved by WDSS.  Upon information and belief, Schervier Home Health Care similarly billed Medicaid without first obtaining DSS approval for approximately one third of its Westchester patients.

78.    Shortly after completing the review of Bronx patients in June 2009, Relator Raffington alerted her boss Louis Harris of the failure to secure HRA approval. He responded that the problem did not need to be addressed.  When Relator Raffington insisted that the New York Defendants comply with their legal obligation to secure HRA approval, Mr. Harris assigned Christopher Hickey to secure HRA approval for all patients HRA had not approved.

79.    Shortly thereafter in July 2009, BSNY terminated Mr. Hickey for forging physician signatures.  Relator Raffington then assigned the duty of securing HRA approvals to other Schervier staff.  Upon information and belief, Schervier continues to bill Medicaid for services to patients not approved by a local DSS.  Schervier has similarly failed to obtain local DSS approval for unapproved patients whose treatment Schervier has already billed to Medicaid.

80.    Upon information and belief, Defendants' deceptive DSS approval practices cost and continue to cost the Government millions of dollars each year.

### I. Defendants Fraudulently Billed Medicaid for Amounts Exceeding the Budgets Approved by the Local Departments of Social Services

81.    Upon reviewing patient billing records in early August 2009, Relator Raffington discovered that, even for patients with HRA or WDSS-approved budgets, Schervier billed Medicaid for costs that exceeded those budgets.  A physician's signature

is required to bill Medicaid for costs exceeding local DSS budget limitations. The vast majority of Schervier Home Health Care's excessive bills were not supported by physician approvals. Upon discovering these excessive and unjustified bills to Medicaid, Relator Raffington instructed staff to obtain physicians' approvals for those patients, provided that the physicians deemed it medically necessary for the patients to obtain higher local DSS budgets.

82.   On August 20, 2009, Relator Raffington further notified BSNY CFO Kity Khundkar, Schervier Billing Supervisor Ebnul Hassan, and BSNY Executive VP Louis Harris of Schervier's failure to obtain the required physician approvals before billing Medicaid for costs exceeding the local DSS budgets.

83.   At the time of Relator Raffington's wrongful termination, Schervier had not finished securing physician approvals for the patient services it had excessively billed.

84.   Upon information and belief, Defendants' deceptive DSS budgeting practices cost and continue to cost the Government millions of dollars each year.

### J. Defendants Fraudulently and Excessively Billed Medicare while Failing to Provide Services to Meet the Needs of their Medicare-only Patients

85.   To bill Medicare for long term care, providers must enter data reflecting the health needs of its patients into the providers' Medicare billing software, which then provides the amount that Medicare will pay for that patient's treatment. Because Medicare reimburses in this manner, health care providers must act in good faith by actually providing the services for which Medicare pays.

86.     In December 2008, Relator Raffington discovered that Schervier Home Health Care had a policy of sending nurses only once per week to visit patients receiving HHA care with Medicare but not Medicaid ("Medicare-only patients") – despite the fact that these patients required more than one visit per week in order to receive adequate care.  Consequently, most of these patients did not receive enough care to meet their medical needs.  Upon information and belief, approximately one fourth of Schervier Home Health Care's patients were Medicare-only.

87.     Schervier Home Health Care scheduled inadequate nurses' visits for Medicare-only patients in order to increase its profits by taking advantage of Medicare's flat-rate reimbursements.  This fraudulent practice had the effect of defrauding the United States Government and neglecting the needs of Schervier's patients.

88.     Upon discovering this information, Relator Raffington repeatedly advised staff to prioritize the needs of Medicare-only patients when determining the number of weekly nurse visits.  She continuously stressed that the number of weekly nurse visits should be based on individual patient assessments.

89.     In February 2009, after many Medicare-only patients were still not receiving adequate nurse visits, Relator Raffington assigned Myrlhene Descollines, Schervier Director of Patient Services, to review all Medicare-only patient treatment plans.

90.     Relator Raffington learned from Ms. Descollines that Christopher Hickey had been instructing staff since Relator Raffington began employment in December 2008 to ignore Relator Raffington's orders and to continue sending nurses to all Medicare-only patients no more frequently than once per week.

