## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA and the STATE OF NEW YORK**

*ex rel.* **JUNE RAFFINGTON,**

      **PLAINTIFFS,**
      **v.**

**BON SECOURS HEALTH SYSTEM, INC., BON SECOURS NEW YORK HEALTH SYSTEM,  and SCHERVIER LONG TERM HOME HEALTH CARE PROGRAM,**

      **DEFENDANTS.**

**CIVIL ACTION**

_____

**FIFTH AMENDED COMPLAINT**

**FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, [31 U.S.C. § 3729, ET SEQ.]; NEW YORK FALSE CLAIMS ACT [N.Y. STATE FIN. § 189, ET SEQ.].**

**Civ No. 10-CV-9650 (RMB)**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.   PARTIES ...........................................................................................................2

III.  JURISDICTION AND VENUE .........................................................................5

IV.  THE MEDICARE AND MEDICAID PROGRAMS .........................................6

    A.   Medicare .................................................................................................6

    B.   The Medicare Home Health Care Benefit ..............................................8

    C.   Medicaid ...............................................................................................11

    D.   Medicaid Reimbursement for Home Health Services in New York State.....................13

V.   THE FEDERAL AND NEW YORK STATE FALSE CLAIMS ACTS...........16

VI.  FACTUAL ALLEGATIONS ...........................................................................18

    A.   Defendants Submitted Medicare and Medicaid Claims Supported by Forged or
Missing Physician Signatures on 485 Forms or Unsupported by Any 485 Form .........18

        1.   Defendants Forged Physicians' Signatures on 485 Forms that Certified a
Continued Need for Services ...................................................................18

        2.   Defendants Submitted False Recertifications of Continuing Need For
Services in their Electronic Billing Software, Unsupported by the Requisite
OASIS and 485 Forms .............................................................................23

        3.   Defendants Provided Forged 485 Forms to the Office of the Medicaid
Inspector General in Response to an OMIG Medicaid Claims Audit in or
about in Late 2009 and/or Early 2010.....................................................26

    B.   Defendants' Fraudulent Conduct Specific to the Medicaid Program ............................28

        1.   Defendants Fraudulently Billed Medicaid Without Maximizing Dual-
Eligible Patients' Medicare Coverage ....................................................28

2.  Defendants Fraudulently Billed Medicaid for Services to Patients Not Approved by the Relevant Local Departments of Social Services ...........................35

3.  Defendants Submitted False Claims to Medicaid for Medically Unnecessary Home Health Aide Services Provided to Patients Eligible Only for Less Expensive Personal Care Aide Services ...................................................................40

4.  Defendants Fraudulently Enrolled and Recertified Patients for Medicaid's Long Term Home Health Care Program (LTHHCP) ...............................................42

5.  Defendants Misrepresented Patients' Medicare Eligibility in Order to Submit False Claims to Medicaid ...............................................................................43

C.  Defendants' Fraudulent Conduct Specific to the Medicare Program ...........................45

1.  Defendants Falsely Misrepresented Personal Care Aide Services as Home Health Aid Services in Order to Bill Medicare for Home Health Aide Services for which the Patients Were Not Eligible.....................................................45

2.  Defendants Falsely Upcoded Patients' Bundled Medicare Payments to Include Medically Unnecessary Services ...............................................................................47

D.  Defendants Wrongfully Terminated Relator Raffington in Retaliation for her Investigation into Defendants' Fraudulent Billing Practices as Defendants Prepared for an Audit by OMIG in Late 2009 .................................................................50

VII.   CLAIMS FOR RELIEF ...........................................................................................................53

VIII.  PRAYER FOR RELIEF ..........................................................................................................64

IX.   DEMAND FOR JURY TRIAL ...............................................................................................65

**FIFTH AMENDED COMPLAINT**

Plaintiff and *qui tam* Relator June Raffington through her attorneys Sanford Heisler Kimpel, LLP, for her Complaint against the Defendants Bon Secours Health System, Inc., Bon Secours New York Health System, and Schervier Long Term Home Health Care Program (together hereinafter "Defendants") alleges as follows:

## I. <u>INTRODUCTION</u>

1.     This is an action to recover damages and civil penalties on behalf of the United States of America and the State of New York arising from false and/or fraudulent statements, records, and claims made and caused to be made by the Defendants and/or their agents and employees, which resulted in numerous false claims to both the Medicare and Medicaid programs in violation of the Federal False Claims Act, 31 U.S.C. §3729 *et seq.,* (hereinafter "the FCA") and the New York State False Claims Act, N.Y. State Fin. Law §189 *et seq.* (hereinafter denoted as "the New York State FCA").

2.     Since at least 2007, Defendants perpetrated a widespread, systematic and ongoing scheme to defraud the Government by knowingly causing Medicaid and Medicare to pay millions of dollars in false claims for home health services, including by:

- *Submitting Medicare and Medicaid Claims Supported By Forged or Missing Physician Signatures on Clinical Documentation or Unsupported by Any Required Clinical Documentation, including "485 Forms" and "OASIS Forms";*

- *Fraudulently Billing Medicaid Without Maximizing Dual-Eligible Patients' Medicare Coverage;*

- *Fraudulently Billing Medicaid for Services to Patients Not Approved by the Relevant Local Departments of Social Services;*

- *Submitting False Claims to Medicaid For Medically Unnecessary Home Health Aide Services Provided to Patients Eligible Only For Less Expensive Personal Care Aide Services;*

- *Fraudulently Enrolling and Recertifyinig Patients for Medicaid's Long Term Home Health Care Program (LTHHCP);*

- *Falsely Misrepresenting Patients' Medicare Eligibility in Order to Submit False Claims to Medicaid;*

- *Falsely Misrepresenting Personal Care Aide Services as Home Health Aide Services in Order to Bill Medicare for Home Health Aide Services For Which the Patients Were Not Eligible; and*

- *Falsely Upcoding Patients' Bundled Medicare Payments to Include Medically Unnecessary Services.*

3.     Defendants intentionally concealed their fraud from the Government—including during audits conducted by the New York State Office of the Medicaid Inspector General in late 2009 and/or early 2010—and terminated Ms. Raffington for raising concerns about Defendants' billing practices.

4.      Defendants' fraud has cost the United States, the State of New York and taxpayers millions of dollars annually.  Furthermore, Plaintiff-Relator June Raffington seeks to recover damages and/or injunctive relief arising from Defendants' wrongful termination of her employment, in violation of 31 U.S.C. § 3730(h) and N.Y. State Fin. Law § 191.

## II. <u>PARTIES</u>

5.     Relator JUNE RAFFINGTON is a resident of Poughkeepsie, New York. Relator Raffington holds an Associate degree in Nursing from Dutchess Community College, a Bachelor's degree in Nursing from the State University of New York at New Paltz, and a Master's degree in Nursing from Hunter College.  Relator Raffington has held a New York state nursing license since 1986.  From 2000 to 2008, Relator Raffington worked at Hudson Valley Home Care as Director of Professional Services.

2

6.     Relator Raffington was employed by Defendants Bon Secours Health System, Inc., Bon Secours New York Health System, and Schervier Long Term Home Health Care Program from December 2008 through October 2009 as Vice President ("VP") of Home Care Services of Defendant Schervier Long Term Home Health Care Program ("Schervier Home Health Care" or "Schervier LTHHCP").

7.     As VP of Home Care Services, Relator Raffington was responsible for the operational, fiscal and clinical leadership of the long term home health care program at Defendant Bon Secours New York Health System ("BSNY").  Defendant BSNY is in the business of providing home health care to patients who are elderly, post-surgery, or who generally require home attendant care.  In her VP capacity, Relator Raffington promoted the home health care agency within the local market, upheld regulatory compliance, and managed all long term home health care staff to ensure that service delivery standards were being maintained.

8.     The Defendants wrongfully terminated Relator Raffington in October 2009 in retaliation for investigating and attempting to rectify the fraudulent billing practices she witnessed at Defendant Schervier Home Health Care.

9.     Defendant BON SECOURS HEALTH SYSTEM, INC., ("Bon Secours") is a not-for-profit Catholic health system headquartered in Marriotsville, Maryland that owns, manages, and/or joint ventures 18 acute-care hospitals, one psychiatric hospital, five nursing care facilities, five assisted living facilities, and 15 home care and hospice programs.  Its 2009 annual report states that Bon Secours earned revenues of $2.9 billion in 2009.  Bon Secours owns and operates Defendant Bon Secours New York and its subsidiaries, Schervier Home Health Care and Schervier Nursing Care Center.  Bon

Secours, Bon Secours New York and its subsidiaries are home health agencies ("HHA"s) as defined by 42 U.S.C. §1395x(o) that provide home health services, defined in 42 U.S.C. §1395x(m).  Bon Secours New York and its subsidiaries are Long Term Home Health Care Programs ("LTHHCPs) as defined by New York State Medicaid.   Barbara Knott, the Vice President of Home Health Services for Bon Secours, consulted with Bon Secours Home Health Care programs across the nation during Relator Raffington's tenure with the company, and, upon information and belief, much earlier. Ms. Knott has acted and continues to act as a direct agent and representative of Bon Secours with regards to long term home health care policies.

10.     Defendant BON SECOURS NEW YORK HEALTH SYSTEM ("BSNY") is a subsidiary of Bon Secours.  BSNY owns and operates Schervier Nursing Care Center and Schervier Home Health Care.  The BSNY executive team, including Chief Executive Officer ("CEO") James Higgins, Chief Financial Officer ("CFO") Kity Khundkar, Executive VP Louis Harris, and VP of Human Resources ("HR") Frances Sequeira, encouraged, aided, and directly participated in the fraudulent activity Relator Raffington witnessed during her employment with the Defendants.

11.     Defendant SCHERVIER LONG TERM HOME HEALTH CARE PROGRAM ("Schervier Home Health Care") is a not-for-profit program that provides in-home medical care to up to 480 individuals.  Upon information and belief, approximately 70 percent of the program's patients live in Bronx County, while the remaining 30 percent live in Westchester County.

12.     The Defendants were Relator Raffington's joint employers.  During her job search, Relator Raffington received a "Position Specification" published by Bon

Secours and BSNY.  Bon Secours gave Relator Raffington a central email address with the domain name "bshsi.org", Bon Secours's web address.  BSNY executives work on the same campus that houses the Schervier Nursing Center and Schervier Home Health Care.

13.     All employees of Schervier Home Health Care, including Relator Raffington, reported and continue to report to the BSNY executive team, including CEO Higgins, CFO Khundkar, and Executive VP Harris.  Every Monday, Relator Raffington met with Mr. Harris to review the status and progress of Schervier Home Health Care. Moreover, Relator Raffington's termination letter explicitly mentions that Mr. Harris "made several attempts to reach [Ms. Raffington] by phone" to inform her of her termination.   Furthermore, the letterhead of Relator Raffington's termination letter features the logo of BSNY.  Bon Secours VP of Home Health Services Barbara Knott also served as a supervisor to Relator Raffington whenever Ms. Knott performed consultation services at the Bronx campus.

### III.  JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over the subject matter of this action pursuant to New York State Finance Laws Sections 189 and 191. Under 31 U.S.C. § 3730(e) and New York State Finance Law Section 190(9), there has been no statutorily relevant public disclosure of the allegations or transactions in this

Complaint.  Moreover, Relator Raffington is the original source of the information on which the allegations of this lawsuit are based.

15.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which provides for nationwide service of process. Further, Defendants have at least minimum contacts with the United States.  Defendants can be found in, reside in, transact and have transacted business in this District.  The Relator also resides in this District.

16.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found in, reside in, and transact and have transacted business in the Southern District of New York.

