UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
UNITED STATES OF AMERICA ex rel. JUNE : 
RAFFINGTON,
                                                                  :
                         Plaintiffs,
                                                                  :      OPINION AND ORDER
          -v.-
                                                                  :      10 Civ. 9650 (RMB) (GWG)

BON SECOURS HEALTH SYSTEM, INC. et al.,  :

                         Defendants.                        :
-----------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Relator June Raffington ("Raffington") has brought this <u>qui tam</u> action under the False

Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, against defendants Bon Secours Health System,

Inc., Bon Secours New York Health System, (together, "Bon Secours"), and Schervier Long

Term Home Health Care Program ("Schervier") alleging that they submitted false claims to

Medicare and the New York Medicaid program.  <u>See</u> Sixth Amended Complaint, filed Feb. 1,

2018 (Docket # 296) ("SAC"), ¶¶ 1-2.  Defendants now move for summary judgment to dismiss

certain of plaintiff's claims on the grounds that plaintiffs cannot prove that any allegedly false

claims were material to New York's or the federal government's payment decisions.[1]  For the

---

[1]  <u>See</u> Notice of Motion, filed Oct. 9, 2018 (Docket # 384) ("Not. Mot."); Memorandum
of Law in Support of the Motion for Summary Judgment on Behalf of Defendants Bon Secours
Health System, Inc., et al., filed Oct. 9, 2018 (Docket # 385) ("Def. Mem."); Statement of
Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment, filed Oct.
9, 2018 (Docket # 386) ("Def. 56.1"); Affirmation of Rena Andoh in Support of Defendants'
Motion for Summary Judgment, filed Oct. 10, 2018 (Docket # 389) ("Andoh Aff."); Statement
of Interest of the United States of America in Response to Defendants' Motion for Summary
Judgment, filed Oct. 30, 2018 (Docket # 403) ("U.S. Statement of Interest"); Relator's
Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, filed Oct.
30, 2018 (Docket # 404) ("Rel. Opp."); Relator's Statement of Additional Material Facts to be
Tried by a Factfinder, filed Oct. 31, 2018 (Docket # 405) ("Rel. 56.1"); Declaration of Jessica
Schmor in Opposition to Defendants' Motion for Summary Judgment, filed Oct. 31, 2018
(Docket # 406); Response to Defendants' Statement of Undisputed Material Facts, filed Oct. 31,

reasons that follow, the defendants' motion is granted in part and denied in part.

I. BACKGROUND

Raffington filed her original qui tam complaint under seal on December 29, 2010.
See Complaint, dated Dec. 29, 2010 (Docket # 22). The United States and New York State investigated the allegations in the complaint and stated at a March 2015 conference that they were not inclined to "go forward on those claims" and that they were "taking a no-decision position" on intervening in the case. See Decision & Order, filed May 24, 2016 (Docket # 99) ("MTD Decision"), at 1 n.1 (citing Transcript, Mar. 16, 2015 (Docket # 92), at 4-5). On April 21, 2015, the Court unsealed the case. See Administrative Order, dated Apr. 21, 2015 (Docket # 21).

Raffington filed a number of amended complaints after the unsealing.[2] See Second Amended Complaint, dated May 5, 2015 (Docket # 27); Third Amended Complaint, dated Aug. 6, 2015 (Docket # 45); Fourth Amended Complaint, dated Oct. 22, 2015 (Docket # 65); Fifth

---

2018 (Docket # 407) ("Rel. Resp. 56.1"); Affirmation of Ross Brooks in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, filed Oct. 31, 2018 (Docket # 409) ("Brooks Aff."); Defendants' Reply to Relator's Opposition to Defendants' Motion for Summary Judgment, filed Nov. 14, 2018 (Docket # 413) ("Def. Reply"); Reply to Plaintiff's Response to Defendants' Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment, filed Nov. 14, 2018 (Docket # 414) ("Def. Resp. to Rel. Resp. 56.1"); Response to Relator's Statement of Additional Material Facts to be Tried by a Factfinder, filed Nov. 14, 2018 (Docket # 415) ("Def. Resp. to Rel. 56.1"); Affirmation of Rena Andoh in Support of Defendant's Motion for Summary Judgment, filed Nov. 15, 2018 (Docket # 417) ("Andoh Reply Aff."); Supplemental Affirmation of Ross Brooks in Support of Relator's Opposition to Defendants' Motion for Summary Judgment, filed Nov. 29, 2018 (Docket # 427) ("Brooks Supp. Aff."); Notice of Supplemental Authority, filed June 28, 2019 (Docket # 449) ("Supp. Auth. 1"); Notice of Supplemental Authority, filed July 2, 2019 (Docket # 450) ("Supp. Auth. 2"); Letter from Ross Brooks, filed July 11, 2019 (Docket # 451).

    [2] While a First Amended Complaint was filed while the case was under seal, it does not appear to have been filed on the docket.

2

Amended Complaint, dated Dec. 7, 2015 (Docket # 76) ("FAC"). On December 23, 2015, the defendants filed a motion to dismiss the FAC, <u>see</u> Notice of Motion, filed Dec. 23, 2015 (Docket # 81), and on May 24, 2016, the Court granted in part and denied in part the motion. <u>See</u> MTD Decision. The MTD Decision dismissed certain claims for failure to plead with sufficient particularity as required by Fed. R. Civ. P. 9(b). <u>See</u> MTD Decision at 20-29. The remaining claims — "Allegations 1, 2, 3, 4, and 5" and Raffington's retaliation claim — were allowed to proceed. <u>Id.</u> at 9, 29, 31. These allegations are that defendants committed their fraud by (1) "submitting Medicare and Medicaid claims supported by forged . . . physician signatures on clinical documentation," FAC ¶ 2; MTD Decision at 9-11; (2) "submitting Medicare and Medicaid claims . . . unsupported by any required clinical documentation" of medical approvals, FAC ¶¶ 2, 89-93; MTD Decision at 11-13; (3) "providing [the New York Office of the Medicaid Inspector General] with forged . . . forms during an audit," FAC ¶ 59; MTD Decision at 13-15; (4) "[f]raudulently billing Medicaid without maximizing dual-eligible patients' Medicare coverage," FAC ¶ 2; MTD Decision at 15-17; and (5) "fraudulently billing Medicaid for amounts exceeding" the "local DSS [Department of Social Services] budget limitations" and "improperly retain[ing]" payments from Medicaid," FAC ¶¶ 146, 224, 239; MTD Decision at 17-19.[3]

---

[3] The dismissed claims alleged that defendants committed fraud by (6) "fraudulently misrepresenting patients' medical needs to obtain excessive payments from Medicaid" or "medically unnecessary home health aide services provided to patients eligible only for less expensive personal care aide services," FAC ¶¶ 2, 224, 252; MTD Decision at 20-21; (7) "fraudulently enrolling and recertifying patients for Medicaid's Long Term Home Health Care Program," FAC ¶ 2; MTD Decision at 22-23; (8) "misrepresenting patients' Medicare eligibility in order to submit false claims to Medicaid," FAC ¶ 2; MTD Decision at 23-26; (9) "misrepresent[ing] the services that patients had received so that Medicare would pay for [home health aide] services that were never delivered," FAC ¶ 183; MTD Decision at 26-27; and (10) falsely "upcoding" patients as "suffering from the condition of 'abnormality of gait'" for

On January 25, 2018, this Court granted Raffington's motion to file the SAC.

See Opinion and Order, filed Jan. 25, 2018 (Docket # 295). While defendants initially moved to dismiss that complaint on the ground that it failed to allege materiality, the defendants acceded to the Court's request that their materiality arguments be raised in the context of a summary judgment motion rather than a motion to dismiss, given that discovery was complete and that materiality was the sole issue raised in the motion to dismiss. See Order, filed Sept. 13, 2018 (Docket # 375); Order, filed Sept. 18, 2018 (Docket # 378). The instant motion for summary judgment followed.

II.  GOVERNING LAW

A.  Standard for Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure states that summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Beard v. Banks, 548 U.S. 521, 529 (2006) (citing Celotex Corp. v. Catrett, 447 U.S. 317, 323 (1986)); Celotex, 477 U.S. at 322 (quoting Fed. R. Civ. P. 56(c)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) (citations omitted); see also Fed. R. Civ. P. 56(c)(4) (parties shall "set out facts that would be admissible in evidence").

In determining whether a genuine issue of material fact exists, "[t]he evidence of the

_____

Medicare payments, FAC ¶¶ 2, 198; MTD Decision at 28-19.

non-movant is to be believed" and the court must draw "all justifiable inferences" in favor of the nonmoving party. Anderson, 477 U.S. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)). Once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor," Anderson, 477 U.S. at 256, and "[a] party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory," Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008). "Where it is clear that no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment should be granted." FDIC v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).

B.  The False Claims Act

 Raffington brings claims against the defendants under the federal FCA, 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), and its New York State equivalent, N.Y. Fin. Law §§ 189(1)(a), (1)(b) ("NY FCA").[6] See SAC ¶¶ 217-230, 234-47. The FCA "imposes significant penalties on those who defraud the Government." Universal Health Servs., Inc. v. United States ex rel.