91.     Upon information and belief, Mr. Hickey instructed staff to ignore Relator Raffington's orders at the direction of the BSNY executive team and Barbara Knott.

92.     Relator Raffington repeatedly informed Louis Harris, James Higgins, and Kity Khundkar of this fraudulent Medicare billing but none of these executives did anything to rectify the fraudulent practice.  Instead, they ordered Ms. Raffington to ignore governing rules and regulations.

93.     Upon information and belief, Schervier Home Health Care continues to fraudulently bill Medicare for reimbursement for care it has not provided to its Medicare-only patients.

94.     Upon information and belief, Defendants' fraudulent and excessive billing of Medicare while failing to provide adequate services cost and continue to cost the Government millions of dollars each year.

### K.  The New York Defendants Wrongfully Terminated Relator Raffington in Retaliation for her Investigation into Defendants' Fraudulent Billing Practices

95.     Despite her many attempts to ensure that the New York Defendants complied with Medicaid and Medicare rules and regulations, Relator Raffington received no support from her superiors or peers.

96.     On August 17, 2009, Relator Raffington met with her boss Louis Harris to discuss Schervier's numerous fraudulent billing practices.  At that meeting, Mr. Harris defended the New York Defendants' blatantly fraudulent conduct, stating, "There's corporate compliance...and then there's corporate compliance."

97.     In September 2009, an HRA representative who had met with Schervier staff in April 2009 called Relator Raffington to schedule a meeting to secure HRA

approval for Schervier's Medicaid patients. The meeting was to be held on October 8, 2009.

98.     Later in September 2009, Relator Raffington informed Mr. Harris of the upcoming meeting. Mr. Harris quickly passed the news of the meeting to James Higgins and Kity Khundkar.

99.     Threatened with exposure of their fraudulent practices, the New York Defendants obstructed Relator Raffington's attempts to meet with the HRA representative. Mr. Higgins required that Mr. Harris be present at the meeting and demanded that Ms. Raffington inform him of the HRA meeting agenda. Upon information and belief, Mr. Higgins intended to prevent Relator Raffington from securing HRA approval for all of Schervier's Medicaid patients.

100.     On September 29, 2009, Relator Raffington discovered that Schervier Billing Supervisor Ebnul Hassan had retaliated against billing staff member Tamara Daniels. Ms. Daniels had earlier informed Relator Raffington of Schervier's failure to secure HRA approval for many Medicaid patients. Shortly after Mr. Hassan discovered Ms. Daniels' involvement, he canceled her vacation and gave her a negative performance review. Relator Raffington reported this incident to HR. Mr. Hassan suffered no disciplinary action. The New York Defendants subsequently terminated Ms. Daniels in February 2010.

101.     On October 2, 2009, Relator Raffington's boss Mr. Harris demanded that Relator Raffington give him records she had gathered for a New York State request regarding erroneous Medicaid billing. James Higgins and Kity Khundkar wanted Barbara Knott to review the records and instructed Mr. Harris to transfer them from

Relator Raffington to Ms. Knott.  Since Relator Raffington knew that Ms. Knott had earlier forged physicians' signatures and was afraid that Ms. Knott would again falsely alter records before Ms. Raffington could meet with the state, she refused to turn the documents over to Mr. Harris for Ms. Knott's review.   Despite Ms. Raffington's objections, Ms. Knott did in fact begin reviewing the records.

102.   A few days later and only days before the scheduled meeting with the HRA representative, Mr. Harris and HR VP Frances Sequeira summoned Relator Raffington to a meeting, where they told Ms. Raffington that she seemed "unhappy" and ordered her to take the next week off from work.   The meeting with the HRA representative was scheduled to occur during that week.   Mr. Harris sent Relator Raffington home to "rest" on Monday, October 5, 2009.

103.   On or around October 10, 2009, Relator Raffington received a termination letter.  Had she not been terminated, she would have returned to work on Monday, October 12, 2009.  Relator Raffington never had the opportunity to meet with the HRA representative as scheduled on October 8, 2009.  Upon information and belief, no one from the New York Defendants ever met with the HRA representative as scheduled.

104.   The New York Defendants retaliated against Relator Raffington by wrongfully terminating her for attempting to uncover and rectify the New York Defendants' fraudulent billing practices.