## IV.  THE MEDICARE AND MEDICAID PROGRAMS

### A.     Medicare

17.     Medicare, enacted in 1965 under Title XVIII of the Social Security Act, is a third party reimbursement program that underwrites medical expenses of the elderly and the disabled. 42 U.S.C. §§ 1395 et seq. Medicare reimbursements are paid from the federal Supplementary Medical Insurance Trust Fund. Medicare Part A covers hospital services.  Medicare Part B generally covers physician services, including medical and surgical treatment and outpatient treatment and diagnosis. Part B, 42 U.S.C. §§ 1395j et seq.; 1395l (payment of benefits). Physicians, non-physician practitioners, and other health care suppliers must enroll in the Medicare program to be eligible to receive Medicare payment for covered services provided to Medicare beneficiaries. 42 C.F.R. § 424.505.

18.     In order to enter into a Provider Agreement authorizing them to provide services to Medicare beneficiaries, all providers, including providers of home health services must submit an enrollment application to the program on its Form CMS 855A. Among other things, the application requires providers to sign a certification that states in relevant part:

> Section 15: CERTIFICATION STATEMENT
>
> A. Additional Requirements for Medicare Enrollment
> …
>
> 3.  I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.
> …
> 6.  I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.
>
> Medicare Enrollment Application, Institutional Providers, CMS – 855A.

19.     Form CMS 855A must be resubmitted every five years, to verify the accuracy of enrollment information, or any time there is a change in the information provided on the form.  42 CFR §424.515.

20.     All providers that submit Medicare claims electronically to CMS must certify in their application that, among other things, they "will submit claims that are accurate, complete, and truthful," and must acknowledge that "all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be

misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law." See Medicare Claims Processing Manual, § 30.2.A.

21.     All providers must also contemporaneously create and maintain accurate medical records that support the providers' claims for reimbursement. See, e.g., CMS MLN Matters Number: SE1022 ("Providers/suppliers should maintain a medical record for each Medicare beneficiary that is their patient. Remember that medical records must be accurately written, promptly completed, accessible, properly filed and retained.")

**B.     The Medicare Home Health Care Benefit**

22.     HHAs may furnish home health care using their own staff, or they may contract with others to provide services.  Additionally, many HHAs are chains that have a central, or "home," office that provides administrative and centralized management services to individual agencies within a chain.

23.     To qualify for home health services coverage under Social Security Act §§1814(a)(2(C) and 1835(a)(2)(A), a patient must be: (1) confined to his/her home; (2) under a physician's care; (3) receiving services under a plan of care established and periodically reviewed by a physician ("Plan of Care"); and (4) in need of skilled nursing care on an intermittent basis or physical therapy or speech-language pathology or have a continuing need for occupational therapy. Medicare Benefits Policy Manual ("Policy Manual") Ch. 30.

24.     The physician who signs the Plan of Care must be qualified to sign the physician certification of need for home health services as described in 42 C.F.R § 424.22. See Policy Manual Ch. 30.2.3.

25.     Under 42 C.F.R § 424.22(a), "[a]s a condition for payment of home health services under Medicare Part A or Medicare Part B, a physician must certify, *inter alia*, that:

(a)(1)(iii)  A plan for furnishing the services has been established and is periodically reviewed by a physician who is a doctor of medicine, osteopathy, or podiatric medicine; and

(a)(1)(iv)  The services were furnished while the individual was under the care of a physician who is a doctor of medicine, osteopathy, or podiatric medicine

26.     Under 42 C.F.R § 424.22(b), "[r]ecertification is required at least every 60 days, preferably at the time the plan is reviewed, and must be signed and dated by the physician who reviews the plan of care….".

27.     CMS Form 485 ("485 form"), the Home Health Certification and Plan of Care, is a form used by physicians as an authorization for the Plan of Care that contains Plan of Care data. The 485 Form meets the State and Federal regulatory requirements for both the Plan of Care and home health certification requirements. See http://www.oasistraining.org/M2/M2_2c2.asp.  The certification "must be obtained at the time the plan of care is established or as soon thereafter as possible and must be signed and dated by the physician who establishes the plan." 42 C.F.R. § 424.22(a)(2)

28.     HHAs must make the Plan of Care elements readily available in an identifiable location in the medical record and the information in the 485 Form satisfies this purpose. http://oig.hhs.gov/oas/reports/region2/20901002.pdf.

9

29.     HHAs providing home health services that are covered under Medicare are paid via the home health prospective payment system ("Home Health PPS").  Pursuant to the Home Health PPS, Medicare pays home health agencies a predetermined base payment. The payment is adjusted for, among other factors, the health condition and care needs of the beneficiary; such adjustment is referred to as the case-mix adjustment.

30.     The home health PPS provides HHAs with payments for each 60-day episode of care for each beneficiary. If a beneficiary is still eligible for care after the end of the first episode, a second episode can begin; there are no limits to the number of episodes a beneficiary who remains eligible for the home health benefit can receive.

31.     There are several key features of the home health PPS. One is the unit of payment, which the CMS website describes as follows: "[t]he unit of payment under HHA PPS will be for a 60-day episode of care. An agency will receive half of the estimated base payment for the full 60 days as soon as the fiscal intermediary receives the initial claim. This estimate is based upon the patient's condition and care needs (case-mix assignment). The agency will receive the residual half of the payment at the close of the 60-day episode unless there is an applicable adjustment to that amount. The full payment is the sum of the initial and residual percentage payments, unless there is an applicable adjustment. This split percentage payment approach provides reasonable and balanced cash flow for HHAs. Another 60-day episode can be initiated for longer-stay patients." https://www.cms.gov/HomeHealthPPS/

32.     A second key feature of the home health PPS is the case-mix adjustment which is the adjusting of the unit of payment based on the patient's condition and needs. According to the CMS website "[a]fter a physician prescribes a home health plan of care,

10

the HHA assesses the patient's condition and likely skilled nursing care, therapy, medical social services and home health aide service needs, at the beginning of the episode of care. The assessment must be done for each subsequent episode of care a patient receives. A nurse or therapist from the HHA uses the Outcome and Assessment Information Set (OASIS) instrument to assess the patient's condition. (All HHAs have been using OASIS since July 19, 1999.) OASIS items describing the patient's condition, as well as the expected therapy needs (physical, speech-language pathology, or occupational) are used to determine the case-mix adjustment to the standard payment rate. This adjustment is the case-mix adjustment. . . ." https://www.cms.gov/HomeHealthPPS/. OASIS reports that include an assessment that patients will require therapy result in an upward adjustment to the unit of payment and ultimately a greater payment to the HHA.

33.     HHAs, including Defendants, submit the foregoing data supporting claims for Medicare payments under the home health PPS payments electronically.

**C.     Medicaid**

34.     Medicaid, enacted in 1965 under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq., is a medical assistance program for indigent and other needy people that is financed by joint federal and state funding and is administered by the states according to federal regulations, oversight, and enforcement. Each state implements its version of Medicaid according to a State Plan that has been approved by HHS. Within broad federal regulatory and policy guidelines (see 42 C.F.R. § 430 et seq., and CMS publications), the states determine who is Medicaid-eligible, what services are covered, and how much to reimburse healthcare providers. The states, through intermediaries, also receive healthcare provider claims for program reimbursements, evaluate those claims,

make payments to the healthcare providers, and present the claims to HHS/CMS for reimbursement of the federal government's share.

35.     New York's Medicaid Program was established in 1966. Act of Apr. 30, 1966, ch. 256, 1966 N.Y. Laws 844. By statute, the New York Department of Health ("NYDOH") administers this program at the state level. N.Y. Pub. Health Law § 201(1)(v). The New York State FCA claims at issue in this case arise under the New York Medicaid program.

36.     The New York Medicaid Program has provider enrollment requirements similar to that of the Medicare program.  See 18 NYCRR 504.1(b)(1) :

> Any person who furnishes medical care, services or supplies for which payments under the medical assistance program are to be claimed; or who arranges the furnishing of such care, services or supplies; or who submits claims for or on behalf of any person furnishing or arranging for the furnishing of such care, services or supplies must enroll as a provider of services prior to being eligible to receive such payments, to arrange for such care, services or supplies or to submit claims for such care, services or supplies.

37.     Pursuant to 18 NYCRR § 504.3(a), by enrolling in the State's Medicaid program, a provider agrees to maintain records demonstrating its right to receive payment and to furnish such records to the State and to the U.S. Department of Health and Human Services ("HHS").

38.     Under New York Medicaid rules and policies, healthcare providers must contemporaneously create and maintain accurate medical records that support the providers' claims for reimbursement.  See e.g. New York State Medicaid Program, Information for All Providers, General Policy, version 2004-1 ("Federal Law and State Regulations require providers to maintain financial and health records necessary to fully disclose the extent of services, care, and supplies provided to Medicaid recipients.").

39.     All healthcare providers, including Defendants, that submit claims to the New York State Medicaid Program must certify, among other things, that all statements in the claim made are true, accurate and complete to the best of the provider's knowledge; that no material fact has been omitted; that the provider is bound by all rules, regulations, policies, standards, fee codes and procedures of the NYDOH as set forth in Title 18 of the Official Compilation of Codes, Rules and Regulations of New York State and other publications of the Department, including Provider Manuals and other official bulletins of the Department; and that the certifications are true. See New York State Medicaid Program: Information For All Providers—General Billing (current version at https://www.emedny.org/ProviderManuals/AllProviders/PDFS/archive/Information_for_ All_ProvidersGeneral_Billing-2004-01.pdf)

40.     NYDOH uses the Medicaid Management Information System (MMIS), a computerized payment and information reporting system, to process and pay Medicaid claims.

### D.     Medicaid Reimbursement for Home Health Services in New York State

41.     Federal Medicaid reimbursement is available only for "home health services," defined in 42 CFR § 440.70(a) as services provided to a beneficiary at the beneficiary's place of residence and "[o]n his or her physician's orders as part of a written plan of care that the physician reviews every 60 days …."

42.     Home health services covered by New York State Medicaid are governed by 18 NYCRR § 505.23.

43.     To comply with federal and State regulations (18 NYCRR § 505.21[b] [2] and 42 CFR§484.18) and assure the Plan of Care reflects the physician's evaluation of

13

the patient's immediate and long term needs, the participant's physician must be involved in the assessment/reassessments and the development of both the initial Plan and those for each reauthorization period. A physician's order is required when an assessment is being done to develop the Plan of Care.

http://www.health.ny.gov/health_care/medicaid/reference/lthhcp/lthhcpmanual.pdf

44. Under the program, a registered nurse, or physician, must complete the New York State Long Term Care Placement Form – Medical Assessment Abstract, or "DMS-1" to evaluate an individual's current medical condition.

http://www.health.ny.gov/health_care/medicaid/reference/lthhcp/lthhcpmanual.pdf

45. Under 42 CFR § 433.32, services for home health services claimed for Federal Medicaid reimbursement must be adequately documented.

46. Under 18 NYCRR § 505.23(e)(1), payments for home health services are prohibited unless the claims for payment are supported by documentation of the time spent providing services.

47. In addition to short-term home health care services, patients may be eligible to receive long-term home health care services under the New York State Medicaid Program. The long-term home health care program is available to individuals who are medically eligible for placement in a nursing home and choose to receive services at home. These individuals must have care costs that are less than the nursing home cost in the county and receive a waiver that allows them to receive home care rather than a nursing home placement.

48.     Eligibility for the Medicaid long-term home health care program is determined by a patient's county of residence, and the local department of social services ("LDSS" or "DSS") must approve all services to be rendered.