_____

[6] Raffington also brings retaliation claims under 31 U.S.C. § 3730(h) and N.Y. Fin. Law § 191, see SAC ¶¶ 231-33, 248-50, which are not at issue in this motion for summary judgment.

Escobar ("Escobar"), 136 S. Ct. 1989, 1995 (2016).  Section 3729(a)(1)(A) provides a private

cause of action against "any person who . . . knowingly presents, or causes to be presented, a

false or fraudulent claim for payment or approval" to an officer or employee of the United

States.  Section 3729(a)(1)(B) provides a private cause of action against "any person who . . .

knowingly makes, uses, or causes to be made or used, a false record or statement material to a

false or fraudulent claim."  "Courts generally treat these two provisions together, as their

elements overlap significantly."  United States v. Strock, 2018 WL 647471, at *6 (W.D.N.Y.

Jan. 31, 2018) (quoting United States ex rel. Hussain v. CDM Smith, Inc., 2017 WL 4326523, at

*8 (S.D.N.Y. Sept. 27, 2017)).  Thus, "[f]raud under the FCA has two components: the

defendant must submit or cause the submission of a claim for payment to the government, and

the claim for payment must itself be false or fraudulent."  United States ex rel. Tessler v. City of

New York, 712 F. App'x 27, 29 (2d Cir. 2017) (summary order) (citations omitted).

   A claim can be "factually" false or "legally" false.  See Mikes v. Straus, 274 F.3d 687,

696 (2d Cir. 2001).  A factually false claim is one in which a party presents the Government with

"an incorrect description of goods or services provided or a request for reimbursement for goods

or services never provided," id. at 697, such as "when a contractor delivers a box of sawdust to

the military but bills for a shipment of guns," Bishop v. Wells Fargo & Co., 823 F.3d 35, 43 (2d

Cir. 2016), judgment vacated on other grounds, 137 S. Ct. 1067 (2017).  A legally false claim

includes "a false representation of compliance with a federal statute or regulation or a prescribed

contractual term."  Mikes, 274 F.3d at 696; see also Strock, 2018 WL 647471, at *7 ("A claim

for payment is legally false where 'a party certifies compliance with a statute or regulation as a

condition to governmental payment, but is not actually compliant.'") (quoting Bishop, 823 F.3d

at 43); United States ex rel. Kester v. Novartis Pharm. Corp., 43 F. Supp. 3d 332, 360-61

(S.D.N.Y. 2014) ("[A] 'legally false' claim is 'false' because it has been tainted by some underlying statutory, regulatory, or contractual violation made in connection with that claim, which renders the claim ineligible for reimbursement.").  In this case, the SAC alleges the submission of legally false claims only.

Within the category of legally false claims are two types of claims: "(1) a claim for payment that is legally false based on an implied false certification and (2) a claim for payment that is legally false based on an express false certification."  Strock, 2018 WL 647471, at *7.  Here, Raffington does not allege any express false certifications, but rather alleges "implied" false certifications.  As the Supreme Court has explained, an "implied" false certification arises from the fact that

> when a defendant submits a claim, it impliedly certifies compliance with all conditions of payment.  But if that claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement, so the theory goes, the defendant has made a misrepresentation that renders the claim "false or fraudulent" under § 3729(a)(1)(A).

Escobar, 136 S. Ct. at 1995.

As explained in Escobar, to be actionable under the FCA, an alleged "misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]."  Id. at 2002; accord Bishop v. Wells Fargo & Co. ("Bishop II"), 870 F.3d 104, 107 (2d Cir. 2017).  Escobar characterized the materiality standard as "familiar and rigorous."  136 S. Ct. at 2004 n.6.  Materiality "looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation."  Id. at 2002 (alteration, internal quotation marks, and citation omitted).  A misrepresentation is material "(1) if a reasonable man would attach importance to it in determining his choice of action in the transaction; or (2) if the defendant knew or had reason to

know that the recipient of the representation attaches importance to the specific matter in determining his choice of action, even though a reasonable person would not." Id. at 2002-03 (internal punctuation altered and citations omitted).

Escobar emphasizes that the materiality standard is "demanding." Id. at 2003. The FCA, Escobar noted, is not "a vehicle for punishing garden-variety breaches of contract or regulatory violations." Id. Accordingly, "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." Id. "Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." Id. Courts should instead use a "holistic approach" to determine whether a misrepresentation is material. United States ex rel. Escobar v. Univ. Health Servs., Inc. ("Escobar II"), 842 F.3d 103, 109 (1st Cir. 2016); accord United States v. Brookdale Senior Living Cmtys., Inc., 892 F.3d 822, 831 (6th Cir. 2018); United States ex rel. Lacey v. Visiting Nurse Serv. of New York, 2017 WL 5515860, at *6 (S.D.N.Y. Sept. 26, 2017).

As Escobar stated,

> proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

Escobar, 136 S. Ct. at 2003-04.

C. NY FCA

"The NY [False Claims Act] follows the federal False Claims Act . . . and therefore it is appropriate to look toward federal law when interpreting the New York act." State ex rel. Seiden

v. Utica First Ins. Co., 96 A.D.3d 67, 71 (1st Dep't 2012) (citing State ex rel. Jamaica Hosp.
Med. Ctr., Inc. v. UnitedHealth Grp., Inc., 84 A.D.3d 442, 443 (1st Dep't 2011)); accord Lacey,
2017 WL 5515860, at *5 n.3 ("when interpreting the NYFCA, New York courts rely on federal
FCA precedent") (citation, alteration, and internal quotation marks omitted); United States ex
rel. Bilotta v. Novartis Pharm. Corp., 50 F. Supp. 3d 497, 509 (S.D.N.Y. 2014) ("'New York
courts rely on federal FCA precedents when interpreting the NYFCA.'") (quoting United States
v. N.Y. Soc'y for Relief of Ruptured & Crippled, 2014 WL 3905742, at *11 (S.D.N.Y. Aug. 7,
2014)).  Here, the parties do not contend that application in this case of the NY FCA differs from
application of the federal FCA.  See Rel. Mem. at 4-7; Def. Mem. at 5-8.  Accordingly, our
conclusions as to the federal FCA claims apply equally to Raffington's NY FCA claims.

III.  DISCUSSION

     Defendants move for summary judgment on three issues relating to materiality.  First,
defendants contend that no reasonable jury could find that submitting claims in excess of patient-
specific budgets, or for services provided to patients who were not yet approved for enrollment
in Schervier's Long Term Home Health Care Program ("LTHHCP"), could be material to the
New York State Department of Health's ("NYS DOH") decision to pay those claims.  Def.
Mem. at 8-15.  Second, defendants argue that no reasonable jury could find that the Medicare
maximization practices alleged by Raffington were material to the NYS DOH's decision to pay
claims.  Id. at 15-22.  Third, defendants argue that no reasonable jury could find that a forged or
missing signature on a "Form 485" could be material to the NYS DOH's decision to pay claims
associated with those forms.  Id. at 22-24.[7]

     [7] In a separate section of their brief, and in support of all their arguments, defendants
contend that the NYS DOH's decision to continue paying their submitted claims since the filing

We address these argument next.

A. Materiality of Billing in Excess of Patient-Specific Budgets or for Services Provided to Patients Not Yet Enrolled in the LTHHCP

Defendants argue that submitting claims in excess of patient-specific budgets, or for services provided to patients not yet enrolled in the Schervier's LTHHCP, was not material to the NYS DOH's payment decisions. Id. at 8. We do not further address the issue of patients not yet enrolled, however, because Raffington's brief simply does not address the defendants' specific argument on this issue and thus we deem the defendants' argument on this point to be unopposed. We therefore consider only the treatment of claims submitted in excess of patient-specific budgets.

1. The LTHHCP

New York Medicaid is a medical assistance program for individuals with financial need, and is jointly financed by the federal and state government. See Medicaid in New York State (annexed as Ex. J to Brooks Aff.) ("Medicaid in New York State"); see also 42 U.S.C. § 1396 et seq. Federal law sets broad requirements regarding the operation of state Medicaid programs, while leaving certain policy decisions to the states. See Def. 56.1 ¶ 14 (citing Waivers, Medicaid and CHIP Payment and Access Commission, https://www.macpac.gov/subtopic/waivers/ ("Waiver Infosheet")). Medicaid Waiver programs allow states to "waive out" of certain federal Medicaid requirements and to use Medicaid funds to provide benefits that would not ordinarily be available, giving states more flexibility in designing programs. See id. LTHHCP was a New York State Medicaid Waiver program that allowed New York State to use Medicaid funds to pay for home- and community-based services

of the complaint in this case weighs in their favor. Id. at 24-26.

provided to individuals who would otherwise require institutionaliation. <u>See</u> Long Term Home Health Care Program Medicaid Waiver Program Manual, revised May 18, 2012 (annexed as Ex. 18 to Andoh Aff.) ("LTHHCP Manual"), at I-1. In particular, LTHHCP was a "1915(c) program," <u>see</u> 42 U.S.C. § 1396n(c), intended to allow states to provide home- and community-based service ("HCBS") to limited numbers of enrollees as an alternative to institutional care. <u>See</u> Waiver Infosheet. To be eligible to participate in a 1915(c) program, a potential enrollee must meet "level-of-care requirements," such that the individual would require institutionalization but for HCBS services, including case management, home health aid and personal care services, and habilitation services. <u>Id.</u> Under federal law, 1915(c) programs must be "cost neutral," "meaning that states must provide assurances that the average per capita expenditures for covered HCBS services will not exceed 100 percent of the average per capita expenditures that would have been made for the level of care provided in an institution." <u>Id.</u>