### VII.  CLAIMS FOR RELIEF

### COUNT ONE

### FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. §3729(a)(1)(A)

## CAUSING FALSE OR FRAUDULENT CLAIMS FOR PAYMENT TO BE PRESENTED TO THE UNITED STATES GOVERNMENT

### (Against All Defendants)

105.   Relator June Raffington realleges and reincorporates all the preceding paragraphs of the Complaint as if fully set forth herein.

106.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 et seq.

107.   From at least October 2005 to the present, Defendants caused the submission of hundreds and likely many thousands of false claims to Medicaid and Medicare by: (1) fraudulently billing Medicaid without first properly maximizing billings to Medicare; (2) forging physician signatures on patient bills to Medicaid and Medicare; (3) fraudulently misrepresenting patients' medical needs to obtain excessive payments from Medicaid for an unnecessary level of care; (4) fraudulently misrepresenting the level of care actually provided to receive payments from Medicare; (5) fraudulently billing Medicare for long term services not covered by Medicare; (6) fraudulently billing Medicaid and Medicare based on fraudulent recertifications; (7) fraudulently billing Medicaid for patients not approved by the local DSS; (8) fraudulently billing Medicaid for amounts exceeding the HRA or WDSS-approved budgets; and (9) fraudulently and excessively billing Medicare while failing to provide adequate nurse visits required to meet the needs of their Medicare-only patients.

108.   As described above, Defendants have ordered their agents to submit false records and false statements to Medicaid and Medicare and to forge physicians' signatures on treatment forms.

109.     Through the acts described above, Defendants knowingly presented and caused to be presented to the United States, Westchester County, New York City, and, upon information and belief, all locations where Defendants did business, fraudulent claims, records, and statements in order to obtain reimbursement from Medicaid and Medicare.

110.     Unaware of the falsity and rampant fraudulence of the statements, records or claims made or submitted by Defendants, their agents, and employees, the United States approved, paid and continues to approve and pay claims that otherwise would not have been approved or paid, and has not recovered funds that would otherwise have been recovered.

111.     Through the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims, to the United States Government, in order to obtain government reimbursement for health care services provided under Medicaid and Medicare.

112.     As a result of these false claims, the United States has been damaged and continues to be damaged in an amount believed to be in excess of $10,000,000.

## COUNT TWO

### FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729 (a)(1)(B):

### FALSE STATEMENTS USED TO OBTAIN PAYMENT OF FALSE CLAIMS

### (Against All Defendants)

113.     Relator June Raffington realleges and reincorporates all the preceding paragraphs of the Complaint as if fully set forth herein.

28

114.    From at least October 2005 to the present, Defendants knowingly caused to be made or used false records or statements in order to have false or fraudulent claims paid or approved by the Government.

115.    Defendants directed their staff to submit false records and false statements to Medicaid and Medicare and to forge physicians' signatures on treatment forms.

116.    These false statements were used by Defendants to fraudulently bill Medicaid and Medicare for ineligible medical services or patients.

117.    Through the acts described above, in the Southern District of New York, throughout the City of New York and Westchester County, and, upon information and belief, in all locations where Defendants did business, Defendants knowingly made, used, and caused to be made and used false records and statements in order to obtain reimbursement from the United States for services fraudulently billed to Medicare and Medicaid.

118.    As a result of these false claims, the United States has been damaged and continues to be damaged in an amount believed to be in excess of $10,000,000.

## COUNT THREE

### FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729 (a)(1)(C):

### FALSE CLAIMS ACT CONSPIRACY

### (Against All Defendants)

119.    Relator June Raffington realleges and reincorporates all the preceding paragraphs of the Complaint as if fully set forth herein.

120.    From at least October 2005 to the present, Defendants together with others known and unknown violated the False Claims Act by conspiring to knowingly and

willfully cause the submission of false claims to obtain over-reimbursements from Medicaid and Medicare.

121.   It was a part of this conspiracy that Defendants and their co-conspirators knowingly and willfully submitted false claims to Medicaid and Medicare for ineligible medical services or patients.

122.   Defendants willfully conspired to submit false claims to Medicaid and Medicare in the Southern District of New York, throughout the City of New York and Westchester County, and, upon information and belief, in all locations where Defendants did business.