49.     In order to qualify for long-term home health care services through the Long Term Home Health Care Program ("LTHHCP"), patients must be admitted to the program on the basis of submission of New York State Long Term Care Placement Form - Medical Assessment Abstract (DMS-1). Using this form, patients are assessed and patients who achieve a threshold "Medical Predictor Score" are admitted to the LTHHCP. A registered nurse or physician must complete the DMS-1 to evaluate the patient's current medical condition.

http://www.health.ny.gov/health_care/medicaid/reference/lthhcp/lthhcpmanual.pdf

50.     Following a medical assessment and admission to the Program, a Plan of Care ("POC") is created for each long-term patient.

51.     To comply with federal and State regulations (18 NYCRR § 505.21(b)(2) and 42 CFR § 484.18) and assure the POC reflects the physician's evaluation of the patient's immediate and long term needs, the participant's physician must be involved in the assessment/reassessments and the development of both the initial Plan and those for each reauthorization period.

http://www.health.ny.gov/health_care/medicaid/reference/lthhcp/lthhcpmanual.pdf

52.     A physician's order is required when an assessment is being done to develop the POC, including the Home Assessment Abstract ("HAA") or federal OASIS required of Certified Home Health Agencies ("CHHA").

http://www.health.ny.gov/health_care/medicaid/reference/lthhcp/lthhcpmanual.pdf

15

53.     Once the POC is developed, the physician's signature on the POC becomes the sustaining physician's order applicable to the POC and required for an applicant approved to begin waiver participation. Once an individual has been approved for waiver participation by the LDSS, the physician must renew all medical orders every 60 days in accordance with federal rules for home health agencies. As required by waiver rules, s/he must also verify the individual's continued ability to be cared for at home and must approve of any change in the Summary of Service Requirements arising from changes in the individual's health status as part of the waiver's 180-day reassessment process. If the responsible physician determines that the individual's health and safety needs cannot be met in a home or community, the individual is deemed ineligible for care under the program.

### V.  THE FEDERAL AND NEW YORK STATE FALSE CLAIMS ACTS

54.     The Federal False Claims Act was originally enacted in 1863 and was substantially amended in 1986 by the False Claims Amendments Act, Pub.L. 99-562, 100 Stat. 3153.  After finding that federal program fraud was pervasive, Congress enacted the 1986 amendments to enhance and modernize the Government's tools for recovering losses sustained by frauds against it.  The amendments were intended to create incentives for individuals with knowledge of Government frauds to disclose the information without fear of reprisals or Government inaction and to encourage the private bar to commit resources to prosecuting fraud on the Government's behalf.

55.     The FCA provides that any person who presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States Government, or knowingly makes, uses, or causes to be made or used false records and

statements to induce the Government to pay or approve false and fraudulent claims, is liable for a civil penalty ranging from $5,500 up to $11,000 for each such claim, plus three times the amount of the damages sustained by the federal Government.

56.     The FCA allows any person having information about false or fraudulent claims to bring an action for himself and the Government, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendants during that time).  Based on these provisions, qui tam Plaintiff and Relator June Raffington seeks through this action to recover damages and civil penalties arising from the Defendants' fraud on the U.S. Government.

57.     In 2007, New York State passed its own parallel False Claims Act statute. The New York False Claims Act, N.Y. Fin. Law §§ 187 - 194, allows the Attorney General, a local government, or any person to file a lawsuit against a person or a company that obtains or withholds funds or property from the state or local government through false or fraudulent conduct. A person or company found liable under the act must generally pay treble damages, civil penalties, plus costs and attorneys' fees.

58.     Falsification of records, upcoding, and billing for services not rendered violate Medicare and New York State fraud and abuse standards requiring that submitted claims accurately reflect the services actually rendered.  See, e.g., HHS Office of Inspector General's "Roadmap for New Physicians, Avoiding Medicare and Medicaid Fraud and Abuse," http://oig.hhs.gov/fraud/PhysicianEducation/ at pp. 9-12 (explaining the general requirement for billing accurately, the requirement to maintain accurate and complete medical records and documentation of the services provided to ensure submitted claims are supported by true and accurate records,  and specifically warning

against upcoding, billing for services not rendered, and billing more than once for the same service..).

## VI.  FACTUAL ALLEGATIONS

**A.**  **Defendants Submitted Medicare and Medicaid Claims Supported by Forged or Missing Physician Signatures on 485 Forms or Unsupported by Any 485 Form**

59.     Since at least 2007, Defendants fraudulently feigned compliance with applicable federal and state regulations governing home health services by (1) forging physicians' signatures on 485 forms that certified a continuing need for services; (2) submitting recertifications on their electronic billing software unsupported by any 485 Forms certifying a continuing need for services for that patient and/or billing period and (3) providing OMIG with forged 485 forms during an audit performed in late 2009 and/or early 2010.

**1.**     **Defendants Forged Physicians' Signatures on 485 Forms that Certified a Continued Need for Services**

60.     During relevant periods, Defendants forged physician signatures on 485 forms to enable them to submit false claims for unauthorized Medicaid and Medicare home health services. Defendants' executives and managers both forged physician signatures directly and ordered lower-level employees to do so.

61.     During her tenure at the Company, Relator Raffington reviewed numerous "error reports" that had been generated by Defendants' electronic billing software and circulated to her by Schervier's billing department. These error reports, which were on average generated several times per week, indicated batches of claims that could not be billed to the Government because the underlying patient files were incomplete.  Among

18

other deficiencies, the documentation was missing the required physicians' approvals on 485 forms.

62.     Relator Raffington observed that the error report printed on a given day would show that numerous patients lacked required physicians' approvals. Subsequently, a new error report would be created one or two days later, now indicating that the entire batch of patients had "obtained" the required signatures.   Relator found these error reports to be highly suspicious given that they had suddenly been reconciled in such a wholesale manner and within an extremely short period of time, such as overnight or within a couple of days.

63.     Based on this suspicious pattern, Relator Raffington suspected that the administrative staff at Schervier had been artificially reconciling error reports rather than obtaining the physicians' approvals. Eventually, she was able to confirm with Schervier's billing staff, including Billing Supervisor Ebnul Hassan and Schervier billing clerk Tamara Daniel, that Schervier Operations Manager Christopher Hickey would "clear" error reports within the office in advance of billing deadlines.

64.     In or about April 9, 2009, Schervier's billing department provided Relator Raffington with a "Billing Run," dated April 9, 2009, that summarized 137 patients whose 485 forms were missing, but nonetheless had received medical services for the period from September 1, 2008 through February 28, 2009. Of those 137 patients, at least 74 were patients who were dual-eligible for Medicare and Medicaid. On the bottom of the log appeared the words, "Target Collection by Tuesday, April 21, 2009."

65.     Knowing that Schervier faced a fast-approaching deadline for billing, on or about April 9, 2009, Relator Raffington spoke with  Mr.  Hassan about the status of the

19

137 patients. Mr. Hassan told Relator Raffington that Schervier Operations Manager Christopher Hickey would clear up the error reports internally at Schervier, and he would then bill the services to the Government without delay.

66.     Shortly thereafter, Relator Raffington reviewed that day's error report and saw that many of the patients' files were recorded in the billing system as having included the required physician's signatures.   Based upon this determination, Relator Raffington concluded that these claims were falsely reconciled.

67.     Numerous claims were submitted to both Medicare and Medicaid for services rendered to these 137 patients during the period of September 1, 2008 through February 28, 2009.

68.     In total, 74 patients who were eligible for both Medicare and Medicaid ("dual eligible") received services billed to one or both of those programs during the period of September 1, 2008 through February 28, 2009.  Many of these claims were supported by 485 forms that lacked the required physicians' approvals.

69.     Defendants' billings included: services to Patient AG, a dual eligible patient, for which Medicaid was billed $887.71 during the relevant period; services to Patient AR, a dual eligible patient, for which Medicaid was billed charges of $9, 168.64 during the relevant period; and services to Patient BH, dual eligible patient, for which Medicaid was charged $288.62 during the relevant period.

70.     Subsequently, in or around late August 2009, Relator Raffington discovered copies of patients' physician orders that contained forged physicians' signatures. The documents contained obvious disparities between different versions of the same physicians' signatures.

71.     On or around May 19, 2008, employees at Schervier forged the signature of Doctor Victor D. Ribeiro on the Home Health Certification and Plan of Care (485 Form) for Patient AG, a resident of Yonkers, NY. As a result, Schervier falsely stated to the Government that its services rendered to Patient AG from April 19, 2008, to June 17, 2008, were supported by the required physician authorization.  As a result of Defendants' false statement, Defendants wrongfully obtained Government reimbursement for health care services provided to Patient AG from April 19, 2008, to June 17, 2008.

72.     On or about July 29, 2008, employees at Schervier forged the signature of Doctor Robert E. Feingold on the 485 Form for Patient AT, a resident of Bronx, NY. As a result, Schervier falsely stated to the Government that its services rendered to Patient AT from August 15, 2008, to October 13, 2008, were supported by the required physician authorization.   As a result of Defendants' false statement, Defendants wrongfully obtained Government reimbursement for health care services provided to Patient AT from August 15, 2008, to October 13, 2008.

73.      On or about August 10, 2008, employees at Schervier forged the signature of Doctor Angela Astuto on the 485 Form for Patient AJ, a resident of Bronx, NY. As a result, Schervier falsely stated to the Government that its services rendered to Patient AJ from August 7, 2008, to October 5, 2008 were supported by the required physician authorization.   As a result of Defendants' false statement, Defendants wrongfully obtained Government reimbursement for health care services provided to Patient AJ from August 7, 2008, to October 5, 2008.

74.     After reviewing a number of patient records similar to those of Patients AG, AT and AJ, Relator Raffington believed even more strongly that many physicians'

21

signatures had been forged by Defendants.  She later confirmed with a medical records clerk that Operations Manager Hickey (who reported to Ms. Raffington) stayed at work after-hours to forge these records.  Mr. Hickey had never informed his supervisor, Ms. Raffington, of these late-night review sessions.

75.     In or around August 2009, Mr. Hickey admitted to Relator Raffington that he had forged doctors' signatures on medical records submitted to Medicaid and Medicare in the past.  He further admitted that he had engaged in this fraudulent conduct since before Relator Raffington's employment with the Defendants.  He explained that Bon Secours VP of Home Health Services Barbara Knott had ordered him to forge the signatures, and that Ms. Knott herself had forged signatures on medical records submitted to Medicaid and Medicare.

76.     During this conversation with Relator Raffington, Mr. Hickey showed Relator Raffington the 485 Forms for Patients AG, AT and AJ.  He stated that Bon Secours VP Barbara Knott had forged the physician signatures on all three forms.

77.     Subsequently, Relator Raffington instructed the Schervier Medical Records Department to obtain authentic signatures from the physicians on all forged forms.

78.     In or about August 2009, Relator Raffington reported the forgeries to her supervisor, BSNY Executive VP Louis Harris, Corporate Compliance, and Schervier HR.  Mr. Harris responded by transferring the records to BSNY CFO Kity Khundkar, who would then handle repayment to the Government of fraudulent charges identified by Ms. Raffington.  Mr. Harris next gave copies of the forged physicians' orders to HR VP

22

Frances Sequeira, who was tasked with investigating Ms. Knott's participation in forging the signatures.

79.     Bon Secours subsequently terminated Mr. Hickey, allegedly for forging physicians' signatures.  Ms. Knott never suffered any consequences.

80.     By the time Bon Secours wrongfully terminated Relator Raffington in October 2009, many forged forms remained uncorrected, and Defendants, through CFO Khundkar, had not repaid the Government for the fraudulent charges.  Upon information and belief, Ms. Knott still works as Bon Secours's nationwide consultant on long term healthcare policy.