New York State regulations authorizing the LTHHCP program implement these federal requirements. <u>See</u> 18 NYCRR § 505.21. In order to be eligible for an LTHHCP, an "invalid, infirm[,] or disabled person[]" must be "medically eligible for placement for an extended period of time in a hospital or residential health care facility (RHCF) if the LTHHCP were unavailable." <u>Id.</u> § 505.21(a)(1). To comply with the cost neutrality requirement, New York regulations require that participants be able to be safely served by a "plan of care," the costs of which must be less than or equal to — depending on the individual's designated "level of care" — the average cost of providing an individual at that level of care with services in a RHCF in the county in which the individual resides. <u>See id.</u> § b(4)(i)-(iii). The NYS DOH is charged with calculating the county-specific monthly "budget cap" for each level of care, taking into account the average cost of nursing facility care in each county. <u>See</u> LTHHCP Manual at I-3. For most

individuals, the monthly budget cap was set at 75% of the cost of care at an RHCF.  See id. at I-3-4; see also NYCRR § 505.21(b).  For "Individuals with Special Needs," the budget cap was set at 100% of the cost of care at an RHCF, and for residents of Adult Care Facilities, the budget cap was set at 50%.  See LTHHCP Manual at I-4.

To be eligible for the LTHHCP program, an individual is required to "be able to be served safely and effectively" within the respective budget cap.  Id. at I-3-4.  To make this decision, after a potential LTHHCP participant's needs have been determined by a physician, the potential participant's budget is first calculated.  See id. at II-9.  During this process, the LTHHCP agency seeking to serve the individual partners with the local Department of Social Services ("LDSS") — that is, the local agency charged by the NYS DOH with administering social services within a particular county, including Medicaid and Medicaid waiver programs.  See id. at I-2, II-9.  After an assessment of the potential participant's medical and social needs, the LDSS and LTHHCP work together to determine the type and frequency of services required to maintain the individual in his or her home in accordance with the individual's physician's order.  Id. at II-9.  The LTHHCP agency and the LDSS then determine the monthly cost of those services.  Id.  If the cost of care fits within the relevant budget cap, the LDSS authorizes the individual's participation in the waiver program, enrolls the individual in the LTHHCP program, notifies the individual, and notifies the LTHHCP agency to begin providing care.  Id.  If the budget determination indicates that an individual's cost of care exceeds the individual's corresponding budget cap, LDSS staff may not authorize further LTHHCP participation, and LDSS staff is responsible for referring the individual to other appropriate resources.  Id.  In addition, if the individual is not approved for LTHHCP participation, LDSS staff is required to issue a "Notice of Decision" regarding the denial of waiver participation, and to inform the

applicant of his or her right to request a "fair hearing" to challenge the decision.  Id. at II-10.

Schervier LTHHCP ("Schervier") was a Medicare-certified home health agency and a licensed New York Medicaid LTHHCP.  See SAC ¶ 10.  Raffington has not alleged that Schervier submitted fraudulent claims for services not actually rendered.  So, for the purposes of this section, we are referring only to over-budget claims for services actually rendered.

The LTHHCP Manual, issued by the NYS DOH Office of Health Insurance Programs Division of Long Term Care, anticipates that there will be certain over-budget fluctuations in the monthly cost of LTHHCP enrollees' care.  LTHHCPs were not required to obtain prior LDSS authorization before exceeding a patient's budget by less than 10%.  LTHHCP Manual at IV-5. Thus, exceeding the monthly budget by less than 10% is plainly not material to the NYS DOH's decision to pay claims that bring an individual's budget over the cap by less than 10%.

The Manual requires LTHHCP providers to obtain LDSS prior approval for costs that will exceed a patient's budget by 10%.  See id.  Where prior approval is obtained, the fact that claims are over-budget also cannot be material to the NYS DOH's decision to pay them.  The Manual explicitly permits a patient's monthly budget to be exceeded where the additional costs can be covered by LDSS-authorized "paper credits" that the patient has accrued in prior months when his or her costs were below budget.  See id. at IV-7.  These protocols are consistent with "[t]he underlying philosophy" of the LTHHCP, as articulated in the Manual, which holds that "proper delivery of home and community based services can be substituted, with equal appropriateness and lower costs, for placement in a skilled nursing facility."  Id.

The Manual articulates that a goal of the LTHHCP is to keep individuals enrolled, and out of institutional care settings, whenever possible, noting that "[o]ne of the primary goals of the LTHHCP waiver is to prevent the premature institutionalization of individuals and allow

13

individuals who are at risk for institutionalization to remain in the community." Id. at IV-1.  To

that end, the Manual suggests the use of various "budgeting strategies" to keep an individual

enrolled in LTHHCP when his or her monthly costs exceed the monthly budget.  See id.  These

include the use of "paper credits" and "annualization" of the budget to accommodate monthly

fluctuations, as well the use of more creative measures, such as combining waiver services with

"informal supports." Id. at IV-1-2.  For example, the Manual suggests using "the waiver service

of 'moving assistance' to relocate a participant closer to a family member," who can then

"provide informal support on a more frequent basis lowering the participant's budget for paid

assistance." Id. at IV-2.

　　　In light of these provisions, we do not accept Raffington's broad assertion without caveat

that the NYS DOH "will not pay for services provided where the payments exceed the budget

amount." Rel. Opp. at 10.  The Manual makes clear that exceeding budget caps in certain

instances, described above, was not only not material to the NYS DOH's decision to pay claims,

but was actually permissible and expected.

　　　Accordingly, the question before us is whether Raffington has marshaled evidence

sufficient to allow a reasonable jury to find that the submission of claims resulting in a

participant's budget being exceeded by over 10%, where the LTHHCP has not obtained prior

permission for exceeding the budget, and where it is not otherwise permitted by the program

rules, is material to the NYS DOH's payment decisions regarding those claims.

　　　2.　Analysis

　　　Raffington first argues that New York State regulations require compliance with LDSS

budget caps.  Rel. Opp. at 7.  Raffington points specifically to 18 NYCRR §§ 505.21(b)(4) and

540.1.  Section 505.21(b)(4) provides, in the relevant part highlighted by Raffington, Rel. Opp.

at 7: "At the time of the initial assessment, and at the time of each subsequent assessment performed for a LTHHCP, or more often if the person's needs require it, the social services district must establish a monthly budget in accordance with which payment will be authorized," 18 NYCRR § 505.21(b)(4). Section 540.1 provides that "Vendor payments for medical care and other items of medical assistance shall not be made unless such care or other items of assistance have been furnished on the basis of the appropriate authorization prescribed by the rules of the board and regulations of the department." 18 NYCRR § 540.1.

Neither of these provisions, however, states that the Government will recoup or deny any claims that exceed the monthly budget for a patient. Section 540.1 does contain an express condition of payment, see Mikes, 274 F.3d at 700 (defining an "express condition of payment" as consisting of language such as "'no payment may be made'"), that might suggest materiality. Specifically, Section 540.1 provides that "payments . . . shall not be made unless such care or other items of assistance have been furnished on the basis of the appropriate authorization prescribed by the rules of the board and regulations of the department." 18 NYCRR § 540.1 (emphasis added). But this language does not necessarily show materiality. As Escobar notes, "not every undisclosed violation of an express condition of payment automatically triggers liability." Escobar, 136 S. Ct. at 2001. Rather, "[w]hether a provision is labeled a condition of payment is relevant to but not dispositive of the materiality inquiry." Id. In addition, Escobar criticized the notion that the Government's designation of "every legal requirement [as] an express condition of payment" would show materiality. Id. at 2002. The Escobar Court found that this approach would result in "further arbitrariness," as "billing parties are often subject to thousands of complex statutory and regulatory provisions." Id. Section 540.1 takes this approach by not specifying which "rules" or "regulations" might result in payment being

withheld.  Accordingly, the text of § 540.1 provides only very limited evidence of the materiality to the NYS DOH of unapproved claims that exceed patient budgets.  Additionally, the term "authorization" is itself vague and does not suggest that the submission of claims in excess of patient-specific budgets is without "authorization" within the meaning of the regulation.[8]

Raffington's next argument concerns provisions contained in the LTHHCP Manual.  Several of the cited provisions concern the disenrollment process for participants who are consistently over budget, see Rel. Opp. at 8 (citing Rel. 56.1 ¶¶ 47, 50).  Under the Manual, "when the individual's monthly budget exceeds the cap by more than 10% for two consecutive months and the accrued paper credits . . . have been used" — that is, where an individual has used up "credits" that he or she can accrue when his or her monthly care costs are under budget — the "LDSS must authorize a reassessment" to "determine whether the participant is still eligible for the waiver based on an annualized budget," or with the implementation of other cost-saving strategies.  See LTHHCP Manual at IV-5.  The Manual provides that "[i]f it is determined that the individual will continue to require services in excess of both the monthly and yearly cap, LTHHCP participation is no longer appropriate," and alternate arrangements, including referrals to other programs, must be made for the participant.  Id. at IV-5-6.  Thus, the LTHHCP Manual