123.   As a result of these false claims, the United States has been damaged and continues to be damaged in an amount believed to be in excess of $10,000,000.

**COUNT FOUR**

**FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. § 3730(h)**

**FALSE CLAIMS ACT RETALIATION**

**(Against the New York Defendants)**

124.   Relator June Raffington realleges and reincorporates all the preceding paragraphs of the Complaint as if fully set forth herein.

125.   While working for the New York Defendants, Relator Raffington spearheaded an initiative to rectify her employers' failure to comply with the state and federal rules governing Medicare and Medicaid funding.  Relator Raffington's superiors consistently reassigned compliance projects to employees known to participate in fraudulent activity.   After Ms. Raffington made numerous attempts to bring her employers into compliance with the FCA, the New York Defendants wrongfully and

abruptly terminated her. The New York Defendants' blatant retaliation against Relator Raffington for her engagement in the protected activity of investigating fraud against the Government violated 31 U.S.C. § 3730(h).

126.    Relator Raffington is entitled to relief including reinstatement with the same seniority status she would have had but for the retaliation, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the retaliation, including litigation costs and reasonable attorneys' fees.

**COUNT FIVE**

**NEW YORK STATE FALSE CLAIMS ACT**
**N.Y. STATE FIN. LAW § 189(1)(a):**

**CAUSING FALSE OR FRAUDULENT CLAIMS FOR PAYMENT TO BE**
**PRESENTED TO THE GOVERNMENT**

**(Against the New York Defendants)**

127.    Relator June Raffington realleges and reincorporates all the preceding paragraphs of the Complaint as if fully set forth herein.

128.    This is a claim for treble damages and penalties under Article XIII of the New York State Finance Law.

129.    From at least October 2005 to the present, Defendants caused the submission of hundreds or likely thousands of false claims to Medicaid by: (1) fraudulently billing Medicaid without maximizing Medicare; (2) forging physician signatures on patient bills to Medicaid; (3) fraudulently misrepresenting patients' medical needs to obtain excessive payments from Medicaid for an unnecessary level of care; (4) billing Medicaid based on fraudulent recertifications; (5) fraudulently billing Medicaid for patients not approved by the local DSS; and (6) fraudulently billing Medicaid for

amounts exceeding the HRA or WDSS-approved budgets.

130.    As described above, Defendants have required their staff to submit false records and false statements to Medicaid and to forge physicians' signatures on treatment forms.

131.    Through the acts described above, Defendants knowingly presented and caused to be presented to the New York State Government fraudulent claims, records, and statements in order to obtain reimbursement from Medicaid.

132.    The New York State Government, unaware of the falsity or fraudulence of the statements, records, or claims made or submitted by Defendants, their agents, and employees, approved, paid, and continues to approve and pay claims that otherwise would not have been approved or paid and has not recovered funds that would otherwise have been recovered.

133.    Through the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the New York State Government in Westchester County, New York City, and, upon information and belief, all locations where Defendants do business, in order to obtain government reimbursement for health care services provided under Medicare.

134.    As a result of these false claims, the New York State Government has been damaged and continues to be damaged in an amount believed to be in excess of $10,000,000.

## COUNT SIX

## NEW YORK STATE FALSE CLAIMS ACT
## N.Y. STATE FIN. LAW § 189(1)(b):

**FALSE STATEMENTS USED TO GET FALSE CLAIMS PAID**

**(Against the New York Defendants)**

135.    Relator realleges and reincorporates all the preceding paragraphs of the Complaint as if fully set forth herein.

136.    From at least October 2005 to the present, Defendants knowingly caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the New York State Government in the Southern District of New York, throughout the City of New York and Westchester County, and, upon information and belief, in all locations where Defendants do business.

137.    Defendants directed their staff to submit false records and false statements to Medicaid and Medicare and to forge physicians' signatures on treatment forms.

138.    These false statements were used by Defendants to fraudulently bill Medicaid and Medicare for ineligible medical services or patients.

139.    Through the acts described above, Defendants knowingly made, used, and caused to be made and used false records and statements in order to obtain reimbursement from the New York State Government for services fraudulently billed to Medicaid and Medicare.