## 2.     Defendants Submitted False Recertifications of Continuing Need for Services in Their Electronic Billing Software, Unsupported by the Requisite OASIS and/or 485 Forms

81.     In or about August 2009, around the same time that Relator Raffington discovered the three forged 485 forms, she acquired additional evidence that Bon Secours also had been submitting recertification forms to Medicare and Medicaid without the required nurses' visits or physician approvals.

82.     Relator Raffington recalls that, in or about August 2009, she received an error report concerning claims submitted to the Government for services provided to a particular patient. A couple of days later, Relator Raffington reviewed the underlying file for that patient, and determined that the error report had been cleared. This raised Relator Raffington's suspicions because she knew a nursing visit could not have been made within that short time interval; yet, proper reconciliation of the error report would have required Schervier to complete and enter a medical assessment of the patient.

83.     Relator Raffington further investigated the patient's case by requesting that clerical staff member Sheila Graham-Atkinson provide her with the paper documentation of the nurse's assessment findings. Ms. Graham-Atkinson acknowledged that no such documentation existed, and informed Relator Raffington that Mr. Hickey had instructed the clerks to simply create the recertification in Schervier's software system, without the required nurses' visits.

84.     Further corroborating Ms. Graham-Atkinson's allegations, on or about August 18, 2009, Schervier clerical staff circulated a document to Relator Raffington, titled "Bon Secours Health System Inc., Checked-In Documents," that was dated August 18, 2009. The document showed dozens of patients with 485 forms signed by physicians, as well as the clerical staff member "Sheila Graham" as the "author" of the orders to generate the 485 forms.

85.     The "author" of the order for a 485 should have been listed as the nurse who completed the patient medical assessment, upon which the 485 is based, as required by federal and state regulations. However, within the document reviewed by Relator Raffington, no nurses were listed as associated with the signed 485 forms, which were instead generated by Ms. Graham-Atkinson.

86.     Schervier and BSNY executives instructed clerical staff to complete and submit the recertification forms to the Government, even though the clerical staff lacked the medical expertise required to reassess patients and never left the office to perform actual patient evaluations.

87.     To further corroborate the widespread nature of this practice, Relator Raffington reviewed the entire medical file of Patient GW, a 91 year-old female patient who was dual eligible for Medicare Part A and B, as well as Medicaid.

88.     Defendants submitted numerous claims for payment on behalf of Patient GW for the period of October 18, 2007 through December 16, 2007.

89.     Claims billed to Medicaid for the period of  October 18, 2007 through December 16, 2007 included: a charge of $146.93 for a medical social work visit on October 9, 2007; a charge of $153.22 for a skilled nursing visit on October 25, 2007; a charge of $153.22 for a skilled nursing visit on November 15, 2007; a charge of  $146.93 for a medical social work visit on December 6, 2007; and a charge of $153.22 for a skilled nursing visit on December 6, 2007.

90.     Defendants billed for these services even though they had not completed an OASIS form or a 485 form for the relevant period, as required by federal regulations pertaining to both Medicare and Medicaid.

91.     Between the period of December 17, 2007 through February 14, 2008, Defendants continued to provide care for Patient GW and submitted numerous claims for payment on behalf of Patient GW for such care.

92.     Claims billed to Medicaid for the period from December 17, 2007 through February 14, 2008 included: a charge of $148.32 for a skilled nursing visit on January 10, 2008; a charge of $148.32 for a skilled nursing visit on January 24, 2008; a charge of $144.31 for a medical social work visit on January 31, 2008; and a charge of $148.32 for a skilled nursing visit on February 7, 2007.

93.     Defendants billed for these services even though they had not completed a 485 form for the relevant period, as required by federal regulations pertaining to both Medicare and Medicaid.

94.     Upon discovering BSNY's blatantly fraudulent practice of recertifying patients without the required medical approvals, Relator Raffington addressed her concerns to BSNY CEO Kity Khundkar. Ms. Khundkar disregarded Relator Raffington's objections. Instead, Ms. Khundkar ordered Relator Raffington to instruct her staff to complete reassessments in the office without seeing patients in person.

95.     Before Relator Raffington could review the records and correct this problem, Defendants wrongfully terminated her in October 2009.

### 3. Defendants Provided Forged 485 Forms to the Office of the Medicaid Inspector General In Response To an OMIG Medicaid Claims Audit in Late 2009 and/or Early 2010

96.     In or about August 2009, Schervier received a letter from OMIG requesting that Schervier produce a discrete set of patient files by December 31, 2009. Relator Raffington met with Mr. Harris to discuss Schervier's plan for preparing the necessary records.  Mr. Harris and Relator Raffington agreed that she would be tasked with preparing for the OMIG audit, along with an outside auditor to be hired by Schervier.

97.     Immediately thereafter, Relator Raffington instructed Schervier's Records Clerk to gather the requested patient files.  The Records Clerk assembled the patient files, and Relator Raffington performed a preliminary review of each of them.

98.     During these initial reviews, Relator Raffington confirmed that many of the patient files were missing 485 forms; contained 485 forms with questionable

26

signatures; or contained 485 forms listing a clerical staff member as the "creator," without a clinical paper documentation showing that a medical staff had initiated the order.  In addition, many of the files Relator Raffington reviewed were missing interim physicians' orders and/or missing the application forms, disseminated by the New York State Department of Social Services ("DSS") and local Human Resources Adminstration offices ("HRA"), that are required to admit a patient into the long term care program.

99.    In total, Relator Raffington detected 80 to 85 patient files with fraudulent physician signatures during her initial review in preparation for the OMIG audit.

100.    On October 2, 2009, Relator Raffington's supervisor, Executive VP Harris, demanded that Relator Raffington give him records she had started to gather in preparation for the OMIG audit. According to Mr. Harris, CEO Higgins and CFO Khundkar wanted Bon Secours VP Barbara Knott, solely and with no participation from Relator Raffington or an outside auditor, to lead Schervier's preparations for the OMIG audit.

101.    Mr. Higgins and Ms. Khundkar instructed Mr. Harris to transfer the patient records from Relator Raffington to Ms. Knott.  Since Relator Raffington knew that Ms. Knott had earlier forged physicians' signatures and was afraid that Ms. Knott would again falsely alter records before Ms. Raffington could meet with the state, she refused to turn the documents over to Mr. Harris for Ms. Knott's review.  Despite Ms. Raffington's objections, Ms. Knott did in fact begin reviewing the records.

**B.**   **Defendants' Fraudulent Conduct Specific to the the Medicaid Program**

    **1.**   **Defendants Fraudulently Billed Medicaid Without Maximizing Dual-Eligible Patients' Medicare Coverage**

102.   CMS requires Medicaid participants to adopt a claims processing system which identifies and bills any liable third party prior to any claim payment by Medicaid. Medicaid is required to reject such a third party claim and return it to the provider, with information for the provider to bill the liable third party. See 42 C.F.R. § 433.139. During the relevant periods, HHAs that provided services to dual-eligible patients were subject to this standard, referred to as "Medicare maximization," or "split-billing."

103.   In order to properly maximize Medicare coverage for dual-eligible patients, HHAs such as Bon Secours may not claim Medicaid payments for services qualified for Medicare unless (1) the provider has prepared written justification for not having made an application for Medicare or (2) the provider's application for Medicare benefits has been rejected.    The Office of the Medicaid Inspector General determined that, as a condition of payment, Medicare must first make such coverage determinations for HHA services in order for the HHA to claim payment from New York State Medicaid.

104.   Medicaid typically reimburses providers for the full cost of a patient's treatment, whereas Medicare reimburses at a flat rate lower than the actual cost of treatment based upon certain predefined fee schedules. For dual eligible patients, qualified services covered by Medicare must be billed to Medicare even if Medicaid would pay the provider a higher rate for the services if the patient had only Medicaid coverage.

105.   The Defendants defrauded New York State taxpayers by obtaining state

Medicaid funds for services that should have been billed to the wholly federal Medicare program.  Through means of this scheme, Defendants caused both New York State and the United States to pay claims for Medicaid reimbursements at a higher cost than what would have been paid by Medicare.

106.    In or around July 2009, Relator Raffington discovered that Defendants Schervier Home Health Care and Schervier Nursing Center (together "Schervier") staff had not been meeting the split-billing requirement.

107.    During Ms. Raffington's tenure, patient review meetings were typically held at least twice per week. In or about July 2009, Relator Raffington attended a patient review meeting with clinical supervisors at Schervier.   She recalls that, during this meeting, the clinical supervisors discussed a certain specific patient. The patient was eligible both for Medicare, which covers acute care needs (but not long term care needs for non-homebound patients), and for Medicaid, which covers long term care needs. The patient required acute care, which was thus covered by Medicare and should have been billed to Medicare. Accordingly, Relator Raffington instructed the clinical staff that the patient required "split-billing."

108.    Once the clinical supervisors questioned Relator Raffington's instruction for Defendants to engage in "split-billing," Relator Raffington understood that the patient's entire medical costs had been improperly billed to Medicaid even though the patient's acute care needs should have been billed to Medicare.

109.    Relator Raffington immediately notified Ebnul Hassan, Schervier's Billing Supervisor, of the organization's failure to comply with the split-billing requirement.  In response, Mr. Hassan stated that Schervier had not engaged in split-billing since at least

29

October 2005, when the billing software was updated.  Relator Raffington discovered that Schervier had programmed the billing software so that it did not even allow for split-billing.  Defendants' tracking system failed to confirm that split-billing was properly performed.

110.   Mr. Hassan further told Relator Raffington that split-billing involved "a lot of work," and that for patients categorized as Low Utilization Payment Adjustment ("LUPA") patients, the payout through split-billing was very low. In addition, Mr. Hassan commented that Medicaid paid more as a sole payor. Relator Raffington responded to Mr. Hassan that these reasons were not valid and that Schervier was required to maximize Medicare.

111.   Due to Schervier's intentional or reckless failure to program its software for split-billing, Schervier wrongly billed Medicaid for the entire medical bill of the patient discussed at the foregoing review meeting attended by Relator Raffington.   As a consequence, the Government paid the false claim.

112.   Upon further investigation, Relator Raffington also discovered that Barbara Knott, Bon Secours VP of Home Health Services, had intentionally directed Schervier nurses not to comply with split-billing requirements, in knowing violation of applicable Medicare and Medicaid regulations.

113.   Schervier nurse Mary Meehan told Relator Raffington that BSNY leadership had issued a directive not to maximize Medicare.

114.   Another nurse, Lina Ojar, told Relator Raffington that Barbara Knott had ordered her to ignore the Medicare maximization requirement.

115.    After hearing these distressing reports from Ms. Meehan and Ms. Ojar, Relator Raffington met with the Schervier VP of Risk Management and Corporate Compliance, Ewe Winiarska, to discuss repayment to Medicaid. Ms. Winiarska agreed with the understanding of nurses Meehan and Ojar that split-billing was required, but stated to Relator Raffington that she needed to confirm this position with BSNY CEO James Higgins first. Ms. Winiarska never followed up further about the matter with Relator Raffington.

116.    On August 6, 2009, Relator Raffington informed BSNY Executive VP Louis Harris of Schervier's failure to comply with the Medicare maximization requirement. He intentionally or recklessly did not take any action in response to Relator Raffington's notification.

117.    In early August 2009, Relator Raffington began drafting a directive for the split-billing process to be utilized by the Schervier staff. Ms. Raffington reviewed approximately 60 to 70 percent of the records for Schervier Home Health Care patients who were eligible for both Medicaid and Medicare, both in Schervier's electronic records system and in paper records kept in Schervier's medical records room.