---

[8]  Raffington cites Judge Berman's pre-Escobar ruling on defendants' motion to dismiss noting that compliance with DSS budgets was a condition of payment.  Rel. Opp. at 7 (citing MTD Decision at 19).  We do not view that ruling as dispositive here given that it was decided before Escobar and at the time Second Circuit case law did not circumscribe the effect of conditions of payment as was done later in Escobar.  See Mikes, 274 F.3d at 700 ("[I]mplied false certification is appropriately applied only when the underlying statute or regulation upon which the plaintiff relies expressly states the provider must comply in order to be paid.").  Thus, we view Judge Berman's ruling as merely recognizing that New York Medicaid regulations, such as NYCRR § 540.1, operate to make compliance with every regulation and condition of participation a condition of payment.  See MTD Decision at 19 (citing, inter alia, U.S. ex rel. Bilotta v. Novartis Pharm. Corp., 50 F. Supp. 3d 497, 536 (S.D.N.Y. 2014)).

contemplates first a "reassessment" to determine if the patient's costs would be consistently over budget and then contemplates a potential future disenrollment of the patient from LTHHCP participation. There is no discussion of denials of payments or recoupment of payments. Thus, these provisions in fact lend support to defendants' position: the effect of exceeding the budget cap is not a recoupment of payments for over-budget services but the seeking out of alternative services — that is, eventual disenrollment. See Def. Mem. at 11.

Raffington makes a separate argument about how the Government's "[e]nforcement of the [r]egulations" provides evidence of materiality, noting that "the Government closely tracks budgets and removes patients from the LTHHCP services if the budget is exceeded." See Rel. Opp. at 9. What is missing, however, is any evidence marshaled by Raffington that the Government denies or recoups, or indeed has ever denied or recouped, payment for a patient who was over-budget. It is one thing to disenroll a patient from a program (thereby preventing claims for future payments), and it is quite another to refuse or recoup payment for services actually rendered based on the fact that the claim for the patient is over budget. It is the latter situation that would provide strong evidence of materiality here.

Raffington argues that the LTHHCP disenrollment process in fact demonstrates that "(1) the Government cared enough about the budget to assign an agency to closely track it, and (2) if claims consistently exceeded the budget, it would terminate services provided to the patient, which would of course in turn result in the provider no longer being able to bill for such services." Id. This argument, however, does not address what the Government would likely actually do if presented with a claim for payment that was explicitly over-budget, which is the materiality inquiry mandated by Escobar. See Escobar, 136 S. Ct. at 2002 ("Under any understanding of the concept, materiality looks to the effect on the likely or actual behavior of

17

the recipient of the alleged misrepresentation.") (internal punctuation and citation omitted).  The NYS DOH's policy of disenrolling LTHHCP participants who could no longer have their needs safely met within the specified budget caps for their counties — rather than recouping or rejecting claims — tells us little about the likelihood that NYS DOH would reject or recoup already-provided, over-budget billed services.  Moreover, the fact that the program entailed monitoring by the LDSS strongly suggests that FCA liability is not an appropriate mechanism for handling over-budget claims.  See United States ex rel. Schimelpfenig v. Dr. Reddy's Labs. Ltd., 2017 WL 1133956, at *7 (E.D. Pa. Mar. 27, 2017) (where "Plaintiffs' own pleadings reflect[ed] the existence of federal agencies equipped with the administrative power to address Defendants' statutory and regulatory violations . . . [t]o allow Plaintiffs to bring suit based on Defendants' noncompliance with federal packaging requirements would mean to short-circuit the very remedial process the Government has established to address noncompliance with those regulations") (internal quotation marks and citations omitted).

Raffington points to three other provisions in the Manual that she argues provide evidence of the materiality of compliance with LDSS budgets to the Government's payment decisions.  First, she notes that pending an LDSS reassessment — which is to be performed at least every 180 days, see LTHHCP Manual at II-15, as well as "when the individual's monthly budget exceeds the cap by more than 10% for two consecutive months and the accrued paper credits . . . have been used," id. at IV-5 — the Manual provides that "[w]hile necessary services from the existing [plan of care] can be maintained . . . the LTHHCP agency must not provide for any new services until the reassessment process is completed and such services are approved for inclusion in the new [plan of care]."  Rel. Opp. at 8 (quoting LTHHCP Manual at II-15) (emphasis in original).  While "'[t]here have been numerous cases imposing FCA liability, and

even criminal false claims liability, based on violations of Medicare manual provisions,'" United States v. Mount Sinai Hosp., 256 F. Supp. 3d 443, 450 (S.D.N.Y. 2017) (quoting In re Cardiac Devices Qui Tam Litig., 221 F.R.D. 318, 351 (D. Conn. 2004)), under Escobar, there must still be evidence that any such manual provision is material to the NYS DOH's decision to pay claims, see United States v. Planned Parenthood of Heartland, Inc., 2016 WL 7474797, at *7 (S.D. Iowa June 21, 2016) (noting that post-Escobar, "[t]he Court . . . looks to both the language of the regulations cited in the [Third Amended Complaint] — including the Manual provisions . . . — and their context to determine whether submission of a claim despite noncompliance with the condition constitutes a material misrepresentation"); see also Mount Sinai Hosp., 256 F. Supp. 3d at 452 (discussing the Medicare Program Integrity Manual in the context of materiality).

Here, the LTHHCP Manual does not state that claims for payments for new services submitted during the pendency of a reassessment will be, or even may be, denied. This provision accordingly does not provide support for the contention that billing for new services that exceed a patient's budget pending an LDSS reassessment would be material the NYS DOH's decision to pay those claims.

Raffington points to a provision of the Manual which provides that "[t]he LDSS may disallow payment for services that are considered unnecessary, that exceed the budget cap, or that were provided to individuals who were not [Medicaid] eligible at the time services were provided." Rel. Opp. at 8 (quoting LTHHCP Manual at V-6). Escobar states, however, that it is not "sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." Escobar, 136 S. Ct. at 2003. Thus, given the use of the word "may" in the Manual, this language does not provide strong support for

19

Raffington's position.[9]

A section of Raffington's brief argues that the Government's "enforcement" of its regulations is evidence of the materiality of budgetary caps. Rel. Opp. at 9-10. This section consists essentially of the argument that the NYS DOH's decision to require LDSS to monitor participant budgets and disenroll consistently over-budget patients is evidence of materiality. See also Rel. Resp. 56.1 ¶ 69 (making the argument that communications between defendants and HRA showing monitoring of patient budgets "evidences the government's diligence in ensuring that LTHHCP billed within budget"). Thus, Raffington argues that "New York State has also underscored the importance of the budgetary requirement to the Medicaid program in its Manual." Rel. Opp. at 10. But as we have just noted, the monitoring of budgets by the LDSS does not show that the Government ever failed to pay or was likely to fail to pay based on submission of over-budget claims.

While defendants do not have the burden of disproving materiality, they point to evidence suggesting that when over-budget claims were made, LDSS staff would contact Schervier to ask them to submit a budget modification, or would inform them that a patient would be reassessed, but would not deny claims for already rendered services. See Def. Mem. at

_____

[9] Raffington points to a provision of the Manual providing that "where there was 'a change in the individual's condition requiring a significant adjustment in the intensity of needed care and concerning any changes in the authorized Summary of Services,' the LTHHCP had to notify the LDSS on the next working day." Rel. Opp. at 8 (quoting LTHHCP Manual at V-7). We do not see how this requirement has any bearing on the NYS DOH's decision to pay over-budget, unauthorized claims.

Raffington's also cites a November 2017 Centers for Medicare and Medicaid Services ("CMS") publication "Preventing Medicaid Improper Payments for Personal Care Services" for its mention of "potential violations including services provided without documentation and for ineligible beneficiaries." Rel. Opp. at 9. Escobar makes clear that broad language of this kind is also of little relevance to the materiality question. See 136 S. Ct. at 2003.

12; see Exs. 35-38 to Andoh Aff.

Raffington cites to language in United States ex rel. Hussain v. CDM Smith, Inc., 2017 WL 4326523 (S.D.N.Y. Sept. 27, 2017), stating that "Escobar made clear [that] the misrepresentation does not have to be so grievous that the government would have completely denied payment upon discovering the truth — it is enough that the omission would have affected the government's payment decision." Rel. Opp. at 10 (quoting Hussain, 2017 WL 4326523, at *8). But Raffington points to no evidence, either of any government enforcement action or text in the Manual, to suggest that compliance with budget requirements has ever impacted Government payment decisions in any way. The court in Hussain made the statement quoted by Raffington to explain that it believed that if the government had known that a contractor was "improperly shifting billables" from "fixed fee" contracts, where the government pays an agreed-upon fixed fee for a service, to "cost-plus-fee" contracts in which the government pays the actual, variable, cost of a service, it might have opted to pay the lower, fixed-fee cost it was contractually obligated to pay. See Hussain, 2017 WL 4326523, at *8. That is, the court in Hussain was simply clarifying that evidence that a claim is likely to be denied in its entirety is not necessary for a showing of materiality in every case. This principle has no application here; Raffington points to no evidence suggesting, for example, that if the NYS DOH had known that claims were over-budget it would likely have chosen to reimburse only those claims that fell within the budget.