140.    As a result of these false claims, the New York State Government has been damaged and continues to be damaged in an amount believed to be in excess of $10,000,000.

**COUNT SEVEN**

**NEW YORK STATE FALSE CLAIMS ACT**
**N.Y. STATE FIN. LAW § 189(1)(c):**

**FALSE CLAIMS ACT CONSPIRACY**

33

**(Against the New York Defendants)**

141.    Relator realleges and reincorporates all the preceding paragraphs of the Complaint as if fully set forth herein.

142.    From at least October 2005 to the present, Defendants, together with others known and unknown, violated the False Claims Act by conspiring to knowingly and willfully cause the submission of false claims to obtain over-reimbursements from Medicaid and Medicare in the Southern District of New York, throughout the City of New York and Westchester County, and, upon information and belief, in all locations where Defendants do business.

143.    It was a part of this conspiracy that Defendants and their co-conspirators knowingly and willfully submitted false claims to Medicaid and Medicare for ineligible medical services or patients.

144.    As a result of these false claims, the New York State Government has been damaged and continues to be damaged in an amount believed to be in excess of $10,000,000.

## COUNT EIGHT

### NEW YORK STATE FALSE CLAIMS ACT
### N.Y. STATE FIN. LAW § 191:

### FALSE CLAIMS ACT RETALIATION

**(Against the New York Defendants)**

145.    Relator June Raffington realleges and reincorporates all the preceding paragraphs of the Complaint as if fully set forth herein.

146.    While working for the New York Defendants, Relator Raffington spearheaded an initiative to rectify her employers' failure to comply with the state and

federal rules governing Medicare and Medicaid funding.  Relator Raffington's superiors consistently reassigned compliance projects to employees known to participate in fraudulently activity.   After Ms. Raffington made numerous attempts to bring her employers into compliance with the FCA, the New York Defendants abruptly terminated her employment.   The New York Defendants' blatant retaliation against Relator Raffington for her engagement in the protected activity of investigating fraud against the government violated New York State Finance Law § 191.

147.   Relator Raffington is entitled to relief including reinstatement with the same seniority status she would have had but for the discrimination, two times the amount of back pay, interest on the back pay, an injunction to restrain continued discrimination, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against the Defendants as follows:

148.   that Defendants cease and desist from violating 31 U.S.C. § 3729 et seq. and N.Y. State Fin. Law § 189;

149.   that this Court assess liability against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

150.    that Plaintiff be awarded the maximum amount allowed pursuant to § 3730(d) of the Federal False Claims Act and § 189 of the New York State False Claims Act;

151.    that Plaintiff be awarded two times the amount of back pay, plus interest, pursuant to § 3730(h) of the Federal False Claims Act and § 191(1)(d) of the New York State False Claims Act;

152.    that Plaintiff be reinstated with the same seniority status, fringe benefits, and seniority rights she would have had but for Defendants retaliation and discrimination against her pursuant to § 3730(h) of the Federal False Claims Act and §§ 191(1)(b) and 191(1)(c) of the New York State False Claims Act;

153.    that Plaintiff receive any special damages sustained as a result of Defendants' discrimination and retaliation against her pursuant to § 3730(h) of the Federal False Claims Act and § 191(e) of the New York State False Claims Act;

154.    that Plaintiff be awarded all costs of this action, including attorneys' fees and expenses pursuant to § 3730(h) of the Federal False Claims Act and §§ 189(3) and 191(1)(e) of the New York State False Claims Act;

155.    that the Court issue an injunction restraining Defendants from continuing discrimination pursuant to § 191(1)(a) of the New York State False Claims Act;

156.    that Plaintiff recover all costs and expenses incurred in this case and attorneys' fees; and

157.    that the United States, New York State, and Plaintiff recover such other and further relief as the Court deems just and proper.

## IX.  DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury.

Dated:  December 29, 2010

Respectfully submitted:

Steven L. Wittels (SLW-8110)
Jeremy Heisler (JH-0145)
SANFORD WITTELS & HEISLER, LLP
1350 Avenue of the Americas, 31st Floor
New York, NY 10019
(646)-723-2947
swittels@swhlegal.com

*Attorneys for the Plaintiff-Relator June Raffington*