118.    After reviewing these records, Relator Raffington identified approximately 40 to 44 patients, admitted between January 2009 and August 2009, for whose services Schervier Home Health Care had failed to split-bill.  Relator Raffington saw that these patients were eligible for both Medicaid and Medicare; however, 100 percent of their services were billed to Medicaid. This billing was improper because, according to the records Relator Raffington reviewed, all 40 to 44 patients had acute care needs that could only lawfully be billed to Medicare.

119.    Relator later reviewed comprehensively the medical and billing records for three patients who received care during 2007 and 2008. Relator determined that in all three cases, Schervier had failed to perform split-billing and wrongly billed Medicaid for services that should have been billed to Medicare.

120.    Patient BH, a 69-year-old man, was a dual eligible patient who had been receiving home health services from Schervier since August 25, 2004.

121.    OASIS forms submitted on behalf of Patient BH indicated he was a homebound patient eligible for Medicare services, including OASIS forms dated December 3, 2007; February 4, 2008; April 2, 2008; June 4, 2008; and August 2, 2008.

122.    Plans of Care (Form 485) submitted to Medicaid on behalf of Patient BH indicated that he required the following skilled nursing services: nursing, medical social work, physical therapy and a Personal Care Aide to assist with activities of daily living. These Plans of Care included those dated October 29, 2007; December 21, 2007; February 26, 2008; April 14, 2008; and June 26, 2008.

123.    Schervier failed to bill the skilled services it provided to Patient BH to Medicare, and instead submitted false claims for payment to New York State Medicaid.

124.    For a period from October 2007 through October 2008, Defendants fraudulently billed Medicaid for numerous charges associated with Patient BH that should have been billed to Medicare including: (1) a charge for a social work visit on October 17, 2007, in the amount of $146.93; (2) a charge for a social work visit on November 20, 2007, in the amount of $146.93; and (3) a session of physical therapy on October 31, 2007, in the amount of $109.46.

125.    Patient AG, a 79-year-old man, was a dual eligible patient who had been receiving home health services from Schervier since January 25, 2007.

126.    A Plan of Care (Form 485) dated January 25, 2007, and submitted to Medicaid on behalf of Patient AG indicated that he required the following skilled nursing services: nursing, medical social work, physical therapy and a Personal Care Aide to assist with activities of daily living.

127.    Clinical records show that Patient AG was hospitalized from July 16, 2008 to July 25, 2008. Following Patient AG's discharge from the hospital on July 25, clinical records show that Defendants provided him with skilled nursing services.

128.    Schervier failed to bill the skilled services it provided to Patient AG to Medicare, and instead submitted false claims for payment to New York State Medicaid.

129.    During Patient AG's post hospitalization period, Defendants fraudulently billed Medicaid for charges that should have been billed to Medicare including: (1) a charge for a nursing evaluation on July 31, 2008, in the amount of $148.32; (2) a charge for a nurse visit on August 13, 2008, in the amount of $148.32; (3) a charge for a social work visit on August 13, 2008, in the amount of $144.31; and (4) a charge for a visit from a home health aide on August 13, 2008, in the amount of $88.16.

130.    Patient AR, a 73-year-old woman, was a dual eligible patient who had been receiving home health services from Schervier since September 30, 2004.

131.    OASIS forms submitted on behalf of Patient AR indicated she was a homebound patient eligible for Medicare services, including OASIS forms dated November 11, 2007; January 9, 2008; May 15, 2008; July 22, 2008; and September 12, 2008.

132.   Plans of Care (Form 485) submitted to Medicaid on behalf of Patient AR indicated that she required the following skilled nursing services: nursing, medical social work, and a Personal Care Aide to assist with activities of daily living. These Plans of Care included those dated January 13, 2008; March 13, 2008; May 12, 2008; July 11, 2008; and September 9, 2008; as well as a Plan of Care dated February 6, 2008, and covering a period from November 14, 2007 through January 12, 2008.

133.   Schervier failed to bill the skilled services it provided to Patient AR to Medicare, and instead submitted false claims for payment to New York State Medicaid.

134.   For a period from October 2007 through September 24, 2008, Defendants fraudulently billed Medicaid for numerous charges on behalf of Patient AR that should have been billed to Medicare including: (1) a charge for a skilled nursing visit on October 9, 2007 in the amount of $153.22; (2) a charge for a skilled nursing visit on February 25, 2008 in the amount of $148.32; and (3) a charge for a skilled nursing visit on March 10, 2008 in the amount of $148.32.

135.   Such patients, who were not properly split-billed, resulted in the Government's payment of millions of dollars in false claims to Defendants.

136.   Around late September 2009, Relator Raffington arranged for a representative from Schervier's Information Technology Department to alter the software to allow split-billing.  By the time the Defendants terminated Relator Raffington, the software had not been fully updated to allow for split-billing.  No repayment to Medicaid was made prior to Relator Raffington's wrongful termination.

137.   Upon information and belief, Defendants' fraudulent Medicaid billing practices cost and continue to cost the Government millions of dollars each year.

34

2.      **Defendants Fraudulently Billed Medicaid for Services to Patients Not Approved by the Local Departments of Social Services**

138.     Under applicable Medicaid regulations, for a long term healthcare provider to bill Medicaid for patient services, the local Department of Social Services ("DSS") must first approve each patient.  Once DSS approves a patient, it sets an individualized budget for that patient.  In order to bill above the amount budgeted for a patient, a provider must obtain further approval for that patient from their local DSS.  The local DSS offices for Bronx County and Westchester County are New York City Human Resources Administration ("HRA") and Westchester DSS ("WDSS"), respectively.

139.     In or about April 2009, HRA representatives met with Relator Raffington and Schervier staff to emphasize that HRA approvals were required for all patients with Medicaid.

140.     Immediately after the meeting, Relator Raffington initiated an in-depth review of Schervier Home Health Care's billing records for 2008.  By June 2009, Relator Raffington identified 80 to 90 patients in the Bronx for whom Schervier had submitted billing to Medicaid without any HRA approval. These patients constituted approximately one third of Schervier Home Health Care's Bronx patients.

141.     As a result of her wrongful termination by Defendants for complaining about Defendants' fraudulent practices, Relator Raffington did not have the opportunity to review the records of Westchester Medicaid patients who were not approved by WDSS.  Upon information and belief, Schervier Home Health Care similarly billed Medicaid without first obtaining DSS approval for numerous Westchester patients.

142.     Shortly after completing the review of Bronx patients in June 2009, Relator Raffington alerted her supervisor, BSNY Executive VP Harris, to the failure to

secure HRA approval.  He responded that the problem did not need to be addressed. When Relator Raffington insisted that Defendants comply with their legal obligation to secure HRA approval, Mr. Harris assigned Christopher Hickey to secure HRA approval for all patients that HRA had not approved.

143.    Shortly thereafter in July 2009, BSNY terminated Mr. Hickey for forging physician signatures.  Relator Raffington then assigned the duty of securing HRA approvals to other Schervier staff.  Upon information and belief, Schervier continues to bill Medicaid for services to patients not approved by a local DSS.  Schervier has similarly failed to obtain local DSS approval for unapproved patients whose treatment Schervier has already billed to Medicaid.

144.    Moreover, Defendants failed to refund the overages to the Government and instead knowingly and improperly retained the payments rendered for the services for which Defendants lacked local DSS approval and therefore was obligated to repay.

145.    Upon information and belief, Defendants' deceptive DSS approval practices cost and continue to cost the Government millions of dollars each year.

146.    Upon reviewing patient billing records in early August 2009, Relator Raffington discovered that even for patients with HRA or WDSS-approved budgets, Schervier billed Medicaid for costs that exceeded those budgets.  Under applicable Medicaid regulations, a physician's signature is required to bill Medicaid for costs exceeding local DSS budget limitations.  The vast majority of Schervier Home Health Care's excessive bills were not supported by physician approvals.

147.    In or about May 2009, Schervier billed Medicaid for medical services provided to Patient AR. According to regulations, the budget cap for these services was

$4,008. However, Scheriver billed Medicaid for $5,017.83 in services. Schervier did not have the required physician approval, in the form of a physician override form, when it submitted the bill to Medicaid. As a result of Defendants' fraudulent billings, Defendants wrongfully obtained Medicaid reimbursements for health care services provided to Patient AR from in or about May 2009 to December 2009.

148.  On or about February 11, 2009, Schervier billed Medicaid for medical services provided to Patient JT. According to regulations, the budget cap for these services was $4,008. However, Schervier billed Medicaid for $4,311.51 in services. Schervier did not have the required physician approval, in the form of a physician override form, when it submitted the bill to Medicaid. As a result of Defendants' fraudulent billings, Defendants wrongfully obtained Medicaid reimbursement for health care services provided to Patient JT from in or about late February 2009 to late August 2009.

149.  On or about November 19, 2008, Schervier billed Medicaid for medical services provided to Patient TH. According to regulations, the budget cap for these services was $5,733. However, Scheriver billed Medicaid for $6,084.74 in services. Schervier did not have the required physician approval, in the form of a physician override form, when it submitted the bill to Medicaid. As a result of Defendants' fraudulent billings, Defendants wrongfully obtained Medicaid reimbursement for health care services provided to Patient TH from in or about November 2008 to May 2009.

150.  On or about March 18, 2009, Schervier billed Medicaid for medical services provided to Patient JH. According to regulations, the budget cap for these services was $4,008. However, Schervier billed Medicaid for $4,195.24 in services.

37

Schervier did not have the required physician approval, in the form of a physician override form, when it submitted the bill to Medicaid. As a result of Defendants' fraudulent billings, Defendants wrongfully obtained Medicaid reimbursement for health care services provided to Patient JH from in or about March 2009 to September 2009.

151. On or about November 19, 2008, Schervier billed Medicaid for medical services provided to Patient SD. According to regulations, the budget cap for these services was $4,008. However, Schervier billed Medicaid for $5,413.97 in services. Schervier did not have the required physician approval, in the form of a physician override form, when it submitted the bill to Medicaid. As a result of Defendants' fraudulent billings, Defendants wrongfully obtained Medicaid reimbursement for health care services provided to Patient SD from in or about November 2008 to May 2009.

152. On or about November 1, 2008, Schervier billed Medicaid for medical services provided to Patient GW. According to regulations, the budget cap for these services was $4,008. However, Schervier billed Medicaid for $4,831.88. in services. Schervier did not have the required physician approval, in the form of a physician override form, when it submitted the bill to Medicaid. As a result of Defendants' fraudulent billings, Defendants wrongfully obtained Medicaid reimbursement for health care services provided to Patient GW from in or about November 2008 to May 2009.

153. On or about July 15, 2009, Schervier billed Medicaid for medical services provided to Patient MC. According to regulations, the budget cap for these services was $4,008. However, Schervier billed Medicaid for $4,501.23 in services. Schervier did not have the required physician approval, in the form of a physician override form, when it submitted the bill to Medicaid. As a result of Defendants' fraudulent billings, Defendants

38

wrongfully obtained Medicaid reimbursement for health care services provided to Patient MC from in or about July 2009 to January 2010.

154.   Upon discovering these excessive and unjustified bills to Medicaid, Relator Raffington instructed staff to obtain physicians' approvals for those patients, provided that the physicians deemed it medically necessary for the patients to obtain higher local DSS budgets.

155.   On August 20, 2009, Relator Raffington further notified BSNY CFO Kity Khundkar, Schervier Billing Supervisor Ebnul Hassan, and BSNY Executive VP Louis Harris of Schervier's failure to obtain the required physician approvals before billing Medicaid for costs exceeding the local DSS budgets.