Raffington argues that defendants' internal communications reflect their understanding that budget and authorization requirements were material, and their understanding that compliance with these requirements potentially impacted Schervier's ability to receive payments from the government. Rel. Opp. at 10. Raffington devotes almost no space to this argument in

her briefing but rather points to a section of her 56.1 statement stating the communications "reflect an understanding that the requirements were material to the Government."  See id. (citing Rel. 56.1 ¶¶ 51-64).

We begin by noting that we do not read Escobar as holding that to prove materiality it would be sufficient to show that the defendant believed that compliance with the requirement at issue was material to the Government's payment decision even if the requirement was not in fact material to the Government's decision.  See, e.g., Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 459 (2013) ("materiality is judged according to an objective standard" in the context of fraud).[10]  As Escobar emphasized, "[u]nder any understanding of the concept, materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation."  136 S. Ct. at 2002 (emphasis added) (citation and internal punctuation omitted).  Nonetheless, an FCA defendant certainly could have knowledge as to how the Government makes payment decisions and might be familiar with the types of violations that are likely to be overlooked as opposed to the types of violations that could result in a claim being denied.

While Raffington marshals none of the evidence in her brief, in a series of paragraphs contained in her 56.1 statement, Rel. 56.1 ¶¶ 51-64, Raffington cites a number of internal communications among defendants' employees.  After examining them, however, we find that they provide no proof that the Government ever denied claims or likely would deny payments

_____

[10] One of Escobar's references to what the defendant "knows is material" makes clear that this knowledge is relevant to whether the defendant "knowingly" committed a violation, not to whether the defendant's belief by itself would permit a finding of materiality.  See 136 S. Ct. at 1996 ("What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision.").

based on over-budget billing.  For example, Raffington points to a "comprehensive report of the [Schervier] LTHHCP" with "evaluation findings" prepared in August 2005 by Barbara Knott of Schervier.  Rel. 56.1 ¶¶ 51-52.  The report found that Schervier performed "Unsatisfactorily" with respect to the following category: "Patients are discharged from service according to established admission criteria."  Id. ¶ 52 (quoting Ex. U to Brooks Decl. at 664).  As "Evidence," Ms. Knott indicated that "Admission/Discharge criteria are not defined in policy.  Practice not consistent with NYDOH regulations or HRA[11]/DSS requirements."  Id. (quoting Ex. U to Brooks Decl. at 664).  This statement provides no indication whatsoever of the potential impact of the violation of these "NYDOH regulations" and "HRA/DSS requirements" on NYS DOH's decision to pay claims associated with these patients.

Raffington cites handwritten notes written by Scharisse Sierra, Raffington's administrative assistant at Schervier, which contain an entry reading "[c]annot blind bill — no excuse you can give to gov't! Illegal billing."  Id. ¶ 53 (quoting Ex. V to Brooks Aff.) ("Ex. V.").  The notes cited in the exhibit appear to be minutes from a "Med Max Meeting" which took place on August 31, 2009, and included Raffington.  See Ex. V at BONSEC00001656, 1662.  The comment appears to have been made during a discussion of the need to perform budget modifications when there are variations in the costs of a patient's care.  See id. at BONSEC00001661-62.  Prior to the cited notation, Sierra transcribed the following, which she labeled as "problem 3" of three discussed billing issues:

> We do not look @ budget before we bill.  Gov't system pump out what you
> request which is over budget!  Daily wounds are going to be a problem.  Refer
> daily wound patients to CHAA.  Cannot bill w/o knowing what budget will be.

---

[11]  "HRA" stands for Human Resources Administration, and is the name of the city agency that serves as the LDSS for New York City.

Cannot blind bill - no excuse you can give to gov't! illegal billing.

Id. at BONSEC00001662.  Defendants point out that, based on her deposition testimony, it appears that Sierra was recording a statement that Raffington herself made during the meeting.  Def. Reply at 20 n.14.  But even putting aside the question of who made the statement, viewing the cited statement in context does little to support Raffington's materiality argument.  The statements are vauge and do not allow even the inference that they reflect knowledge of whether the Government would likely refuse to pay an over-budget bill.  The fact that one of defendants' employees — possibly Raffington herself —  believed that billing for services without first consulting a patient's budget was "illegal" is not sufficient to show materiality.  See Escobar, 136 S. Ct. at 2003 ("The False Claims Act is not . . . a vehicle for punishing garden-variety . . . regulatory violations.").

Raffington points to an April 2011 email chain between Schervier employees about seeking HRA approval of past-due budgets.  Pl. 56.1 ¶ 55 (quoting Ex. X to Brooks Decl.).  In the email, Hope Henry-Soules, who is identified in her email signature block as Schervier's Patient Services Manager, writes the following to Angela Macchio, Schervier's Executive Director:

> Hi Angela,
> I have attached a list of HRA certifications that are overdue.  As I mentioned Joann and I are working on submitting the packets to bring them up to date.  The issue we keep bumping into is that these patients have been getting more services than their budget allows, and they do not qualify for 100% cap.  I've asked Nat to approve the past due ones which he has tentatively agreed to, but he will add in vendor note that the patients do not qualify for the cap.  That's ok unless of course if we get audited, then it will show that we never really had the authorization to go over budget.  The other option would be to submit the packets within the budget, and not bill for the additional hours that were provided.  Which option would you like us to go with?  Do you gamble?

Ex. X to Brooks Aff.  Defendants contend, and Raffington does not contest, that the "Nat"

mentioned is Nat Weiner, an LTHHCP supervisor at HRA. Def. Reply at 20. Notably, the email

shows that Henry-Soules believed that HRA — which was an agent of NYS DOH with respect

to administration of the LTHHCP, see Def. Reply at 22-23 — would excuse Schervier's over-

budget billing for services already rendered "despite [his] actual knowledge that certain

requirements were violated," Escobar, 136 S. Ct. at 2003. Certainly, Henry-Soules expresses

concern about the potential consequences of an audit, suggesting that she believes that even if

Weiner were to approve the payments, there could be consequences if NYS DOH found out what

really occurred. Importantly, Henry-Soules does not discuss what consequences might ensue if

an auditor were to discover Schervier's over-budget billing and thus does not indicate that any

audit would result in a recoupment of payments.

    In her final argument, Raffington argues that defendants "do not establish" that "DSS" —

by which we assume they mean "LDSS" since "DSS" is not defined in their brief — "had actual

knowledge of Defendants' submission of bills in excess of the permitted amounts." Rel. Opp. at

10. Raffington further argues that defendants ignore the fact that the NYS DOH, not the LDSS,

is the entity responsible for administering Medicaid and making payments. Id. at 11.

    The most obvious flaw in these arguments is that it is Raffington, not the defendants,

who bear the burden of proving materiality. See generally Citizens Bank of Clearwater v. Hunt,

927 F.2d 707, 710 (2d Cir. 1991) (where movant for summary judgment points to the absence of

evidence to support the non-movant's claims, "[t]he non-movant then bears the burden of

establishing the existence of elements essential to its case, which it would have to prove at

trial"). Raffington might have discharged this burden by providing testimony from persons with

knowledge at DOH or the LDSS that claims for over-budget services were not paid or that if

such claims were known to have been made, they would not have been paid. See, e.g., United

<u>States ex rel. Ortiz v. Mount Sinai Hosp.</u>, 256 F. Supp 3d 443, 451-52 (S.D.N.Y. 2017). While Raffington was certainly not required to produce such evidence to show materiality, she cannot fault the defendant for failing to produce evidence that supports its own position given that she bears the burden of proof.

Rather than providing evidence of her own on this issue, Raffington questions evidence provided by the defendants (who have no burden of proof) that LDSS was aware of over-budget billing on the ground that it is DOH's knowledge that matters, not the LDSS. Rel. Opp. at 11. But the LDSS was responsible for implementing the LTHHCP waiver program, under the supervision of the NYS DOH. <u>See</u> LTHHCP Manual at I-2. Absent evidence that an LDSS was acting contrary to the directives of the NYS DOH, under ordinary principles of agency, LDSS's knowledge relating to the LTHHCP program should be imputed to NYS DOH. <u>See</u> Restatement (Third) of Agency § 5.03 (Am. Law Inst. 2006) ("notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal, unless the agent (a) acts adversely to the principal as stated in § 5.04, or (b) is subject to a duty to another not to disclose the fact to the principal").

While they have no burden, defendants in fact point to several instances in which HRA or Westchester County's LDSS identified and discussed patients who were over budget. Def. Mem. at 12-14. Some of the emails cited indicate that when a patient was over-budget, Schervier and LDSS staff would seek to disenroll the patient and find another suitable program. <u>See</u> Ex. 37 to Adoh Aff. ("Ex. 37"); Ex. 38 to Andoh Aff. ("Ex. 38"). These emails do not indicate that payment was ever denied or recouped for these over-budget claims, nor do the emails indicate that continuing to submit these type of claims in the future could result in the claims being denied. <u>See</u> Ex. 37; Ex. 38.