156.   In September 2009, Tamara Daniel, a Schervier billing clerk, informed Relator Raffington and VP Knott that BSNY CFO Kity Khundkar had regularly instructed Schervier staff to bill excessively over HRA and WDSS-approved budgets over the previous 1.5 years because she "wanted revenue to come in." Ms. Daniel told Relator Raffington and Ms. Knott that Schervier often billed as much as $4,000 over budget for a single patient's monthly treatment.

157.   Relator Raffington reported the conversation with Ms. Daniel to Executive VP Harris. Neither Mr. Harris nor Ms. Knott took any action in response to Ms. Daniel's concerns.

158.   At the time of Relator Raffington's wrongful termination, Schervier had not finished securing physician approvals for the patient services it had excessively billed.

Upon information and belief, Defendants' deceptive DSS budgeting practices cost and continue to cost the Government substantial sums each year.

> **3.     Defendants Submitted False Claims to Medicaid For Medically Unnecessary Home Health Aide Services Provided to Patients Eligible Only For Less Expensive Personal Care Aide Services**

159.    Under applicable Medicaid regulations, New York State Medicaid reimburses Personal Care Aides ("PCAs") and Home Health Aides ("HHA") at an hourly rate. Medicaid reimburses HHA services at a higher hourly rate than PCA services because HHAs provide skilled or semi-skilled services while PCAs provide services that are not skilled, including for such things as personal hygiene, dressing, feeding, walking, meal preparation, light housekeeping and laundry.

160.    While preparing for the close of the fiscal year in or around August 2009, Relator Raffington discovered that someone at Schervier had improperly raised the level of care for a large number of Schervier Home Health Care patients who originally received care from PCAs to HHAs. Relator determined that no physician or nurse had ordered these changes, nor had the medical status of these patients changed so as to warrant the upgrade in care.

161.    With the help of Billing and Aide Coordinator Yvette Vidal, Relator Raffington identified at least 68 patients who had received unnecessary HHA services at the expense of the Medicaid program. Ms. Vidal provided Relator Raffington with a list of the 68 patients she identified who had received unnecessary HHA care.

162.    In or around 2009, Relator witnessed that Schervier submitted false claims and received payment for nonreimbursable HHA services on behalf of at least 68 patients.

163.     As a result of Defendants' fraudulent billings, Defendants wrongfully obtained Medicaid reimbursement for health care services provided in or around 2009 to 68 patients.

164.     After receiving the patient list from Ms. Vidal, Relator Raffington conducted a further investigation into Schervier's billing practices.  Relator Raffington discovered in conversations with several additional staff members, including Mr. Hickey, that in September 2008, BSNY CFO Kity Khundkar directed Bon Secours VP Barbara Knott to have HHAs replace PCAs for all Schervier patients with Medicaid receiving PCA care, regardless of those patients' medical needs.  Barbara Knott had then instructed Schervier Operations Manager Christopher Hickey to implement this order. Mr. Hickey stated that BSNY CFO Kity Khundkar implemented this change to obtain an "infusion of cash" to inflate BSNY's first quarterly earnings.  BSNY Executive VP Louis Harris and Schervier Quality Systems Manager Dorla Allyene also had knowledge of the PCA to HHA replacements.

165.     Relator Raffington observed an influx of "error reports" generated by Schervier's billing software around September 2009.  Error reports were automatically generated by the software when a patient's services were changed without any corresponding entry of supporting documentation into the system, such as the reason for the change and the required clinical assessment. After observing the abnormally high number of error reports, Relator Raffington spoke with Aide Coordinator Rosa Gaston about the cause. Ms. Gaston confirmed that Chris Hickey instructed the staff to change patients from PCA to HHA services, according to what Mr. Hickey described as a directive from Bon Secours VP Knott.

166.   The fraudulent changes were also confirmed to Relator Raffington by Quality Systems Manager Dorla Alleyne and by data-entry staff member Sheila Graham-Atkinson. According to Ms. Graham-Atkinson, in order to clear the error reports and thus enable billing, Mr. Hickey and his staff entered false medical records into the system.

167.   Upon discovering this blatantly fraudulent conduct, Relator Raffington reported it to her supervisor BSNY Executive VP Louis Harris.  Mr. Harris did nothing in response.

**4.   Defendants Fraudulently Enrolled and Recertified Patients for Medicaid's Long Term Home Health Care Program (LTHHCP)**

168.   To enroll a patient in Medicaid's Long Term Home Health Care Program (LTHHCP), federal and state guidelines require the relevant New York home health care provider to complete a "New York State Department of Health Long Term Care Placement Form – Medical Assessment Abstract," or DMS-1. ("DMS-1"). Based upon a medical assessment, as documented in the DMS-1, the patient receives a "predictor score." Only patients at the minimum threshold of "60" are eligible to enroll in the LTHHCP, and in addition, the patient predictor score determines the level of care a patient receives. Once a patient is admitted to the program, the form must be completed every six months to lawfully maintain the patient in the Medicaid LTHHCP.

169.   During the course of her employment, Relator Raffington repeatedly witnessed Defendants recertify patients for LTHHCP when the required DMS-1 forms were missing, incomplete or not filled out accurately or reliably.

170.   Upon reviewing individual patient files, Relator Raffington repeatedly saw DMS-1 forms that were photocopied and re-used for a given patient across multiple recertification periods, so that they were identical, except for the date changed, or were

42

identical with the dates missing. For example, if a patient had been enrolled in the LTHHCP for 1.5 years, Relator Raffington often would find three identical DMS-1 forms—one for each six-month period—that were clearly photocopied, with one or more of the forms undated.

171.    Defendants frequently failed to correctly record required medical documentation on the required DMS-1 forms. For example, even when the forms recorded a final "predictor score," Defendants often failed to include the medical information needed to substantiate the final predictor score.

172.    In addition, Relator Raffington observed a questionable pattern, whereby certain patients appeared to receive artificially-inflated predictor scores that put them at or above the minimum threshold for the Medicaid LTHHCP, or allowed Defendants to bill Medicaid for providing a higher level of services. For example, Relator Raffington often observed that a patient who was admitted to the LTHHCP after a spell of acute care under Medicare often had an initially high predictor score due to their acute level of illness, but would then often stay at this "acute level" for a lengthy period of time. However, before she could investigate further, Relator Raffington was terminated by Defendants.

### 5.    Defendants Misrepresented Patients' Medicare Eligibility in Order to Submit False Claims to Medicaid

173.    Since at least 2007, Defendants routinely misclassified the medical condition of dual-eligible patients in order to provide them with long-term nursing care under the more lucrative Medicaid program, rather than Medicare. Defendants perpetrated this scheme upon New York Medicaid because the payments by the state program for long-term home health care can exceed Medicare's flat fee reimbursements.

43

174.    For example, Patient GW, a 91 year old homebound patient, was admitted to Schervier's home health program in or about June 20, 2007 for care following inpatient treatment for a myocardial infarction, or heart attack. From June until August 3, 2007, she was classified as a homebound patient, which qualified her for home health coverage under Medicare.

175.    Although clinical records show that Patient GW remained homebound, Defendants billed Medicaid for services rendered after August 3, 2007, according to a "Change Slip" filed on that date.

176.    On August 18, 2007, Defendants classified Patient GW as no longer homebound, and therefore no longer eligible for Medicare long-term care services.

177.    Defendants' change of Patient GW's clinical status to "not homebound" is contradicted by the Patient GW's diagnoses and clinical conditions, which did not change after August 18, 2007.

178.    According to the Plan of Care covering the period of August 19, 2007 through October 17, 2007, Patient was receiving skilled nursing, medical social work services, and a personal care aide for eight hours per day, seven days per week.

179.    Upon information and belief, Defendants submitted bills to Medicaid for the Medicaid services recorded in Patient GW's medical file.

180.    Due to Defendants' misclassification of Patient GW as "not homebound," skilled nursing services were billed fraudulently to Medicaid rather than appropriately to Medicare, including a skilled nursing visit on August 9, 2007.

181.    Upon information and belief, Defendants' fraudulent Medicaid billing practices cost and continue to cost the Government millions of dollars each year.

**C.**     **Defendants' Fraudulent Conduct Specific to the Medicare Program**

**1.**     **Defendants Falsely Misrepresented Personal Care Aide Services as Home Health Aide Services in Order to Bill Medicare for Home Health Aide Services for which the Patients Were Not Eligible**

182.    Under applicable Medicaid and Medicare regulations, HHA services are covered by Medicaid, as well as by Medicare where the patient can demonstrate acute medical need.

183.    Relator Raffington reviewed and identified specific medical records showing that, although patients had received PCAs, Schervier had fraudulently billed for HHAs on invoices sent to Medicare.  Relator Raffington discovered that Bon Secours VP Barbara Knott had instructed Schervier Billing Supervisor Ebnul Hassan to alter billing records to misrepresent the services that patients had received  so that Medicare would pay for HHA services that were never delivered. Because PCA services are cheaper to provide, Defendants were able to earn more revenue than they would had they provided the HHA services for which they billed.

184.    In order to bill Medicare for acute care,  providers must enter information about the  frequency of visits per week and duration of weeks for each service ordered by the physicians for the patient into the providers' Medicare billing software, which then provides the amount that Medicare will pay for that patient's treatment.   Because Medicare reimburses in this manner, health care providers must act in good faith by actually providing the services for which Medicare pays.

185.    In December 2008, Relator Raffington discovered that Schervier Home Health Care had a policy of sending nurses only once per week to visit patients receiving

45

acute home care services solely under Medicare ("Medicare-only patients"), despite the fact that these patients required more than one visit per week under their Plan of Care.

186.    In or about December 2008, Relator Raffington attended a clinical meeting with Schervier's nursing supervisors, Dorla Alleyle and Andrea Llewellyn, regarding an acutely-ill patient. At the meeting, the nursing supervisors confirmed that the patient had not been visited over the past week, in violation of Medicare regulations. As a result of Defendants' fraudulent billings, Defendants wrongfully obtained Medicare reimbursement for health care services provided to this patient in or about December 2008.

187.    As a result of Schervier's fraudulent practices, most of the patients receiving acute home care services under Medicare did not receive enough care to meet their medical needs.

188.    Schervier scheduled inadequate nurses' visits for Medicare-only patients in order to increase its profits by taking advantage of Medicare's flat-rate reimbursements.  This fraudulent practice had the effect of defrauding the United States Government and neglecting the needs of Schervier's patients.

189.    Upon discovering this information, Relator Raffington repeatedly advised staff to prioritize the needs of Medicare-only patients when determining the number of weekly nurse visits.  She continuously stressed that the number of weekly nurse visits should be based on individual patient assessments.

190.    In February 2009, after many Medicare-only patients were still not receiving adequate nurse visits, Relator Raffington assigned Myrlhene Descollines,

Schervier Director of Patient Services, to review all Medicare-only patient treatment plans.

191.    Relator Raffington learned from Ms. Descollines that Christopher Hickey had been instructing staff since Relator Raffington began employment in December 2008 to ignore Relator Raffington's orders and to continue sending nurses to all Medicare-only patients no more frequently than once per week.

192.    Upon information and belief, Mr. Hickey instructed staff to ignore Relator Raffington's orders at the direction of the BSNY executive team and Bon Secours VP Barbara Knott.

193.    Relator Raffington repeatedly informed Executive VP Harris, CEO Higgins, and CFO Khundkar of this fraudulent Medicare billing but none of these executives did anything to rectify the fraudulent practice.   Instead, they ordered Ms. Raffington to ignore governing rules and regulations.

194.    Upon information and belief, Schervier Home Health Care continues to fraudulently bill Medicare for reimbursement for care it has not provided to its Medicare-only patients.