26

Defendants also point to specific examples from Bronx HRA which show that when "Bronx HRA became aware that the actual cost of Schervier's services had exceeded anticipated costs, its practice was to request that Schervier submit a budget modification request, not to object to or deny Schervier's claims for actual costs." Def. 56.1 ¶ 71; see Exs. 47, 50, 56-57 to Andoh Decl. While Raffington points to other emails where the LDSS complained about over-budget billing, see Rel. Resp. 56.1 ¶ 71, none of the evidence marshaled suggests that HRA actually rejected or recouped payment for over-budget claims.[12]

\*   \*   \*

Having considered all of the evidence marshaled by Raffington that relates to the materiality of billing for unapproved, over-budget services, we conclude that a reasonable jury could not find that submitting claims in excess of an LTHHCP patient's budget was material to the NYS DOH's decision pay those claims. Accordingly, we grant defendants summary judgment on this issue.

B. Medicare Maximization

Defendants argue that no reasonable jury could find that the "Medicare Maximization" practices alleged by Raffington, if true, would be material to the NYS DOH's decision to pay claims. See Def. Mem. at 15-22. As defendants summarize, "Relator argues that Defendants

_____

[12] In Exhibit DJ, filed separately, see Letter from Ross Brooks, dated Jan. 28, 2019 (Docket # 445), an email from an employee at Schervier attributes the following statement to Deborah Crabtree, an employee of HRA: "Please note: this client budget exceeds the 75% cap and the client is not eligible for the 100% cap. Kindly adjust the hours/budget and resubmit to HRA. Thank you." It is not clear from the statement whether the hours and budget are to be modified going forward, or if HRA is refusing to reimburse the claims that exceed 75% of the budget. The remainder of the email chain suggests that the statement refers to the budget and hours going forward. See, e.g., id. (statement from Schervier employee stating "[w]e need to call the daughter and explain to her that if we do not reduce the hours she may lose her homecare").

violated New York regulations and the FCA by billing Medicaid for <u>all</u> of the services it provided to dual-eligible patients, instead of billing Medicare for acute care services provided to such patients." <u>Id.</u> at 16 (citing SAC ¶¶ 133-70) (emphasis in original). Further, Raffington alleges that this occurred because defendants' computerized billing system, McKesson, was "deliberately programmed <u>not</u> to do split billing," SAC ¶ 138; that is, to separately bill Medicaid and Medicare.

Medicaid provides medical assistance for financially-needy individuals. <u>See</u> Medicaid in New York State. Medicare provides reimbursement of medical expenses for qualifying elderly and disabled individuals. <u>See</u> 42 U.S.C. §§ 1395 et seq.; <u>see</u> <u>also</u> Rel. Resp. 56.1 ¶ 8. Patients who are qualified for and enrolled in both programs are commonly referred to as "dual-eligible" patients. <u>See</u> Rel. Resp. 56.1 ¶ 78. Under state and federal law, Medicaid is the "payer of last resort," LTHHCP Manual at IV-8; that is, patients and providers have a duty to bill all other applicable health insurance plans before billing Medicaid, <u>see</u> <u>id.</u> at IV-8, V-6. Medicare covers some, but not all, of the services that are covered by the LTHHCP Medicaid Waiver Program. <u>See</u> LTHHCP Manual at I-V-6 (listing services the LTHHCP Waiver Program covers or may cover that are not normally covered by Medicaid); Medicare Benefit Policy Manual: Chapter 7 - Home Health Services (annexed as Ex. 16 to Andoh Decl.), § 40 (describing home health services covered by Medicare).

New York Medicaid regulations provide that "[a]s a condition of payment, all providers of medical assistance must take reasonable measures to ascertain the legal liability of third parties [such as Medicaid] to pay for medical care and services." 18 NYCRR § 540.6(e)(1). The regulations also provide that "[n]o claim for reimbursement shall be submitted unless the provider has . . . sought reimbursement from liable third parties." <u>Id.</u> § 540.6(e)(2)(ii). In light

of <u>Escobar</u>, the labeling of these regulations as "conditions of payment" is relevant, though not dispositive, as to materiality.  <u>See</u> <u>Escobar,</u> 136 S. Ct. at 2003 ("the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive").  The regulations further provide that a medical provider "who becomes aware, or reasonably should have become aware, of available health insurance or other potential third party resources that can be claimed from a liable third party by the provider . . . must submit a claim for such payment to the liable third party" and if the provider fails to do so "reimbursement for such claim will not be made by the medical assistance program and any reimbursement received in violation of the provisions of this paragraph must be repaid to the medical assistance program by such provider."  <u>Id.</u> § 540.6(e)(7).  This text in particular speaks to materiality, using mandatory language to describe the NYS DOH's requirement not to pay — or to recoup if wrongfully paid — claims that a medical provider knew or should have known could have been paid by an insurer other than Medicaid.

42 C.F.R. § 433.139 provides that if Medicaid "has established the probable existence of third party liability at the time the claim is filed, the agency must reject the claim and return it to the provider for a determination of the amount of liability."  While this regulation does not speak directly to the payment decisions of the NYS DOH, the fact that federal Medicaid will not reimburse submitted claims where a third party may be liable for the payment of those claims makes it more likely that New York State would conform its behavior to comply with this regulation.[13]

---

[13]  While the above regulations strongly support Raffington's position, we find other materials cited by Raffington to be of little value in determining whether first seeking Medicare payments was material to the Government's payment decision with respect to claims submitted in connection with the LTHHCP Medicaid waiver program.  For example, governmental reports

As noted, the New York State regulation imposes an obligation to take "reasonable measures" to ascertain the liability of third parties such as Medicare. 18 NYCRR § 540.6(e)(1). Because this motion addresses only the issue of materiality, we assume arguendo that the system that Raffington alleges defendants maintained, in which all services, including Medicare-eligible services, were billed to Medicaid, would not be "reasonable" under the regulations.[14]

In addition to the regulations making clear the importance of this requirement to the Government and its view that any improper Medicaid claims should not be paid is the fact that, after audits, the Government required the defendant and others to make claims to Medicare and then recouped previously-paid Medicaid money if Medicare in fact paid on the claim. Specifically, the New York State Office of the Medicaid Inspector General ("OMIG") conducted audits of Schervier in 2011, 2012, 2013, and 2015, "to ensure regulatory compliance for dual eligible Medicaid/Medicare beneficiaries," as part of the office's effort to "make certain that providers seek reimbursement from Medicare and all other third parties before submitting a claim to Medicaid," in order to comply with NYCRR § 540.6(e)(1). Ex. QQ, RR, SS, TT, UU, VV, WW, XX, & YY to Brooks Aff. OMIG contracted with the University of Massachusetts Medical School ("UMass") Third Party Liability "Medicaid Maximization Project" to perform the audits. New York State of Opportunity Office of the Medicaid Inspector General, 2016 Annual Report (annexed as Ex. MM to Brooks Decl.) ("2016 OMIG Report"), at 22. The audit

---

on efforts to reduce Medicaid expenditures through third party maximization provide little or no evidence that an entity's failure to take "reasonable measures" to maximize Medicare coverage would result in a refusal to pay a Medicaid claim. See Rel. Opp. at 13-14.

[14] Raffinton claims that defendant had a policy of never seeking to make claims to Medicare for its patients. See SAC ¶¶ 133-70. Defendants vehemently deny this. See Def. Mem. at 16 n.13, 17 n.14. As noted, for purposes of this motion, we assume that whatever policy defendants had with respect to billing Medicare was not reasonable.

process involved UMass identifying home health providers who served dual-eligible patients, but had not first billed Medicare for home health services paid by Medicaid.  Id.  UMass would then direct the provider to "demand bill" Medicare for those services; that is, UMass would direct the provider to submit the claims for payment to Medicare to determine whether Medicare would pay the claims.  See id.; see also Rel. Resp. 56.1 ¶ 122.  UMass then used the appeals process to attempt to obtain Medicare coverage for the claims Medicare denied.  2016 OMIG Report, at 22.  If Medicare paid the claims, the money paid by Medicaid would be recouped.  See id.  The OMIG reported that $10 million was recovered through this project in 2016.  Id.

This recoupment process provides strong evidence that actual knowledge by the Government of a failure to comply with the third-party maximization regulations in a particular case would have caused the Government to reject (or ultimately recoup) a Medicaid claim. While Escobar did not speak directly to the probative value of a government's decision to regularly recoup wrongful payments, at least one court, interpreting Escobar, has found such evidence to be highly relevant to the question of materiality.  See United States ex rel. Rose v. Stephens Inst., 901 F.3d 1124, 1133-34 (9th Cir. 2018) ("in many cases, through one means or another, the Department recouped many millions of dollars from the violating schools, showing that it was not prepared to pay claims 'in full' despite knowing of violations of the incentive compensation ban. . . .  A full examination of the Department's past enforcement habits in similar cases . . . reveals that a reasonable trier of fact could find that Defendant's violations of the incentive compensation ban were material."), opinion amended and superseded on other grounds on denial of rehearing en banc, 909 F.3d 1012 (9th Cir. 2018).