195.    Upon information and belief, Defendants' fraudulent and excessive billing of Medicare cost and continue to cost the Government millions of dollars each year, while Defendants fail to provide adequate medical services to vulnerable patients

### 2.    Defendants Falsely Upcoded Patients' Bundled Medicare Payments to Include Medically Unnecessary Services

196.    During the course of her employment, Relator Raffington witnessed Defendants' fraudulent scheme to maximize payments under Medicare's "bundled" payment system.

47

197.    Defendants frequently falsely assessed the presence of medical conditions and ailments in order to fraudulently boost Medicare's bundled payments. In addition, Defendants falsely assessed certain conditions as a patient's "primary" diagnosis or condition to further fraudulently boost Medicare's payments.

198.    Relator Raffington observed repeatedly that patients were fraudulently classified as suffering from the condition of "abnormality of gait." In addition, she often witnessed Defendants fraudulently list "abnormality of gait" as a patient's primary diagnosis to further maximize Medicare payments.

199.    During the relevant time period, Medicare covered physical therapy and rehabilitation services for patients with a diagnosis of "abnormality of gait" only if the condition could be improved by therapy. Nevertheless, Defendants routinely charged Medicare for treatment of abnormality of gait in patients who could not be helped by treatment. These patients included those who used a cane or walker, who had no hope of walking without the aide, and who did not suffer from any acute problem which affected their use of a walking aide.

200.    For example, on or about January 2, 2009, Schervier began providing nursing care for Patient IF, an 85 year-old dual eligible patient who was discharged from St. John's Riverside Hospital on January 2, 2009.

201.    The admission document for Patient IF, titled "Resident Profile – Face Sheet," dated January 2, 2009, listed her primary admission diagnosis as congestive heart failure (Code 428), with a secondary diagnosis of heart disease chronic ischemic (Code 414.9). Her other conditions were listed as atrial fibrillation; cellulitis of the finger and

nose; and cellulitis of the hand. Abnormality of gait was not listed as a medical condition suffered by Patient IF.

202.    In contrast to the Face Sheet, in subsequent medical records created soon after and within Medicare's 60-day episodic window, Defendants added the diagnosis "abnormality of gait" (Code 7812) and listed "abnormality of gait" as Patient IF's primary condition. A "Patient Intake Summary" created on February 12, 2009 listed IF's primary condition as abnormality of gait.

203.    In fact, medical records for Patient IF that post-date the care episode that began on or about January 2, 2009, show that she long had extremely limited mobility, used a walker or wheeled walker for mobility, and that her condition of "abnormality of gait" was constant.

204.    A "nursing progress" note for Patient IF, dated August 6, 2009, revealed that Patient IF relied upon a walker or wheeled walker for mobility.

205.    Moreover, ten months after the care episode that began on January 2, 2009, Defendants still listed as "abnormality of gait" as Patient IF's primary diagnosis. On or about October 6, 2009, Defendants completed a DMS-1 form that listed "abnormality of gait" as Patient IF's primary diagnosis.

206.    Upon information and belief, Defendants billed Medicare for services provided to Patient IF as part of an episode of acute care associated with her discharge from St. John's Riverside Hospital on January 2, 2009. Upon information and belief, these charges included a fraudulent billing to Medicare for treatment of the primary condition "abnormality of gait." Under Medicare guidelines in place during the relevant

period, Patient IF, an 85 year-old congestive heart failure patient who used a walker, was not eligible for treatment for the primary condition of abnormality of gait.

**D.  Defendants Wrongfully Terminated Relator Raffington in Retaliation for her Investigation into Defendants' Fraudulent Billing Practices as Defendants Prepared for an Audit by OMIG in Late 2009**

207.   Despite her many attempts to ensure that the Defendants complied with Medicaid and Medicare rules and regulations, Relator Raffington received no support from her superiors or peers.

208.   On August 17, 2009, Relator Raffington met with her supervisor, BSNY Executive VP Louis Harris, to discuss Schervier's numerous fraudulent billing practices. At that meeting, Mr. Harris defended the Defendants' blatantly fraudulent conduct, stating, "There's corporate compliance...and then there's corporate compliance."

209.   Soon after Relator Raffington's meeting with Mr. Harris, as discussed above, Schervier received a letter from OMIG requesting that Schervier produce a discrete set of patient files by December 31, 2009.  Relator Raffington met with Mr. Harris to discuss Schervier's plan for preparing the necessary records.  Mr. Harris and Relator Raffington agreed that she would be tasked with preparing for the OMIG audit, along with an outside auditor to be hired by Schervier.

210.   Immediately thereafter, Relator Raffington instructed Schervier's Records Clerk to begin gathering the requested patient files.    The Records Clerk assembled the patient files, following which Relator Raffington performed a preliminary review of each of them.

211.   During these initial reviews, Relator Raffington confirmed that many of the patient files were missing 485 forms; contained 485 forms with questionable

signatures; or contained 485 forms listing a clerical staff member as the "creator," without a clinical paper documentation showing that a medical staff had initiated the order. In addition, many of the files Relator Raffington reviewed were missing interim physicians' orders and/or missing the DSS/HRA form required to admit a patient into the long term care program.

212. In total, Relator Raffington detected 80 to 85 patient files with fraudulent physician signatures during her initial review in preparation for the OMIG audit.

213. Relator Raffington instructed her assistant to make copies of the fraudulent patient files and sent the copies to CFO Khundkar. She never received any response from Ms. Khundkar regarding the patient files.

214. In addition, after observing these substantial shortcomings, Relator Raffington informed Mr. Harris that Schervier lacked many of the forms requested by the OMIG auditors and would almost certainly fail OMIG's audit.

215. Shortly after Schervier received notice of OMIG's audit, in or about September 2009, Relator Raffington was contacted by a representative from the New York City Human Resources Administration ("HRA"), who previously had met with Schervier staff in April 2009. The HRA representative called Relator Raffington to schedule a meeting to secure HRA approval for Schervier's Medicaid patients. The meeting was to be held on October 8, 2009.

216. Later in September 2009, Relator Raffington informed Executive VP Harris of the upcoming meeting. Mr. Harris quickly passed the news of the meeting to BSNY CEO James Higgins and BSNY CFO Kity Khundkar.

51

217.     Threatened with exposure of their fraudulent practices, the Defendants obstructed Relator Raffington's attempts to meet with the HRA representative.   CEO Higgins required that Executive VP Harris be present at the meeting and demanded that Ms. Raffington inform him of the HRA meeting agenda.  Upon information and belief, Mr. Higgins intended to prevent Relator Raffington from securing HRA approval for all of Schervier's Medicaid patients.

218.     On September 29, 2009, Relator Raffington discovered that Schervier Billing Supervisor Ebnul Hassan had retaliated against billing staff member Tamara Daniel.  Ms. Daniel had earlier informed Relator Raffington of Schervier's failure to secure HRA approval for many Medicaid patients.  Shortly after Mr. Hassan discovered Ms. Daniel's involvement, he canceled her vacation and gave her a negative performance review.   Relator Raffington reported this incident to HR.   Mr. Hassan suffered no disciplinary action.   The Defendants subsequently terminated Ms. Daniel in February 2010.

219.     On October 2, 2009, Relator Raffington's supervisor, Executive VP Harris, demanded that Relator Raffington give him records she had started to gather in preparation for the OMIG audit. According to Mr. Harris, CEO Higgins and CFO Khundkar wanted Bon Secours VP Barbara Knott, solely and with no participation from Relator Raffington or an outside auditor, to lead Schervier's preparations for the OMIG audit. Mr. Higgins and Ms. Khundkar instructed Mr. Harris to transfer the patient records from Relator Raffington to Ms. Knott.  Since Relator Raffington knew that Ms. Knott had earlier forged physicians' signatures and was afraid that Ms. Knott would again falsely alter records before Ms. Raffington could meet with the state, she refused to turn the

documents over to Mr. Harris for Ms. Knott's review.   Despite Ms. Raffington's objections, Ms. Knott did in fact begin reviewing the records.

220.    A few days later and only days before the scheduled meeting with the HRA representative, Mr. Harris and HR VP Frances Sequeira summoned Relator Raffington to a meeting, where they told Ms. Raffington that she seemed "unhappy" and ordered her to take the next week off from work.   The meeting with the HRA representative was scheduled to occur during that week.   Mr. Harris sent Relator Raffington home to "rest" on Monday, October 5, 2009.

221.    On or around October 10, 2009, Relator Raffington received a termination letter.   Had she not been terminated, she would have returned to work on Monday, October 12, 2009.   Relator Raffington never had the opportunity to meet with the HRA representative as scheduled on October 8, 2009.   Upon information and belief, no one from the Defendants ever met with the HRA representative as scheduled.   The Defendants retaliated against Relator Raffington by wrongfully terminating her for attempting to uncover and rectify the Defendants' fraudulent billing practices.

## VII.  CLAIMS FOR RELIEF

### COUNT ONE

**FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. §3729(a)(1)(A)**

**CAUSING FALSE OR FRAUDULENT CLAIMS FOR PAYMENT TO BE PRESENTED TO THE UNITED STATES GOVERNMENT**

222.    Relator June Raffington realleges and reincorporates all the preceding paragraphs of the Complaint as if fully set forth herein.

223.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 et seq.

224.    From at least 2007 to the present, Defendants caused the submission of hundreds and likely many thousands of false claims to Medicaid and Medicare by: (1) fraudulently billing Medicaid without first properly maximizing billings to Medicare; (2) forging physician signatures on patient bills to Medicaid and Medicare; (3) fraudulently misrepresenting patients' medical needs to obtain excessive payments from Medicaid for an unnecessary level of care; (4) fraudulently misrepresenting the level of care actually provided to receive payments from Medicare; (5) fraudulently billing Medicare for long term services not covered by Medicare; (6) fraudulently billing Medicaid and Medicare based on fraudulent recertifications; (7) fraudulently billing Medicaid for patients not approved by the local DSS; (8) fraudulently billing Medicaid for amounts exceeding the HRA or WDSS-approved budgets; and (9) fraudulently and excessively billing Medicare while failing to provide adequate nurse visits required to meet the needs of their Medicare-only patients.

225.    As described above, Defendants have ordered their agents to submit false records and false statements to Medicaid and Medicare and to forge physicians' signatures on treatment forms.

226.    Through the acts described above, Defendants knowingly presented and caused to be presented to the United States, Westchester County, New York City, and, upon information and belief, all locations where Defendants did business, fraudulent claims, records, and statements in order to obtain reimbursement from Medicaid and Medicare.

227.    The United States approved, paid and continues to approve and pay claims that otherwise would not have been approved or paid, and has not recovered funds that would otherwise have been recovered.

228.    Through the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the United States Government, in order to obtain government reimbursement for health care services provided under Medicaid and Medicare.

229.    As a result of these false claims, the United States has been damaged and continues to be damaged in an amount believed to be in excess of $10,000,000.

## COUNT TWO

### FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729 (a)(1)(B):

### FALSE STATEMENTS USED TO OBTAIN PAYMENT OF FALSE CLAIMS

230.    Relator June Raffington realleges and reincorporates all the preceding paragraphs of the Complaint as if fully set forth herein.

231.    From at least 2007 to the present, Defendants knowingly caused to be made or used false records or statements in order to have false or fraudulent claims paid or approved by the Government.

232.    Defendants directed their staff to submit false records and false statements to Medicaid and Medicare and to forge physicians' signatures on treatment forms.

233.    These false statements were used by Defendants to fraudulently bill Medicaid and Medicare for ineligible medical services or patients.