Defendants argue that the audits in fact show that the Government knew that defendant was not "regularly" billing Medicare prior to billing Medicaid and that defendants were making

appropriate billing decisions in many cases. Def. Mem. at 21. However, defendants do not

contest that in cases in which a claim was appealed to Medicare and Medicare paid the claim,

that the NYS DOH would recoup the payment that Medicaid had already made. Defendants try

to downplay the significance of the audit process by stating that

> New York Medicaid recoupments resulting from [third-party liability ("TPL")]
> audits did not occur when a provider simply failed to submit a claim to Medicare
> prior to submitting a claim to Medicaid, but rather only when the provider
> submitted claims to both Medicare and Medicaid, and both Medicare and
> Medicaid actually paid the provider's claims.

Def. Mem. at 27. However, the TPL audit process was not targeting the problem of double

payment. Rather, it required the audited entity to submit a claim to Medicare so that any

payment by Medicare would then permit the Government to recoup the Medicaid payment. The

fact that the NYS DOH recouped any audited claims that Medicaid paid that were actually

Medicare-eligible is significant evidence that maximizing Medicare by submitting each

Medicare-eligible claim to Medicare was material to the NYS DOH's payment decision. That is,

the recoupment process is circumstantial evidence that if the NYS DOH knew that a claim

submitted to Medicaid was eligible for Medicare reimbursement, this knowledge have impacted

its decision of whether to pay the claim using Medicaid funds. Cf. Hussain, 2017 WL 4326523,

at *8 (S.D.N.Y. Sept. 27, 2017) (allegation that government contractor was improperly shifting

"billables" from "fixed fee" to "cost-plus-fee" contracts sufficiently alleged materiality even

though there was no allegation that "the government would have completely denied payment

upon discovery the truth").

Defendants assert that NYS DOH had "access" to information regarding the eligibility

for Medicare of each Medicaid patient because it was contained in various databases transmitted

to DOH. See Def. Mem. at 17-19. Raffington disputes that these databases would have

provided the NYS DOH with complete information, because evidence indicates that Schervier failed to consistently and correctly enter the required information.  See Rel. Resp. 56.1 ¶¶ 111, 114, 117.  We need not resolve this dispute, however, because the Government's mere access to data that could suggest that some Medicaid claims might be Medicare eligible, coupled with Government inaction, is very weak evidence that the Government would have likely paid the purportedly fraudulent claims if the specific falseness had been brought to its attention.

Rather, in cases where courts have found that the Government was actually aware of allegedly fraudulent claims, and that therefore the materiality test had not been met, there was evidence that the Government had been put on specific and direct notice of the conduct that was allegedly fraudulent.  This was the case in the recent cases of United States ex rel. Hartpence v. Kinetic Concepts Inc., 2:08-cv-01885-CAS-AGR (C.D. Ca. June 14, 2019), and United States ex rel. Hussain v. CDM Smith, Inc., 2019 WL 1428360 (S.D.N.Y. Mar. 29, 2019), which defendants have cited.  See Supp. Auth.1; Supp. Auth. 2.  In Hartpence, the defendant formally initiated a blanket policy of billing for services it provided in a way that controverted Local Coverage Determinations ("LCDs") interpreting general Medicare regulations.  See United States ex rel. Hartpence v. Kinetic Concepts, Inc. (annexed as Ex. A to Supp. Auth. 1) ("Hartpence"), at 9-10.  However, the defendant made the decision to institute this billing policy while engaging in frequent "written communication, telephonic conferences, and in-person meetings" with the "Medical Directors" responsible for drafting the LCDs regarding the defendants' desire to have the LCDs modified to align with their billing practices, see id. at 8, and the defendant sent the Medical Directors a letter explicitly explaining its billing practices, see id. at 10.  There is no suggestion that the allegedly improper conduct here — the alleged failure to take reasonable measures to bill Medicare and the resulting submission of claims that

failed to comply with regulations requiring the billing of Medicare first — was explicitly disclosed to NYS DOH.  Defendants' citation to <u>United States ex rel. Hussain v. CDM Smith, Inc.</u>, 2019 WL 1428360, is unpersuasive for the same reason.  In that case, defendants pointed to evidence showing that they affirmatively disclosed the disputed "proportional billing practice" to the Government, including in proposals submitted to the Government.  <u>See id.</u> at *11.

Finally, we reject the argument that the Government's failure to intervene in this suit suggests that any failure to take "reasonable measures" was not material.  <u>See</u> Def. Mem. at 26. As the Eleventh Circuit has noted, a court should not

> assume that in each instance in which the government declines intervention in an FCA case, it does so because it considers the evidence of wrong doing insufficient or the qui tam relator's allegations for fraud to be without merit.  In any given case, the government may have a host of reasons for not pursuing a claim.

<u>United States ex rel. Atkins v. McInteer</u>, 470 F.3d 1350, 1360 n.17 (11th Cir. 2006).  We similarly reject the argument that the fact that the federal and state governments continued to pay certain unspecified claims after they conducted an investigation and suit was filed, Def. Mem. At 24-25; Def. 56.1 ¶¶ 510-161, would, in light of the other evidence in this case, require a jury to find in defendants' favor on the materiality question.  The defendants have not pointed to any evidence that the Government knew after this lawsuit was filed that it was receiving claims for payments under Medicaid that should have been presented first to Medicare.

In sum, there is sufficient evidence for a reasonable jury to conclude that any failure by defendants to take "reasonable measures" to maximize Medicare payments for a particular claim was material to the Government's decision to pay the claim.

C.  <u>Forged or Missing Signatures on Form 485s</u>

Defendants move for summary judgment on the ground that a forged or missing signature

on a CMS "Form 485," or "plan of care form," would not have been material to the Government's decision to pay claims associated with that form. Def. Mem. at 22-24.[15]  A patient's "plan of care," and the patient's physician's certification of that plan of care, are typically recorded on a CMS-generated form referred to as a "Home Health Certification," or a "Form 485."  Rel. Resp. 56.1 ¶ 12; see also Ex. 17 to Andoh Aff. (providing sample Form 485). While home health care providers are not required to use a Form 485 to record a patient's plan of care ("POC") and the physician's certification of the plan of care (which they are required to record), the Form 485 is "a convenient way to submit a signed and dated POC" that meets regulatory requirements.  Rel. Resp. 56.1 ¶ 12 (citing Dep't of Health and Hum. Servs., Ctrs. for Medicare & Medicaid Servs., Medicare Program Integrity Manual (Mar. 18, 2002), ch. 6, § 3.1). In the SAC, Raffington alleges that defendants' Medical Director Joseph Scarpa, Vice President Barbara Knott, and other employees routinely forged physician signatures in an effort to prepare claims for billing after regularly waiting "unreasonably long periods before attempting to obtain the requisite physicians' signatures on 485 forms."  SAC ¶¶ 71-78.

Defendants argue that Raffington "has failed to adduce any evidence that a forged or a missing physician signature on a Form 485 would have been material to the DOH's decision to pay Schervier's claims."  Def. Mem. at 23.  In response, Raffington argues, inter alia, that "physician authorization" is material to the Government's payment decision.  Rel. Opp. at 17-18.

---

[15]  The Court is puzzled by the lumping together of forged and missing signatures. Certainly, NYS DOH would not be aware that a signature was forged.  It would presumably be quite obvious, however, that a signature was missing.  As Escobar noted, "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material."  136 S. Ct. at 2003.  Thus, if the Government paid claims knowing that the forms were missing signatures, this would seem to be strong evidence of a lack of materiality.  The defendants have not made this argument, however.  Accordingly, we do not address it.

Defendants respond that the complaint does not in fact make any allegations of a lack of physician authorization.  Def. Reply at 29-30.  We do not find it necessary to reach the question of whether a claim of a lack of physician authorization is stated in the complaint.  The defendants are moving for summary judgment only on the issue of whether forged or missing signatures by themselves were material to the Government's payment decision.  We thus assume <u>arguendo</u> that a physician authorized any services for which a claim was made but that this authorization was not properly documented — either because a doctor's signature was written by someone else or because the signature was missing.  Thus, we address only the question of whether the fact that there was a forged or missing signature on a Form 485 was material to the Government's payment decision.  We note that, while the parties consistently use the word "forged" to describe the signatures, in fact the sole purpose of the signatures was to indicate that the doctor had approved the authorization or reauthorization, and that for purposes of this motion we assume all such approvals had in fact been given by the doctor in question, even if the doctor failed to sign the form.