234.     Through the acts described above, in the Southern District of New York, throughout the City of New York and Westchester County, and, upon information and belief, in all locations where Defendants did business, Defendants knowingly made, used, and caused to be made and used false records and statements in order to obtain reimbursements from the United States for services fraudulently billed to Medicare and Medicaid.

235.     As a result of these false claims, the United States has been damaged and continues to be damaged in an amount believed to be in excess of $10,000,000.

## COUNT THREE

### FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729 (a)(1)(G)

### VIOLATION OF THE REVERSE FALSE CLAIMS ACT PROVISION

236.     Relator June Raffington realleges and reincorporates all the preceding paragraphs of the Complaint as if fully set forth herein.

237.     As a result of the foregoing conduct, Defendants knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

238.     The claims relevant to this Count include retention of improper Government payments for Medicare and Medicaid services from at least October 2008 to present.

239.     The Defendants knowingly and improperly retained such improper payments knowing they had an obligation to remit such payments.

56

240.    Defendants had knowledge (as defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)) of their obligations to pay or transmit money or property to the Government for improper Government payments for Medicare and Medicaid services. Defendants had actual and constructive knowledge of the requirements underlying their obligations to pay or transmit money or property to the Government for improper Government payments for Medicare and Medicaid services.

241.    As a result of these false claims, the United States has been damaged and continues to be damaged in an amount believed to be in excess of $10,000,000.

**COUNT FOUR**

**FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. § 3729 (a)(1)(C)**

**FALSE CLAIMS ACT CONSPIRACY**

242.    Relator June Raffington realleges and reincorporates all the preceding paragraphs of the Complaint as if fully set forth herein.

243.    From at least October 2008 to the present, Defendants, together with others known and unknown, violated the False Claims Act by conspiring to knowingly and willfully cause the submission of false claims to obtain over-reimbursements from Medicaid and Medicare.

244.    It was a part of this conspiracy that Defendants and their co-conspirators knowingly and willfully submitted false claims to Medicaid and Medicare for ineligible medical services or patients.

245.    Defendants willfully conspired to submit false claims to Medicaid and Medicare in the Southern District of New York, throughout the City of New York and

57

Westchester County, and, upon information and belief, in all locations where Defendants did business.

246.    As a result of these false claims, the United States has been damaged and continues to be damaged in an amount believed to be in excess of $10,000,000.

**COUNT FIVE**

**FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. § 3730(h)**

**FALSE CLAIMS ACT RETALIATION**

247.    Relator June Raffington realleges and reincorporates all the preceding paragraphs of the Complaint as if fully set forth herein.

248.    While working for the Defendants, Relator Raffington spearheaded an initiative to rectify her employers' failure to comply with the state and federal rules governing Medicare and Medicaid funding.  Relator Raffington's superiors consistently reassigned compliance projects to employees known to participate in fraudulent activity. After Ms. Raffington made numerous attempts to bring her employers into compliance with the FCA, the Defendants wrongfully and abruptly terminated her.  The Defendants' blatant retaliation against Relator Raffington for her engagement in the protected activity of investigating fraud against the Government violated 31 U.S.C. § 3730(h).

249.    Relator Raffington is entitled to relief including reinstatement with the same seniority status she would have had but for the retaliation, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the retaliation, including litigation costs and reasonable attorneys' fees.

## COUNT SIX

## NEW YORK STATE FALSE CLAIMS ACT
## N.Y. STATE FIN. LAW § 189(1)(a):

## CAUSING FALSE OR FRAUDULENT CLAIMS FOR PAYMENT TO BE PRESENTED TO THE GOVERNMENT

250.     Relator June Raffington realleges and reincorporates all the preceding paragraphs of the Complaint as if fully set forth herein.

251.     This is a claim for treble damages and penalties under Article XIII of the New York State Finance Law.

252.     From at least October 2008 to the present, Defendants caused the submission of hundreds or likely thousands of false claims to Medicaid by: (1) fraudulently billing Medicaid without maximizing Medicare; (2) forging physician signatures on patient bills to Medicaid; (3) fraudulently misrepresenting patients' medical needs to obtain excessive payments from Medicaid for an unnecessary level of care; (4) billing Medicaid based on fraudulent recertifications; (5) fraudulently billing Medicaid for patients not approved by the local DSS; and (6) fraudulently billing Medicaid for amounts exceeding the HRA or WDSS-approved budgets.

253.     As described above, Defendants have required their staff to submit false records and false statements to Medicaid and to forge physicians' signatures on treatment forms.

254.     Through the acts described above, Defendants knowingly presented and caused to be presented to the New York State Government fraudulent claims, records, and statements in order to obtain reimbursement from Medicaid.

255.     The New York State Government, unaware of the falsity or fraudulence of the statements, records, or claims made or submitted by Defendants, their agents, and employees, approved, paid, and continues to approve and pay claims that otherwise would not have been approved or paid and has not recovered funds that would otherwise have been recovered.

256.     Through the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the New York State Government in Westchester County, New York City, and, upon information and belief, all locations where Defendants do business, in order to obtain government reimbursement for health care services provided under Medicare.

257.     As a result of these false claims, the New York State Government has been damaged and continues to be damaged in an amount believed to be in excess of $10,000,000.

## COUNT SEVEN

**NEW YORK STATE FALSE CLAIMS ACT
N.Y. STATE FIN. LAW § 189(1)(b):**

### FALSE STATEMENTS USED TO GET FALSE CLAIMS PAID

258.     Relator realleges and reincorporates all the preceding paragraphs of the Complaint as if fully set forth herein.

259.     From at least October 2008 to the present, Defendants knowingly caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the New York State Government in the Southern District of New York,

throughout the City of New York and Westchester County, and, upon information and belief, in all locations where Defendants do business.

260.    Defendants directed their staff to submit false records and false statements to Medicaid and Medicare and to forge physicians' signatures on treatment forms.

261.    These false statements were used by Defendants to fraudulently bill Medicaid and Medicare for ineligible medical services or patients.

262.    Through the acts described above, Defendants knowingly made, used, and caused to be made and used false records and statements in order to obtain reimbursement from the New York State Government for services fraudulently billed to Medicaid and Medicare.

263.    As a result of these false claims, the New York State Government has been damaged and continues to be damaged in an amount believed to be in excess of $10,000,000.

## COUNT EIGHT

### NEW YORK STATE FALSE CLAIMS ACT
### N.Y. STATE FIN. LAW § 189(1)(h):

### VIOLATION OF THE REVERSE FALSE CLAIMS ACT PROVISION

264.    Relator June Raffington realleges and reincorporates all the preceding paragraphs of the Complaint as if fully set forth herein.

265.    As a result of the foregoing conduct, Defendants knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to New York State, in violation of N.Y. State Fin. Law § 189(1)(h).

266.   The claims relevant to this Count include retention of improper Government payments for Medicare and Medicaid services from at least October 2008 to present.

267.   The Defendants knowingly and improperly retained such improper payments knowing they had an obligation to remit such payments.

268.   Defendants had knowledge (as defined by N.Y. State Fin. Law § 188(3)) of their obligations to pay or transmit money or property to the Government for improper Government payments for Medicare and Medicare services. Defendants had actual and constructive knowledge of the requirements underlying their obligations to pay or transmit money or property to the Government for improper Government payments for Medicare and Medicare services.

269.   As a result of these false claims, the New York State Government has been damaged and continues to be damaged in an amount believed to be in excess of $10,000,000.

## COUNT NINE

### NEW YORK STATE FALSE CLAIMS ACT
### N.Y. STATE FIN. LAW § 189(1)(c):

### FALSE CLAIMS ACT CONSPIRACY

270.   Relator realleges and reincorporates all the preceding paragraphs of the Complaint as if fully set forth herein.

271.   From at least October 2005 to the present, Defendants, together with others known and unknown, violated the False Claims Act by conspiring to knowingly and willfully cause the submission of false claims to obtain over-reimbursements from

Medicaid and Medicare in the Southern District of New York, throughout the City of New York and Westchester County, and, upon information and belief, in all locations where Defendants do business.

272.    It was a part of this conspiracy that Defendants and their co-conspirators knowingly and willfully submitted false claims to Medicaid and Medicare for ineligible medical services or patients.

273.    As a result of these false claims, the New York State Government has been damaged and continues to be damaged in an amount believed to be in excess of $10,000,000.

## COUNT TEN

### NEW YORK STATE FALSE CLAIMS ACT
### N.Y. STATE FIN. LAW § 191:

### FALSE CLAIMS ACT RETALIATION

274.    Relator June Raffington realleges and reincorporates all the preceding paragraphs of the Complaint as if fully set forth herein.

275.    While working for the Defendants, Relator Raffington spearheaded an initiative to rectify her employers' failure to comply with the state and federal rules governing Medicare and Medicaid funding.  Relator Raffington's superiors consistently reassigned compliance projects to employees known to participate in fraudulently activity.  After Ms. Raffington made numerous attempts to bring her employers into compliance with the FCA, the Defendants abruptly terminated her employment.  The Defendants' blatant retaliation against Relator Raffington for her engagement in the

protected activity of investigating fraud against the government violated New York State Finance Law § 191.

276.    Relator Raffington is entitled to relief including reinstatement with the same seniority status she would have had but for the discrimination, two times the amount of back pay, interest on the back pay, an injunction to restrain continued discrimination, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against the Defendants as follows:

277.    that Defendants cease and desist from violating 31 U.S.C. § 3729 et seq. and N.Y. State Fin. Law § 189;

278.    that this Court assess liability against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

279.    that Plaintiff be awarded the maximum amount allowed pursuant to § 3730(d) of the Federal False Claims Act and § 189 of the New York State False Claims Act;

280.    that Plaintiff be awarded two times the amount of back pay, plus interest, pursuant to § 3730(h) of the Federal False Claims Act and § 191(1)(d) of the New York State False Claims Act;

281.    that Plaintiff be reinstated with the same seniority status, fringe benefits, and seniority rights she would have had but for Defendants' retaliation and discrimination against her pursuant to § 3730(h) of the Federal False Claims Act and §§ 191(1)(b) and 191(1)(c) of the New York State False Claims Act;

282.    that Plaintiff receive any special damages sustained as a result of Defendants' discrimination and retaliation against her pursuant to § 3730(h) of the Federal False Claims Act and § 191(e) of the New York State False Claims Act;

283.    that Plaintiff be awarded all costs of this action, including attorneys' fees and expenses pursuant to § 3730(h) of the Federal False Claims Act and §§ 189(3) and 191(1)(e) of the New York State False Claims Act;

284.    that the Court issue an injunction restraining Defendants from continuing discrimination pursuant to § 191(1)(a) of the New York State False Claims Act;

285.    that the United States, New York State, and Plaintiff recover such other and further relief as the Court deems just and proper.


## IX.  DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury.

65

Dated:  December 7, 2015

Respectfully submitted:

*s/ Ross Brooks*
_____

Ross B. Brooks, N.Y. Bar No. 922122
Jennifer Siegel, N.Y. Bar No. 856032
Inayat Hemani, N.Y. Bar No. IH2012
**SANFORD HEISLER KIMPEL, LLP**
1350 Avenue of the Americas, 31st Fl.
New York, New York 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
Email: jheisler@sanfordheisler.com
Email: rbrooks@sanfordheisler.com
Email: jsiegel@sanfordheisler.com


David W. Sanford, D.C. Bar No. 457933
H. Vincent McKnight, D.C. Bar No. 293811
**SANFORD HEISLER KIMPEL, LLP**
1666 Connecticut Avenue, NW, Suite 300
Washington, D.C. 20009
Telephone: (202) 499-5201
Facsimile: (202) 449-5199
Email: dsanford@sanfordheisler.com

*Attorneys for the Plaintiff-Relator June Raffington*

66