To support her argument on materiality, Raffington refers to regulations, guidance issued by governmental authorities, enforcement measures, and defendants' internal documents.  Rel. Opp. at 19-24.  We discuss each next.[16]

---

[16]  In one sentence of her brief, Raffington also argues that Judge Berman's decision on defendants' motion to dismiss shows that "Physician Authorization Is a Condition of Payment." <u>Id.</u> at 20.  In his decision, Judge Berman held that Raffington had sufficiently "alleged an unlawful scheme to submit claims to the government without the required medical approvals," MTD Decision at 11, and that Raffington pled her claims "with a high degree of particularity, by identifying eight claims for payment that were submitted to Medicaid with dates of service and reimbursement amounts," <u>id.</u> at 12.  While Judge Berman cited case law articulating the then-existing requirement that FCA claimants plead violations of express conditions of payment, he never actually held that the regulations pertaining to physician authorization contained express conditions of payments.  <u>See id.</u> at 13.  Rather, he cited <u>U.S. ex rel. Bilotta v. Novartis Pharm.</u>

18 NYCRR § 505.23(a) provides that the NYS DOH will make Medicaid payments for services "only when: (i) the services are medically necessary; and (ii) the services can maintain the recipient's health and safety in his or her own home, as determined by the certified home health agency in accordance with the regulations of the Department of Health." While the referenced "regulations of the Department of Health" include the requirement to obtain physician signatures on all medical orders, see 10 NYCRR § 763.7, Escobar made clear that statements such as the one contained in section 505.23(a) that purport to make compliance with all regulations conditions of payment are not strong evidence of materiality. See 136 S. Ct. at 2002. Thus, the text of section 505.23(a) does not provide support for the contention that the physician signature requirement contained in 10 NYCRR § 763.7 is material to the NYS DOH's payment decisions.[17]

The portion of 10 NYCRR § 763.5 cited by Raffington provides that "decisions regarding patient referral, admission and discharge are made based on the patient's assessed needs and the agency's ability to meet those needs in a manner that protects and promotes the patient's health and safety and does not jeopardize the safety of personnel," and that "[s]uch decisions shall reflect a commitment to providing authorized practitioner ordered care and services while

Corp., 50 F. Supp. 3d 497 (S.D.N.Y. 2014), for its citation to NYCRR § 515.5(a)-(b), which provides, in relevant part, that "[n]o payments will be made to or on behalf of any person for the medical care, services or supplies furnished by or under the supervision of the person . . . in violation of any condition of participation in the program." As discussed in Section III.A.2, Escobar changed the then-applicable law in the Second Circuit to make clear that broad statements in contracts or regulations regarding conditions of payment do not show materiality.

[17] The text of 10 NYCRR § 763.7 states that certified home health agencies "shall maintain a confidential clinical record for each patient admitted to care or accepted for service," which must include medical orders "signed by the authorized practitioner," but the regulation does not discuss whether failure to comply impacts payment.

honoring the patient's expressed needs and choices to the extent practicable and shall be made in accordance with the provisions of this section." 10 NYCRR § 763.5. Again, none of this text speaks to the NYS DOH's decisions to pay claims where the patient's forms are missing a physician signature or contain a forged signature.

> 10 NYCRR § 763.7 (2013) provided that all

> medical orders and nursing diagnoses . . . shall be: (i) signed by the authorized practitioner within 30 days after admission to the agency, or prior to billing, whichever is sooner; (ii) signed by the authorized practitioner within 30 days after issuance of any change in medical orders or prior to billing, whichever is sooner, to include all written and oral changes and changes made by telephone by such practitioner; and (iii) renewed by the authorized practitioner as frequently as indicated by the patient's condition but at least every (60) days.

While this regulation required that providers obtain a physician signature within a specified time frame, nothing in the text of the regulation suggests that compliance with this requirement is more important to NYS DOH payment decisions than compliance with other requirements.

The federal Medicare requirements that Raffington cites do make physician certification and recertification express conditions of payment. See 42 C.F.R. § 424.22 ("Medicare Part A or Part B pays for home health services only if a physician certifies and recertifies the content specified in paragraphs (a)(1) and (b)(2) of this section, as appropriate."). But signatures themselves are not made an express condition. Certainly, the regulations say that certifications and recertifications must be signed "by the physician who establishes the plan," or who "reviews the plan of care," see 42 C.F.R. §§ 424.22(a)(2), (b)(1), but the regulations do not make the signature itself a condition of payment. Thus, whatever value these federal regulations may have to showing what was material to the state agency's payment decision, they do not provide strong evidence of materiality in this instance.

Raffington cites guidance from the federal Department of Health and Human Services

38

Office of the Inspector General that makes reference to the importance of certifications and emphasizes at several points the need to have valid physician signatures. Rel. Opp. at 20-22. While this guidance certainly demonstrates that the federal government placed some importance on obtaining physician signatures, the references to signatures are ancillary to the emphasis placed on obtaining certifications and recertifications. That is, any references to signatures are invariably coupled with the need to obtain physician certifications and recertifications and do not appear to have any independent significance other than as a demonstration that the proper certification has been obtained. See, e.g., Publication of the OIG Compliance Program Guidance for Home Health Agencies, 63 Fed. Reg. 42410, 42417 n.58 (Aug. 7, 1998) (annexed as Exhibit OOO to Brooks Decl.) ("[t]he plan of care must be reviewed and signed by the physician who established the plan of care"). Similarly, the references to "forged signatures" cited by the Office of Inspector General in particular cases assumed that in fact there had been no certifications. See Publication of the OIG Special Fraud Alerts: Home Health Fraud, and Fraud and Abuse in the Provision of Medical Supplies to Nursing Facilities, 60 Fed. Reg. 50847, 40848 (Aug. 10, 1995) (annexed as Ex. NNN to Brooks Aff.) (referring to forged signatures by an agency that had billed for services that were not authorized by a physician). As for evidence of audits by state governments, the evidence cited by Raffington relates largely to the certification process. See Rel. Opp. at 23. The few references to missing signatures do not link the missing signatures specifically to any payment decision. Id.

Raffington devotes only four sentences in her brief to the defendants' knowledge of the materiality of signatures. As to such evidence, she refers to a signed statement of one of defendants' employees admitting that he forged signatures, the declarations of doctors who attested that their signatures were forged, and to "[d]efendants' communications generally" that

they knew they needed to have signed Forms 485.  Id. at 24.  But the fact that employees of

defendants forged doctors' signatures on forms is irrelevant to whether the presence of a valid

signature of the Form 485 was material to the Government's payment decision.  As noted,

Escobar held that "proof of materiality can include, but is not necessarily limited to, evidence

that the defendant knows that the Government consistently refuses to pay claims in the mine run

of cases based on noncompliance with the particular statutory, regulatory, or contractual

requirement."  136 S. Ct. at 2003 (emphasis added).  The evidence cited by Raffington certainly

shows that Schervier had a policy of obtaining signatures and that "signed authorization was

needed before billing."  Excerpts of Videotaped Deposition of Kity Khundkar, dated May 11,

2018 (annexed as Ex. AF to Brooks Aff.) ("Khundkar Dep."), at 47, 93; accord Excerpts of

Videotaped Deposition of Barbara Knott, dated May 15, 2018 (annexed as Ex. AE to Brooks

Decl.), at 83 ("[f]inal claims cannot be submitted without a signed 485").  But this tells us only

that Schervier's internal billing system required physician signatures to submit claims and that

Schervier tried to enforce this policy.

The signed statement of former Schervier employee Christopher Hickey explaining how

he and Barbara Knott signed Forms 485 that were missing physician signatures into Schervier's

computer system certainly supports the inference that some sort of signature on the Form 485

was required in order for Schervier's computer system to process a claim.  See Statement of

Christopher D. Hickey (annexed as Ex. BD to Brooks Aff.).  But again, this provides no

evidence of how NYS DOH would have reacted had the failure been known to it.

The cases cited by Raffington are of little relevance.  Most of them, see Rel. Opp. at 18 n.

9, involved situations where the court assumed that the forged signature indicated a separate

material failure, such as a lack of proper approval by a physician.  See, e.g., United States v.

Select Specialty Hosp.-Wilmington, Inc., 2018 WL 1568874, at *6 (D. Del. Mar. 30, 2018) ("valid signature from a medical practitioner is what signals to federal healthcare programs that the services rendered were necessary in the first instance"); United States v. Am. at Home Healthcare & Nursing Servs., Ltd., 2017 WL 2653070, at *15 (N.D. Ill. June 20, 2017) ("Defendants knowingly drafted false physician orders for ineligible patients and submitted those orders to the patients' physicians for signature, and that such misrepresentations misled the certifying physician.").  Notably, two of the cases cited by the Raffington, decided prior to Escobar and under a different set of Medicaid rules, had affidavits from decision makers within the paying agency indicating that they would not reimburse claims based on forged signatures or other infirmities.  United States v. Dynamic Visions, 216 F. Supp. 3d 1, 16 (D.D.C. 2016); United States v. Speqtrum, Inc., 113 F. Supp. 3d 238, 248 (D.D.C. 2014).  In the instant case, however, there is no evidence from a decisionmaker as to how claims with missing or forged signatures have been handled in the past or would be handled.

In sum, we find that there is insufficient evidence for a jury to find that, in situations where a physician had actually authorized the services at issue, DOH would find it material to its payment decision that the form seeking payment did not contain a proper signature of the physician — either because the signature had been written by someone else or because it was missing entirely.

IV.  CONCLUSION

For the reasons stated above, defendants' motion for summary judgment (Docket # 384) is granted in part and denied in part.

SO ORDERED.

Dated: September 13, 2019

     New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge